Ronald Ryan
Attorney for Debtors
1413 E. Hedrick Drive
Tucson, AZ 85719
(520)298-3333 ph 743-1020 fax
ronryanlaw@cox.net
AZ Bar #018140 Pima Cty #65325

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| **ANTHONY TARANTOLA, DEBTOR**<br><br>_____<br><br>**DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE IN TRUST FOR THE BENEFIT OF THE CERTIFICATE HOLDERS FOR ARGENT SECURITIES INC., ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2004-W8, ITS ASSIGNEES AND/OR SUCCESSORS, MOVANT**<br><br>**VS.**<br><br>**ANTHONY TARANTOLA, DEBTOR RESPONDENT** | **Case #   4:09-bk-09703-EWH**<br><br>**SECURITIZED MORTGAGE LOANS MASTER BRIEF**<br><br>**HEARING: 6/23/10 @ 9:00 AM**<br><br>**PERTAINING TO CONTESTED MATTER (STAY RELIEF), OBJECTION TO CLAIM, AND ANY FUTURE HEARINGS**<br><br>Chapter 13 |

## COURTS CRITICIZING IMPROPER STAY MOTION AND PROOF OF CLAIM EVIDENTIARY PRACTICES

This section of the securitized mortgage master brief is not presented first, or at all for that matter, because sanctions are being sought or that anyone in particular is being accused of wrongdoing, these holdings are presented first because the undersigned Attorney is having a hard time getting Courts to see that the evidence being presented is fabricated.  The evidence that has been presented for years on a regular and routine basis

1

has been insufficient under the law for stay relief to be legitimately granted, because movant's cannot meet their burden of proof, or the evidence has been misleading or fabricated.  The undersigned attorney, experts and other investigators across the nation have concluded to their complete satisfaction after years of study, research and investigation that it is literally almost always impossible to establish standing and Real Party in Interest ("RPI") status as to a mortgage note that was securitized during the years 2001 - 2008, unless the evidence is fabricated.  The reason for this is because the various Wall Street Investment Banks and their masterminds, that created almost every such MBS Trust[1] and continue to make every important decision, regardless of what the securitization documents say about authority, intentionally made certain that no person or entity actually performed their responsibility for perfecting the sales, negotiations and transfers and that are clearly spelled out in all Pooling and Servicing Agreements ("PSA") to match the requirements in federal REMIC law.  All that had to be done was to comply with the terms that are in each PSA for the serial sales, negotiations and transfers of the Notes from the Originator to Sponsor to Depositor to Pool Trustee for the benefit of Certificate Holders by the "Cutoff Date."  But they <u>almost never</u> were.  When something like this is never done that would have been so easy to accomplish by anyone with half a brain, the only rational explanation is that it was intentional.  This is the reason it has become routine practice to present insufficient, misleading and/or fabricated evidence.  Even with such evidence, if the law is applied and Movant's are truly required to meet their burden of proof as the law provides, it is still almost always impossible for them to prevail.

---

[1]  See Index of acronyms and abbreviations attached hereto as Exhibit A.

2

According to the collection of cases cited herein, filing a motion for relief that is defective for one of the following reasons is not only fatal to standing, and holder status, but may each also constitute violations of Rule 7011:

a)      That contains inaccurate representations declaring chain of title;

b)      For presenting a note with indorsements that makes it appear that the moving party is the holder when it is not the party to whom the debt is owed in its own right;

c)      when the moving party is not the real party in interest;

d)      when the moving party files a motion without in advance having evidence of the complete chain of title to prove that it is the real party in interest.

See for example, *In re Parrish*, 326 B.R. 708, 720 (Bankr.N.D.Ohio 2005); *In re Maisel*, 378 B.R. 19, 22 (Bankr.Mass., 2007); *In re Hayes*, 393 B.R. 259, 269 (Bankr.Mass., 2008); *In re Rivera*, 342 B.R. 435, 441 (Bankr. D.N.J. 2006).   At an increasing and accelerating pace, Bankruptcy Courts have expressed anger and outrage at the practices of mortgage claimants in the MLS context.[2]

> notwithstanding the volume, pace and electronic systemizing of stay relief motions and applications, this court must remain mindful of the serious stakes—most often it is the family homestead that is in jeopardy. . . . [B]oth

---

[2] Cases in which Bankruptcy Courts have correctly expressed outrage at the wrongful and offensive nature of practices that have been prevalent include: *HSBC Bank USA, N.A. v. Valentin N.Y.Sup., No. 15968/07 (S.Ct. NY 2008); In re Nosek, 363 B.R. 643 (Bankr.Mass., 2007); In re Parsley, 384 B.R. 138 (Bankr. S.D. Tex., 2008); In re Schuessler, Case No. 07-35608 (cgm) (Bankr. S.D.N.Y. 4/10/2008) (Bankr. S.D.N.Y., 2008); In re Wilborn, Case No. 03-48263-H4-13 (Bankr. S.D. Tex. 2/18/2009) (Bankr. S.D. Tex., 2009); In re Wells, 407 B.R. 873 (Bankr. N.D. Ohio, 2009)(Show Cause Order); In re Hudak, Bankruptcy Case No. 08-10478-SBB (Bankr.Colo. 10/24/2008) (Bankr.Colo., 2008), at fn 3; In re Hayes, 393 B.R. 259, 267 (Bankr.Mass., 2008); In re Comcoach Corp., 698 F.2d 571, 573 (2nd Cir.1983) (citations omitted); In re Refco, 505 F.3d 109, 115 fn. 10 (2nd Cir.2007); In re Woodberry, 383 B.R. 373 (Bankr.D.S.C. 2008); In re Maisel, 378 B.R. 19, 21-2 (Bankr.Mass., 2007); In re Vargas,* supra at 516 (Bankr. C.D. Cal. 2008); *MERS Consolidated.*

the data supplied and the verification processes employed by those who
would foreclose on residences **must be above reproach**.

*In re Rivera*, 342 B.R. 435, 441 (Bankr. D.N.J. 2006) (emphasis added).  Cases that state

or imply it is a violation to misrepresent the chain of transfer of note ownership, and even

to file a motion without first researching said information, and that they may be violations

of Rule 7011.  *In re Hayes*, 393 B.R. 259, 269 (Bankr.Mass., 2008); *In re Maisel*, 378 B.R.

19, 22 (Bankr.Mass., 2007);  *In re Parrish*, 326 B.R. 708, 720 (Bankr.N.D.Ohio 2005).  They

may also warrant sanctions under 28 U.S.C. § 1927.[3]  *In re Hayes*, supra.

## STANDING AND REAL PARTY IN INTEREST

A federal court's jurisdiction is dependant upon the standing of the litigant, which

includes both constitutional standing and prudential standing (Real Party in Interest).

Constitutional standing is a requirement of Article III of the Constitution, is a threshold

jurisdictional requirement, cannot be waived, and can be raised at any time.[4]  *In re*

*Jacobson*, 402 B.R. 359 (Bankr. W.D.Wash., 2009); *In re Kang Jin Hwang*, 396 B.R. 757,

768 (Bankr.C.D.Cal., 2008).  Standing to pursue foreclosure action in a judicial foreclosure

State, such as Ohio, presents the same issue in a motion for relief from stay proceeding

in bankruptcy court even in a non-judicial foreclosure state.  *In re Foreclosure Cases*, 521

---

[3]  Unlike Rule 7011, this statute does not call for opposing counsel to take action, but
Court may act on its own.

[4]  Cases discussing Constitutional Standing in broad terms include: *Valley Forge
Christian Coll. v. Am. United for Separation of Church and State*, 454 U.S. 464, 472 (1982);
*Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490,
498 (1975));  *Hasso v. Mozsgai (In re La Sierra Fin. Servs.*), 290 B.R. 718 (9th Cir. BAP
2002); *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S.
544, 551 (1996); *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins.* Co., 219
F.3d 895, 899-900 (9th Cir. 2000); *U.S. v. AVX Corp.,* 962 F.2d 108, 116 n. 7 (1st Cir.1992); .

4

F.Supp.2d 650 (S.D. Ohio, 2007), discusses Constitutional Standing and its importance. Where there is no Constitutional Standing, there is no subject matter jurisdiction. Id at 653. The party seeking to foreclose (or obtain stay relief) must prove it was the <u>holder **and** owner</u> at the time the case was filed (or at least that it is at the time of the hearing on stay relief). *Id* at 653; *In re Kang Jin Hwang*, at 764, 769-772. See also *In re Foreclosure Cases*, 1:07-cv-02282-CAB Doc 11 (U.S. N.D. Ohio 2007), wherein Judge Boyko, dismissed 15 foreclosure complaints, holding that the banks and mortgage companies seeking to foreclose failed to prove Constitutional standing because they failed to prove they owned the beneficial interest in the note and mortgage. A party must have a pecuniary interest to be a "party in interest" entitled to stay relief. *In re Sheridan*, Case No. 08-20381-TLM, Doc 30 Filed 03/12/09 Memorandum of Decision (Bky. D. ID 2009). See also *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619 (Mo. App., 2009). When standing is questioned, the party seeking redress in the Court **must come forward with proof** and cannot merely rely on allegations in the pleadings. *In re Kang Jin Hwang*, supra.

Every Motion to Lift Stay filed in Bankruptcy Court must be brought by the Real Party in Interest.

A motion for relief from stay is a contested matter under the Bankruptcy Code. See Fed. R. Bankr. P. 4001(a); 9014©. Bankruptcy Rule 7017 applies in contested matters. Rule 7017 incorporates Federal Rule of Civil Procedure 17(a)(1) which requires that "[a]n action must be prosecuted in the name of the real party in interest." See also, *In re Jacobson*, 402 B.R. 359, 365-66 (Bankr. W.D. Wash. 2009); *In re Hwang*, 396 B.R. 757, 766-67 (Bankr. C.D. Cal. 2008).

*Mortgage Electronic Registration Systems, Inc. V. Lisa Marie Chong, Lenard E. Schwartzer, Bankruptcy Trustee, et al.*, 2:09-CV-00661-KJD-LRL, Doc 52 (U.S. D. Nev.

(2009)(Appeal of 18 similar consolidated cases affirming wins in every case for the Debtor from Nevada Bankruptcy Court).[5] A party can have standing and not be the real party in interest ("RPI"), and conversely a party can be the RPI but lack standing. *In re Hwang*, supra. Prudential standing requires then that an action must be prosecuted in the name of the RPI.[6]

A MLS movant must assert their own legal interests as the real party in interest, and this means that the financial interests at stake in the outcome of the dispute must be their own. See for example, *In re Hayes*, 393 B.R. 259, 267 (Bankr.Mass., 2008)(*Hayes* is a case that has a fact pattern with many aspects similar to this case); *MERS Consolidated* Appeal; *In re Kang Jin Hwang*, supra; *In re Vargas*, 396 B.R. 511 (Bankr.C.D.Cal., 2008); *In re Jacobson*, supra at *5-6; In re Maisel*, 378 B.R. 19, 21 (Bankr.D.Mass.2007); *In re Simplot*, 2007 WL 2479664 at *9 n.45 (Bankr. D. Idaho Aug. 28, 2007); *In re Sobczak*, 369 B.R. 512, 517-18 (9th Cir. BAP 2007); *In re La Sierra Fin. Servs*, supra at 727; *Bellistri v. Ocwen Loan Servicing, LLC*, supra; *In re Refco*, 505 F.3d 109, 115 fn. 10 (2nd Cir.2007); *In re Woodberry*, 383 B.R. 373 (Bankr.D.S.C. 2008).

Other principals recited within the cited cases include the fact that the claimant has

---

[5] Cited hereafter as (*MERS Consolidated* appeal). The District Court in affirming the wins for the Debtors in all cases also did a review of several major issues that have a much broader implication than merely MERS cases.

[6] Case citing the principal of prudential standing and the RPI rule in general terms are: *Dunmore v. United States*, 358 F.3d 1107, 1112 (9th Cir. 2004); *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); Pershing Park, 219 F.3d at 899-900; In re Godon, 275 B.R. 555, 564-565 (Bankr. E.D. Cal. 2002) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541-42 (1986); *Bennett v. Spear*, 520 U.S. 154, 162, 167-68 (1997); *In re Comcoach Corp.*, 698 F.2d 571, 573 (2nd Cir.1983) (citations omitted).

the burden of proof on the issue of Standing and PRI, and that this proof must be in the form of real and admissible evidence if objected to.[7]  Seemingly logical assumptions do not suffice for real and admissible evidence, and this proof must be made prior to facts, such as that a debtor has not made payments under the original note in many months.  Secondly, RPI status requires that the claimant assert their own interests and not those of another.  Third, to be the RPI, the party must be the owner of the Note, the holder of the Note and be the party entitled to enforce it under the U.C.C.  A movant that shows up with a Note that appears to be indorsed to it, does not establish that the movant is the owner of the Note.  This requires proof.  Fourth, proof of the validity and authority to make indorsements requires proof and shifts the burden to the claimant if challenged in the pleadings.  ARS § 47-3308(A).  Fifth, In this age of securitization, when it is common knowledge that there should be two or three intervening indorsements made within 180 days after the loan was made with the last being to the Trustee of the MBS Trust, proof of the entire chain of sales and transfers thereof is required, or at least that it be sufficiently explained, when the validity and authority to make indorsements has been denied in the pleadings.  *Id.*  Seventh, the right to enforce a Note does not convert a party into a real party in interest.  *In re Kang Jin Hwang,* supra at 767, quoting 6A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1553; *In re Jacobson*, supra at 366; *Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 6223-4 (Mo. App.2009).  Eighth, the RPI must be a named party.  *MERS Consolidated* at p. 4, quoting *Jacobson*, 402 B.R. at 366, n.7 and *Hwang*, 396 B.R. at 767.   Ninth, possession alone does not establish that the party in

---

[7]  See *Bennett v. Spear*, 520 U.S. 154, 167-68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *In re La Sierra Fin. Servs.*, supra at 726; *MERS Consolidated Appeal* at 5.

7

possession of a note is entitled to receive payments under it. *Citizens Fed. Sav. & Loan Ass'n of Dayton v. Core Inv.*, 78 Ohio App.3d 284, 287, 604 N.E.2d 772, 774 (Ohio Ct.App. 1992); *In re Wells*, 407 B.R. 873, 879 (Bankr. N.D. Ohio, 2009), appeal dismissed with prejudice 1:09-cv-01879-DAP, doc 11, filed 1/28/10 (D. Ct. N.D. Oh. 2009). This is true even if the party seeking to enforce the note shows up in Court with a note that has been endorsed in blank. *In re Sheridan*, supra, p 15, Memorandum of Decision (Bky. D. ID 2009).[8] Physically holding the Note does not even necessarily make that party the "holder." *Sheridan Id* at 15. Tenth, an entity named as the beneficiary on a deed of trust or who has been assigned the deed of trust may not enforce it if not the owner of the note, because the financial interest at stake is not their own. *Ocwen Loan Servicing, LLC, supra* at 623-4; *MERS Consolidated, supra* at 5. Eleventh, an attorney-in-fact that merely has agency relationship for the purpose of bringing suit is only a nominal party and not the true party in interest. 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1553 (2d ed. 1990). The mere fact that a party is named as the beneficiary in a deed of trust is insufficient to enforce the obligation, if the party is not really the beneficiary.

The "colorable claim" argument has little or no continued significance in today's environment. Standing and RPI are legal issues and are reviewed de novo on appeal.

---

[8] *In re Hill*, No. 2:08-bk-16161-EWH (Bankr.Ariz. 7 6 2009) (Bankr.Ariz., 2009), which focused on whether the documents presented appeared to qualify the movant as the holder of the note, is distinguishable. Based on the record, several issues were not raised, including the ownership of the note, proof of ownership through tracing chain of ownership transfer, payment of consideration for each such transfer, and whether the note had been pooled and interests sold in the pool to Investors. Unless the validity of the signatures is denied in the pleadings it is admitted, including authority to make and authenticity. ARS § 3308.

8

Creating the **appearance** of a colorable claim is not what was ever intended by the phrase, "colorable claim." Presenting indorsements and allonges that make it appear that the movant is a holder, when the movant is not really the owner has been deemed by courts increasingly and at an accelerated pace to be unethical.[9] If one were to pick a single case as the starting point, a good one would be *In re Wells*, supra, because the case contains a review of several issues, contains a reference to memos on the Court's website, and includes a fact pattern in which the Judge called Officers of U.S. Bank, N.A., to personally appear in Court and explain their basis for filing a proof of claim and why they should not be held in contempt, for presenting the kind of evidence that has become routine.[10]

---

[9] Ownership of the beneficial interest in the note is the essential fact in RPI analysis, and why in this age of securitization, proof of RPI status requires proof of the entire chain of ownership when a Note was securitized. It will also show that an increasing number of Courts have stated that the kind of evidence that has been presented in the securitization age amounts to presenting misleading evidence, and some go so far as to state that even filing motions without having evidence in advance of the complete chain of title is ground for sanctions. As discussed below, in this age of securitization, in almost all cases it is impossible for a claimant to establish standing and RPI status without fabricating evidence, and what the ramifications of this really amount to.

[10] Debtor objected to the primary mortgage POC filed by U.S. Bank NA, as Trustee for MBS Pool ("USB"). The Court sustained Debtor's Objection based on lack of standing and failure to prove it was a Creditor, due to failure to prove it was the owner and holder of the Note with the right to enforce it. The Judge also issued an order that U.S. Bank NA, as Trustee (for holders of MBS), and Ocwen Loan Servicing LLC, were to appear in Court on a given day and time, through officers with general corporate responsibility, to show cause regarding the factual and legal bases for filing the proof of claim. Wells, Doc 47, Filed 06/21/09. US Bank's Attorney was ordered to serve the show cause order on its client and file a certificate of service. Instead of showing up U.S. Bank and Ocwen appealed to the District Court. While the appeal was pending, U.S. Bank filed a MLS, which was abated by the Court sua sponte saying that the same issues in the POC action apply equally to MLS. The appeal was dismissed by stipulation with prejudice. *In re Wells*, 1:09-CV-1879 (US N.D. Oh 2009). The POC objection was sustained in its entirety. The appeal was dismissed by stipulation with prejudice. *In re Wells*, 1:09-CV-1879 (US N.D. Oh 2009). No word on whether bankruptcy judge will still

9

Proof of a proper indorsement includes:

a)   that it was made at a time when the endorser owned the Note;

b)   that it was made by one with the authority to indorse;

c)   that it was made in exchange for value, meaning real consideration paid to purchase the Note, to prove ownership and HDC status.

d)   of the identity of all parties in the chain of title or at least a credible explanation of the history through the SC;

e)   that the sales of the Note, the indorsements or other transfers were properly made <u>by</u> each party in the chain of ownership;

f)   That the sales of the Note, indorsements or other transfers were properly made <u>to</u> each party in the chain of ownership;

g)   proof of the consideration paid by each transferee to each transferor in the SC, and most importantly, specifically proof of the value that Movant paid.  Unless the Note was a gift, it had to cost money.

h)   if it is shown that there was a separate chain of transfers, the burden of proof cannot be carried, unless the Movant proves that the other chain of transfers did not really occur.

## ASSIGNMENT OF NOTES IS INVALID TO TRANSFER THE NOTE

Assignment of a Note is insufficient to transfer the Note and does not create a right to enforce it, but only a claim to ownership, because only negotiation and transfer grant the right to enforce.   *In re Wells*, 407 B.R. 873 (Bankr. N.D. Ohio, 2009), appeal to District Court dismissed with prejudice at *In re Wells*, 1:09-cv-01879-DAP, Doc 11, Filed 01/28/10 (N.D. Ohio 2010); See also see also U.C.C. § 3-203 cmt. 1 (2002).  This same logic holds true in those case where the DOT is assigned "along with all beneficial interest in the Note."

_____

require officers to appear and show cause.

10

**CASES WHERE MERS ATTEMPTS TO ASSIGN NOTE AND DEED OF TRUST**

There are additional reasons that a MERS assignment of DOT along with the beneficial interest in the Note is a nullity. There is now nearly unanimous agreement at this point in time that these MERS assignments are entirely nothing, as a matter of law. This is because the evidence, including admissions from MERS are now overwhelming that they are not and never have been a real Beneficiary at any time in any case. MERS never has any power to assign any beneficial interest in a Note because it never held the Note and never had a tangible interest in the mortgage. *Landmark Nat. Bank v. Kesler*, 216 P.3d 158, 167 (Kan., 2009); *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo. App.2009); *In re Wilhelm*, 407 B.R. 392 (Bankr.D.Idaho 2009); *In re Vargas*, 396 B.R. 511 (Bankr.C.D.Cal.2008); *Saxon Mortgage Services, Inc. v. Hillery*, 2008 WL 5170180 (N.D.Cal.2008) (unpublished opinion); *LaSalle Bank Nat. Ass'n v. Lamy*, 12 Misc.3d 1191, 824 N.Y.S.2d 769, 2006 WL 2251721, at *2 (Sup.2006) (unpublished opinion). Furthermore, since the assignment of the Note is of no force, the assignments of the Deeds of Trust are also of no force, because the Note cannot be separated from the DOT without rendering both into useless pieces of paper. *Landmark Nat. Bank v. Kesler, supra; Bellistri v. Ocwen Loan Servicing, LLC, supra*, citing *St. Louis Mut. Life Ins. Co. v. Walter*, 329 Mo. 715, 46 S.W.2d 166, 170 (1931).; *In re Wilhelm, supra; In re Vargas, supra; Saxon Mortgage Services, Inc; supra*. In fact, it has taken the position in a Court of law that it is not authorized to engage in practices that would make it a party to the transfer of mortgages.

> MERS argued in another forum that it is not authorized to engage in the practices that would make it a party to either the enforcement of mortgages

or the transfer of mortgages. In Mortgage Elec. Reg. Sys. v. Nebraska Dept. of Banking, 270 Neb. 529, 704 N.W.2d 784 (2005), MERS challenged an administrative finding that it was a mortgage banker subject to license and registration requirements.

*Mortgage Elec. Reg. Sys. v. Nebraska Dept. of Banking*, 270 Neb. 529, 704 N.W.2d 784

(2005), quoted by *Landmark Nat. Bank v. Kesler*, 216 P.3d 158, 168 (Kan., 2009). MERS

is a dark recording system designed to avoid legal requirements and obscure the

ownership of note obligations from borrowers and the public, established by Wall Street

Investment Banking Firms as part of an intentional and well thought out plan.

> Permitting an agent such as MERS purports to be to step in and act without a recorded lender directing its action would wreak havoc on notice in this state."

*Southwest Homes v. Carmen Price*, ___ Ark. at ___, quoted by *Landmark Nat. Bank v.*

*Kesler, supra* at 169; See also *Johnson v. Melnikoff*, 20 Misc.3d 1142, 873 N.Y.S.2d 234,

2008 WL 4182397, at *4 (Sup.1008); *In re Schwartz*, 366 B.R. 265 (Bankr.D.Mass.2007).

In fact, MERS and all its members take the position that the information pertaining to

transfers of ownership of notes that they keep a record of is confidential.

> [T]he practices of the various MERS members, including both [the original lender] and [the mortgage purchaser], in obscuring from the public the actual ownership of a mortgage, thereby creating the opportunity for substantial abuses and prejudice to mortgagors . . ., should not be permitted to insulate [the mortgage purchaser] from the consequences of its actions. . .

*Johnson v. Melnikoff, Id; quoted by Landmark Nat. Bank v. Kesler, supra*; See *Bellistri v.*

*Ocwen Loan Servicing, LLC*, 284 S.W.3d 619 (Mo. App., 2009).

**ALLONGE NOT IMMEDIATELY AND PERMANENTLY ATTACHED TO NOTE IS OF NO EFFECT**

In cases where allonges were not immediately and permanently attached to the

12

Note, they were held invalid.  The party indorsing the allonge had to have the original Note in its possession while indorsing the allonge.  An indorsement written on a separate piece of paper must be immediately and permanently affixed to the note and if not it is ineffective as an indorsement and the assignee loses HDC status.  *Adams v. Madison Realty & Development, Inc.*, 853 F.2d 163, 166 (C.A.3 (N.J.), 1988).  It also causes it to lose it holder status, because an invalid allonge is not an indorsement, but establishes only a claim to ownership or right to enforce.  See *Id*; *In re Wells,* supra at 879; *Citizens Fed. Sav.*, 78 Ohio App.3d 284, 287, 604 N.E.2d 772, 774.  Loss of holder status means loss of holder in due course status which in turn causes loss of negotiable instrument law's procedural advantages of the means for "obtaining a judgment on the note promptly and inexpensively."  See ARS § 47-3305. *Adams v. Madison Realty & Development, Inc.*, 853 F.2d 163, 166 (C.A.3 (N.J.), 1988).  By loss of HDC status they also lose the freedom from a panoply of claims and defenses.  The requirement that the allonge be attached to the original note is very strict with unanimous agreement among the Courts (except for two cases found by the *Adams* Court).  The first of the two major rationales for strict requirement of attachment of allonges to qualify as indorsements is to prevent fraud which can occur through the sale of the same note to multiple parties, for example.

> When the drafters of the Uniform Commercial Code replaced the term "attached" in the NIL with the phrase "firmly affixed," they intended to make the use of allonges more difficult. See *Hills v. Gardiner Savings Institution*, 309 A.2d 877, 880-81 (Me.1973); *Estrada*, 550 S.W.2d at 728; 5 Anderson, supra, Sec. 3-202:05. Courts have advanced two justifications for the firmly-affixed requirement. The California Court of Appeals reasoned that the provision serves to prevent fraud, remarking that a signature innocently placed upon an innocuous sheet of paper could be fraudulently attached to a negotiable instrument in order to simulate an indorsement. *Pribus*, 173 Cal.Rptr. at 750. But cf. *Lamson v. Commercial Credit Corp.*, 187 Colo. 382,

13

531 P.2d 966, 968 (1975).

*Adams*, Id at 167.  Emphasis added.  The second rationale is to provide knowledge of a

traceable chain of title to all persons examining them, which is extremely important.

> The affixation requirement has also been cited for its utility in **preserving a
> traceable chain of title**, thus furthering the Code's goal of free and
> unimpeded negotiability of instruments.  Nearly a century ago, the Supreme
> Court of Georgia declared it "**indispensably necessary**" that negotiable
> instruments "should carry within them the indicia by which their ownership is
> to be determined; otherwise, **their value as a circulating medium would
> be largely curtailed, if not entirely destroyed**." *Haug v. Riley*, 101 Ga. 372,
> 29 S.E. 44, 46 (1897). See also *Crosby*, 16 Wis. at 627 (permanently
> attached indorsements to instrument "<u>**travel with it wherever it might go**</u>").

*Adams,* Id at 167.  Emphasis added.  *Adams v. Madison Realty Dev., Inc.*, 853 F.2d 163,

167 (3d Cir. 1988), thoroughly discusses why an indorsement written on a separate piece

of paper must be affixed to the note immediately and permanently or be ineffectual, and

also gives an excellent review of case precedents and clarifies many UCC concepts.  See

also  *In re Canellas*, Case No., 6-09-bk-12240-AB (Bky. MD FL 2 9 2010).

**MOVANT MUST PROVE IT OWNS THE NOTE AND IN SECURITIZATION CASES
WHERE AUTHENTICITY AND AUTHORITY TO MAKE INDORSEMENTS IN
CHALLENGED IN THE PLEADINGS, IT MUST PRESENT PROOF OF ENTIRE CHAIN
OF SALES, INDORSEMENTS AND TRANSFERS**

The moving party in a motion for relief from stay must prove that it has the right to

proceed.  Failure of the moving party to prove that it is the owner of the Note, or to

adequately prove that it has proper authority from another that it has proven is the owner

of the Note causes the moving party to have failed to establish that it has standing as the

RPI. Mortgage Claimants have systematically and routinely presented fabricated evidence

in Court to present the APPEARANCE that they are the Holder over the past several years.

The growing slime of Wall Street reaching unbelievable new lows last decade has made

14

guilty out of many that were previously not naturally pre-designed by DNA to self-denial and

blindness.  Fortunately the UCC provides a cure.  When an alleged Obligor challenges the

validity of the indorsements in the pleadings, the burden is on the party seeking to enforce

the instrument to prove the validity of the indorsements.

> In an action with respect to an instrument, the authenticity of, and authority
> to make, each signature on the instrument is admitted unless specifically
> denied in the pleadings.  If the validity of a signature is denied in the
> pleadings, the burden of establishing validity is on the person claiming
> validity, but the signature is presumed to be authentic. . .

ARS §  47-3308(A).  Although the statute does not require justification for challenging the

validity of indorsements, there is overwhelming justification to challenge the validity of the

indorsements.  The series of parties that held a Note from the Originator to the Pool is the

"Securitization Chain" ("SC").  Validity of indorsements includes the right and authority to

have made the indorsements.  An entity would have no right to make the indorsements if

the Note was sold and indorsed through the SC to the Pool, and the party seeking to

enforce is not the Trustee of the Pool, and the indorsement to the party seeking to enforce

is not from the Trustee of the Pool.  Nor would the indorsements overall have been valid

when necessary indorsements are missing from the Note, meaning that the intervening

indorsements of the entities in the SC are not present on the Note.  Proving the validity of

the indorsements also involves the unexplained absence of indorsements that ought to be

on the Note.  The series of parties usually includes: Originator to Sponsor to Depositor to

Pool Trustee for the benefit of Certificate Holders.  This series is what commentator and

lecturer Max Gardner has called the ABCDs of securitization.  The presentation of evidence

in the form of a Note which does not have each of the intervening indorsements he calls

Case 4:09-bk-09703-EWH    Doc 65    Filed 06/16/10    Entered 06/16/10 21:57:01    Desc
Main Document    Page 15 of 35

the "Alphabet Problem." The reason that each PSA set up a securitization chain is at least in part to make the MBS Trust bankruptcy remote and FDIC remote.[11] Ownership of these notes have been shrouded in secrecy with an industry wide practice of refusing to provide borrowers the identity of the MBS Pool upon request. See above reference to MERS as a dark recording system.[12] Experience has almost without exception proven that the indorsements on Notes that are presented in Court as evidence are misleading. Debtor's expert's opinion confirms each of the following to be valid reasons for Debtor to require proof, or at least an explanation, of the entire chain of title.

> a) Claimant has previously refused this information to Debtor. Failure to provide a reasonable request for information raises reasonable suspicion.
>
> b) Additionally, in this particular case there are valid reasons for suspicion and knowledge that the indorsements are invalid.
>
> c) Shifting the burden of proof as to the validity and authority to make the indorsements is met the moment it is denied in the pleadings. This burden goes to the Claimant to prove it is the LEGITIMATE endorsee. They cannot just present the Note with the mere appearance of validity. They must explain and prove HOW it could possibly be that the indorsements presented are valid, which simply requires an explanation of the facts and evidence pertaining to the chain of transfers of Note ownership through the SC.

---

[11] "Bankruptcy remote" refers to the creation of distance between the Originator, in case it later filed bankruptcy, which we now know from experience has happened many times, and moreover, the creator investment bank that established the MBS knew it was likely the Originator would go bankrupt when the artificially inflated real estate market inevitably collapsed.

[12] This Court would do well to require by a general order that the MERS Min Summary and Milestone History be automatically produced to opposing counsel when an MLS is filed. It takes them 240 seconds to print these off the MERS website. This would save the Court much time and effort, and would help clean its docket much more efficiently.

16

d)      A fourth valid reason is simply that Debtor demands disclosure and proof, or explanation, of the entire chain of ownership of the Note.[13] It is undeniably relevant evidence.

e)      The fifth reason is that it should have become a matter of widespread common knowledge that for years claimants have presented insufficient and fabricated evidence.

f)      The sixth reason is that Debtor has expert testimony that the sales, indorsements and transfers in the SC were not properly performed.

As shown below, there is a near consensus among Courts that have ruled on the issue that, at least when challenged, proof of ownership of the Note, or that one has proper authority from the owner of the Note, requires proof of the entire chain of ownership of the Note beginning from the original Lender to the current owner, and that the current owner must be the party seeking relief.  To obtain stay relief it is necessary to adequately trace the loan from the original holder to the current holder, and not doing so means failure to satisfy the required burden.  *In re Hayes*, 393 B.R. 259, 268 (Bankr.Mass., 2008);  *In re Maisel*, 378 B.R. at 22, and *In re Parrish*, 326 B.R. 708, 719 (Bankr.N.D.Ohio 2005); See also *In re Foreclosure Cases*, No. 1:07CV2282, 2007 WL 3232430 (N.D.Ohio Oct.31, 2007);   Courts have indicated that the stay relief request should explain the serial assignments resulting in the movant becoming the holder of the note. See, e.g., *In re Hayes*, 393 B.R. 259, 269 (Bankr. D. Mass. 2008) ("The Court and the Debtor are entitled to insist that the moving party establish its standing in a motion for relief from stay through the submission of an accurate history of the chain of ownership of the mortgage."); *In re*

---

[13] Debtor does not have to help Movant by asking for this.  Pursuant to the authorities, Debtor could just sit back and do nothing, and then have the motion denied for failure of Movant to prove case, but Debtor wants to know the identity of the Mortgage Creditor.

17

*Maisel*, 378 B.R. 19, 22 (Bankr. D. Mass. 2007) ("'If the claimant acquired the note and mortgage from the original lender or from another party who acquired it from the original lender, the claimant can meet its burden through evidence that traces the loan from the original lender to the claimant.'")(quoting *In re Parrish*, 326 B.R. 708, 720 (Bankr. N.D. Ohio 2005)).  Debtor has an absolute right to demand proof of the entire chain of title through an unbroken and accurate chain of all indorsements that are presented by indorsement. *Adams v. Madison Realty & Development, Inc.*, 853 F.2d 163, 168 (C.A.3 (N.J.), 1988). Some jurisdictions have established local rules requiring that an MLS movant must come forward with disclosure and proof of the complete chain of ownership and show how honestly it came to belief that it owned the note or otherwise believed itself entitled to enforce it and on whose behalf.  Attached hereto are three Memos from Judge Pat E. Morgenstern-Clarren, of the N. D. Ohio, the author of *In re Wells*, 407 B.R. 873 (Bankr. N.D. Ohio, 2009), appeal dismissed by District Court with prejudice, 1:09-cv-01879-DAP, doc 11, filed 1/28/10 (D. Ct. N.D. Oh. 2009).[14]  In these memos at ¶¶ 6(b), 8 & 10, it makes clear that a Motion for Relief from Stay, even without objection, must attach a separate loan transfer history that must start with the entity that originated the loan and move forward to the present with supporting documentation of all transfers, and this transfer history must show movant in the chain of title.[15]  Massachusetts is another jurisdiction that has a rule that requires that the proof of chain be attached:  *In re Hayes*, 393 B.R. 259 (Bankr.Mass.,

---

[14]  Exhibit B.

[15]  These memos also make clear: the original note or a lost note affidavit is required to make a prima faci case; when a note is endorsed by an attorney in fact, to prove the authority a power of attorney must be attached that includes the power to indorse notes.

18

2008).  Massachusetts Local Bankruptcy Rule 4001-1(b)(f) requires a movant to state:

> the original holder of the obligations secured by the security interest and/or mortgage and every subsequent transferee, if known to the movant, and whether the movant is holder of that obligation or an agent of the holder....

*Id*. at 269.

**EFFECTS OF SECURITIZATION ON NOTE PURSUANT TO THE UCC**:

The process that occurs when a Note is Securitized, and the rules governing the administration of the Pool, pursuant to the Securitization Documents ("SD"), has a number of affects upon the Note, pursuant to the UCC.  First, the note is no longer a negotiable instrument, because it is no longer an unconditional promise or order to pay a fixed amount of money.  The SD add new transactions, including contracts between parties unknown to the Maker/Borrower, including the Owner of the beneficial interest in the Note.  The SD add terms and conditions to which the Maker/Borrower is not a party and which vary from those the Maker/Borrower agreed to.  The existence of these additional parties, contracts, terms and conditions are intentionally kept secret from the Maker/Borrower, who has no knowledge of their existence.  The Maker/Borrower loses the opportunity to communicate and negotiate with the Owner of the beneficial interest in the Note.  The SD add new parties that have an obligation to pay the Owners on behalf of the Note, pursuant to terms that bear no resemblance to the original unconditional promise or order to pay a fixed amount of money.  The SD change the amount to be paid to the owners of the beneficial interest. The SD alter the way payments are distributable to the Owners.  Payments made on the Note are not directly related to payments received by any BH or group of them.  The Owners of the Note receive a contract from the Aggregator of the Bond Issue to receive

19

payments pursuant to complex rules contained in the SD and the Bond Indenture, in exchange for their ownership of an interest in a Pool of Notes from many Borrowers. ARS §§ 47-3104; 47-3106(A); 47-3117. Second, because the Note is no longer negotiable, there can be no "Holder." Only a negotiable instrument can be the subject of Holder status. ARS § 47-1201. The Note has become a "Nonnegotiable Promissory Note," which is still enforceable as a contract, but it is not enforceable as by a Holder of a Negotiable Instrument. Third, there can be no HDC, because only the Holder of a Negotiable Instrument can be a HDC. ARS § 47-3302. There are many other reasons why the owner of a securitized Note cannot qualify as a HDC as well. *Id.*

**REQUIREMENT TO PRODUCE THE ORIGINAL NOTE**

Debtor has the absolute right to demand that the original Note be produced in Court, and the cases that mortgage claimants have recently cited, that seem to state that Debtor is not entitled to have the original produced, are distinguishable.[16] In a non-judicial foreclosure state, a party foreclosing can get away with just about anything. But non-judicial foreclosure statutes were never meant to provide for legal larceny and due process violations. They were intended as a convenience established back in the days when the mortgagee's foreclosure was legitimate and there was no need to fabricate the legal

---

[16] We have in out possession literature from training seminars for financial institution employers as well as from CLE for law firms that represent mortgage claimants. They present strategies for how to defeat homeowners and to defend against the type of legal allegations presented here, and other consumer actions. With regard to the issues raised in this brief, none of the training involves substantive means to defend by showing that the law is on their side, they are all about how to avoid, delay, hinder and pretend to be dumb. As for the requirement that the Original Note must be produced, their favorite tactic is to belittle the requirement by calling it the "Show Me the Note Defense," and cite to a few very obscure court decisions, usually involving a pro se debtor, and to over exaggerate the import of the decision.

foundation of their actions. When the matter is before a Court in a judicial foreclosure state or is in bankruptcy court, more is required. The law of standing and RPI has existed as it currently is for a long time. Also, there is nothing magic about Arizona law in relation to property rights or the UCC, which is the same on these issues in almost all other states. It is necessary to bring the original Note to Court in order to enforce it when demanded by the obligor.

a)   First, as an elementary principal of negotiable instruments law, once a note is endorsed, its negotiation is not complete until transfer of physical possession. See ARS § 47-3201.[17] Proof that there has been a real transfer of physical possession means the ability to require that the original Note be brought into Court, particularly in cases where there is good cause for doubt of the veracity of the evidence presented.

b)   Second, if this were not the case, there would be no reason for lost note affidavit statute. § 47-3309.

c)   Third, the requirement that any allonge be immediately and permanently attached to original note would also be of no effect. 47-3204(A).

d)   Fourth, there would also be no teeth to § 47-3305 ( C), which states that an obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have the rights of a HDC and the instrument is proven to be a lost or stolen instrument. The only way to prove this is to require that the party claiming to have possession of it, bring it to Court.[18]

---

[17]   The transfer of possession requires physical delivery of the note "for the purpose of giving the person receiving delivery the right to enforce the instrument." U.C.C. §§ 3-203 cmt. 1, 1-201 (2002).

[18]   Since the Owner of the Nonnegotiable Promissory Note is not a HDC, the rules for lost instruments in A.R.S. § 47-3309 do not apply. Pursuant to 47-3305 ( C), An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a HDC and the obligor proves that the instrument is a lost or stolen instrument. Therefore, if no party comes forward and produce the original

21

e)   Fifth, the law that an obligor on a Note is discharged if it is intentionlly destroyed would be ineffective. "An instrument is discharged by an intentional voluntary act, such as destruction or mutilation of the instrument." 47-3604.

f)   Sixth, is the fact that if there is any description that can be made of the totality of securitization, it is that it has been replete with fraud on every level, including selling the same Note simultaneously more than once through separate chains of transfer, and that misleading, fabricated and incomplete presentation of evidence pertaining to securitized Notes has become the industry standard.

Additionally, the Federal Rules of Evidence ("FRE"), provide a number of important principals. Even with the benefits of UCC Negotiable Instruments law, the instrument is not the ownership of the right to payment, but is merely evidence thereof. "To prove the content of a writing . . . the original writing . . . is required, except as otherwise provided in these rules or by Act of Congress." FRE 1002. But when holdership, ownership, right to enforce and holder in due course status are at issue, it is not really the <u>content</u> of the instrument that is the subject of controversy. The issues are such as: whether the claimant has possession of the original instrument; whether that possession alone is sufficient evidence to prove holdship, ownership, right to enforce and HDC status, or to what extent it aides in providing such proof. "A duplicate is admissible to the same extent as an original unless

(1)   a genuine question is raised as to the authenticity of the original or

_____

Note, such as the Owner, any Participant, any Pool Administrator, or any Document Custodian, all of which the Owner Holder with the right to enforce the document would have a relationship that establishes a duty to provide the Note upon request, Debtor is not obligated to pay and without a debt the DOT is a worthless piece of paper, and there can be no party in interest with an interest in "such property" that can seek stay relief. §362(d)(2)(A).

22

(2)     in the circumstances it would be unfair to admit the duplicate in lieu of the original."

FRE 1003.  For all the reasons above, 1003 requires that the original be produced. Although UCC Article 3 contains its own more specific lost note affidavit and related statutes,  FRE 1004 is pertinent.  This rule says that the original is required unless, by implication, one of the listed exceptions applies.  The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible under FRE 1004, if:

(1)     Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or

(2)     Original not obtainable. No original can be obtained by any available judicial process or procedure; or

(3)     Original in possession of opponent.  At a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and that party does not produce the original at the hearing; or

(4)     Collateral matters. The writing, recording, or photograph is not closely related to a controlling issue.

**DISCHARGE OF DEBTOR'S OBLIGATION AND MISCELLANEOUS PAYMENTS BY 3RD PARTY SOURCE PAYMENTS AND DEBTOR'S EQUITY IN THE PROPERTY SUPPORTED BY DOT AND UCC**

Debtor is entitled to a credit against their obligation as a matter of law, pursuant to Standard Deed of Trust ("DOT") form provisions that are in Debtor's DOT, entitled "Miscellaneous Proceeds," and pursuant to the U.C.C. § 3.602(A), "Discharge by Payment" rule, set forth in the Arizona version at ARS § 47-3602(A).

23

Debtor's Derivative Securities Expert, Neil Garfield, has provided an opinion that it is more likely than not, or better than 50% probability, that there have been payments made by 3rd Party Sources of a great enough sum so as to completely discharge Debtor's obligation. These 3rd Party Sources are independent of "Property Insurance" and "Mortgage Insurance." They consist largely of Credit Default Swap ("CDS") payments. CDS payments are new to mortgages and coincide precisely with Securitization of Mortgages. There are also other 3rd Party Sources, such as "Credit Enhancements" that are also new to mortgages and coincide precisely with Securitization. Each of those 3rd Party Source payments that Garfield has used in his calculations were obligated to have been paid on behalf of Debtor's Note to parties entitled to receive payments on said Note. These payments would have been made for the benefit of the actual Creditor, the Investor in the MBS. Garfield has also provided his expert opinion that there is a 100% probability that enough was paid by these 3rd Party Sources, such that Debtor's Note is not in default.

The Debtor's DOT states at ¶ M, on page 2, "Miscellaneous Proceeds," states:

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds **paid by any third party** (other than insurance proceeds paid under the coverages described in Section 5) for: (I) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

The DOT supports Garfield's opinion that the loan is not in default. The DOT governs in what order "Miscellaneous Proceeds" are to be applied to the Obligation, and the provision is set forth ¶ 2, page 5 of the DOT. In places within the language in the DOT, when discussing the application of Miscellaneous Proceeds, it is specifically stated that the

24

application of such proceeds is governed by ¶ 2 of the DOT.[19]  See 3 separate statements with such language in ¶ 11, page 9 of DOT.

> Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, **with the excess, if any, paid to Borrower**.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

See ¶ 11, page 9 of DOT.  Emphasis added.  Said paragraph 2, paraphrased basically states that they are applied first to the mortgage payments starting with the oldest due at the time, then to accrued late fees if any, then to reduction of the principal, and then surprisingly, that any excess should be paid to Debtor.  Pursuant to the terms of the DOT, the only 3rd Party payments to which Debtor is contractually not entitled to receive credit on their Obligation are Mortgage Insurance payouts, that are required by Lender and for which Debtor was responsible for the premiums, and "Property Insurance" which is to insure against damage to the Property and liability in the event a person is injured on the

---

[19]  The fact that excess Miscellaneous Proceeds, after the entire principal of the Note has been paid, contractually belong to Borrowers in standard DOT forms is one possible reason that there was in nearly every case an intentional failure to make sure that the sale and transfer of Notes was perfected and to provide for proof of perfection of the sale and transfer of Notes in securitized mortgage transactions.  This is because there were multiple credit default swaps and other 3rd Party Source funds, that generated Miscellaneous Proceeds in amounts that were several multiples of all funds loaned.  It is also a possible explanation for the ability to take the position that there was an intentional separation of the Note from the DOT.  There was always plausible deniability, built in to avoid the possibility that some smart mortgagor might claim sums far in excess of the amount borrowed.  The Wall Street Investment Banks that established the MBS Trusts were likely most fearful of the possibility of large class action suits whereby homeowners in droves might seek to obtain not only clear title to their homes, but also in addition sums several times the amount that was borrowed, which would be the money that the Investment Bankers had planned for their own pockets.  With all the power that the Wall Street Investment Banks have, they were not able to have the federally sanctioned DOT form changed, or they may have thought it would draw too much attention to what they were doing.

premises. Standard DOT form provisions such as this are in agreement with the U.C.C.,

"Discharge by Payment" rule that provides that payments made by or on behalf of a party

obliged to pay the Note to a party entitled to enforce it discharges the obligation of Debtor.

ARS § 47-3602(A).

> . . . an instrument is paid to the extent payment is made by or on behalf of a
> party obliged to pay the instrument and to a person entitled to enforce the
> instrument. To the extent of the payment, the obligation of the party obliged
> to pay the instrument is discharged . . .

At a minimum, 3rd Party Source Payments made are definitely relevant to a MLS

proceeding. First, they are relevant to whether or not there was a default existing when the

MLS was filed and/or at the MLS hearing, because they were to be applied first to past

payments due. Secondly, they are relevant to whether Debtor has equity in the property,

because after all past due payments and late charges are brought current by Miscellaneous

Payments the excess is applied to reduction of the principal.

   As stated, if the Debtor's obligation has been discharged due to payments made by

3rd Party Sources, their equity would be 100% of market value. The UCC provides that

payments made by or on behalf of a party obliged to pay the Note to a party entitled to

enforce it discharges the obligation of Debtor. ARS § 47-3602(A). This could result in a

benefit not only to Debtor, but to the estate. The issue of Debtor's equity is Movant's

burden to prove. 11 U.S.C. § 362(g). But certainly a Stay Relief Movant must show the

loan is in default. There is absolutely no doubt that the Wall Street Investment Bank and

its masterminds never intended for borrowers to benefit by a credit against their obligation,

and Servicers and MBS Pool Trustees never make the slightest effort to credit Debtors for

3rd Party Source payments. When Movants present their case, they show up with only

Debtor's payment history and nothing showing all payments to or on behalf of the BH by all 3rd Party sources. Movant clearly has not met its burden of proof. And every single time a request for a 3rd Party Source Accounting is requested in discovery, there is an objection based on relevance, stating that this information has no relevance as to whether Debtor has made their payments pursuant to the terms of the Note. Nevertheless, these mortgage claimants are as wrong as they can possibly be. Debtor is entitled to credit for 3rd Party Source payments as a matter of law, both pursuant to the terms of their DOT and the terms of the standard federal guideline DOT form, and the U.C.C. Discharge by Payment rule. Under the prevailing circumstances, and the facts that will be established by expert testimony, Movant must come forward with a complete 3rd Party Source Accounting, in order for Garfield to present a surer and more precise opinion as to how much the principal of Debtor's Note has been reduced by 3rd Party Source payments.

**EVEN IN NON-JUDICIAL FORECLOSURE STATE BORROWER IS ENTITLED TO DUE PROCESS**

The argument that a Debtor in bankruptcy court should not be entitled to more rights than are provided by state law is fallacious. First, when a case is before a bankruptcy court, the Debtor has all the rights that are set forth in this brief. Secondly, a homeowner facing a non-judicial foreclosure in Arizona has access to the Courts to challenge the foreclosure if the Debtor believes there are improprieties. The standard form DOT provides, as does the DOT in this case provides:

> The notice shall further inform Borrower of the right to reinstate after acceleration and the **right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale**.

27

¶ 22, page 13 of Standard form DOT, as well as the DOT in this case.  Emphasis added.

**CHAPTER 13 BENEFITS DO NOT END IF BENEFITS FOR ONLY THE DEBTOR AND NOT THE BANKRUPTCY ESTATE ARE BEING SOUGHT**

The title of Chapter 13 is "Adjustment of Debts of an Individual with Regular Income."  The purpose of Chapter 13 is mainly to benefit the Debtor, although the unsecured creditors do receive a distribution.  Working to save the home of a Debtor and their family is a core matter in Chapter 13 and many provisions are devoted to this goal.

**A FRESH LOOK AT THE EQUITIES**

DEBTOR'S ARE THE TITLED LEGAL OWNER OF THEIR PROPERTY

When a home buyer purchases real estate they receive a Deed to the Property. They are the owner.  When an MLS has been filed in years past, the question usually turned on whether they had made their mortgage payments pursuant to the original Note and DOT.  The present situation is NOTHING AT ALL THE SAME AS BUSINESS AS USUAL. It appears that policy rationales and discussions of equity are necessary to enable some Courts to apply the law to the situation if they see that doing so will result in what appears to be a windfall for Debtors.  Homeowners with mortgages are the owners of their Property and they hold legal title.  They remain the owner unless and until they voluntarily transfer the Property or lose it fair and square under the law to the real Beneficiary of the Note pursuant to the Deed of Trust, which is the RPI.  Unless and until the RPI shows up in this case and establishes a valid claim and that the automatic stay should be lifted as to them, no party should be entitled to take the home that they own.  The claimants that have been enforcing mortgages that were securitized during the last decade have invested not a penny.  They are not creditors and the issues Debtor has raised are not issues between

28

the creditors, they are issues affecting Debtor's homes and the effort to keep these impostors from obtaining a free house. Ownership of one's own home is one of the most important things in a person's life. Being safeguarded by the law against having one's home taken from them without due process of law is a fundamental right. Moreover, if they are entitled by law to have 3rd Party Source Payments applied to the reduction of their obligation, then that is the way it is even if we have grown incredibly accustomed to the average person getting nothing from their work and the economy other than enough to pay their bills from pay check to pay check. The Wall Street Investment Bankers may not have intended for Debtors to benefit from their purchases of CDS to support the investors in the Pool and themselves, but benefiting Debtors is exactly what they did. It is analogous to someone putting down a bet for you which paid off big. There are no victims from Debtor's obligation being credited for 3rd Party Source Payments, particularly payments from one or multiple CDS. The Investors have been paid, or had money paid on their behalf. The only ones that will receive less than expected are the Wall Street Investment Bankers whose greed will just be a little less satiated. The reason the MBS Trusts were created by the Wall Street Investment Bankers was so that they could make a whole lot of money. And this money was not in the form of commissions from sales of securities. They were the first parties to make money from these vehicles without any risk, they are the ones that will have made far more than any investor, and they will continue to make money from these MBS Trusts long after the Investors have been paid off.

BANKRUPTCY COURT IS ALSO A RIGHT FOR A US CITIZEN AND IT PROVIDES GREATER SAFEGUARDS PARTICULARLY IN A DEED OF TRUST STATE

Debtors have a fundamental right to avoid collection actions, including foreclosure,

29

during the pendency of bankruptcy.

> The automatic stay is ***one of the fundamental debtor protections*** provided by the bankruptcy laws. . . *Dawson v. Wash. Mutual Bank, F.A.* (In re Dawson), 390 F.3d 1139, 1147 (9th Cir. 2004) (quoting H.R. Rep. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296-97); Henkel v. Lickman (In re Lickman), 297 B.R. 162, 187 (Bankr.M.D.Fla.2003) (quoting 3 Collier on Bankruptcy ¶ 362.06 at 362-76 (15th ed. rev. 2003)).

In re Campbell, Case # 06-10570 (Bankr.Vt. 12/24/2008) (Bankr.Vt., 2008).  Emphasis added.  The sanctity of a home and its role in a person's feeling of safety and security cannot be understated.

> The consumer who seeks the relief of a bankruptcy court is an individual who is in desperate trouble.... The short term future that he faces can literally destroy the basic integrity of his household. We believe that this individual is entitled to a focused and compassionate effort on the part of the legal system to alleviate otherwise insurmountable social and economic problems. We believe that relief should be provided with fairness to all concerned but with due regard to the dignity of the consumer as an individual who is in need of help.

*Id.* at 1148 (quoting H.R.Rep. No. 95-595, at 173, reprinted in 1978 U.S.C.C.A.N. 5963, 6134).  Although the foreclosure stay can be lifted when a homeowner is unable to make mortgage payments, it is critical that borrowers not be deprived of such a fundamental protection of bankruptcy without solid evidence that the moving party is the real creditor that is entitled to proceed.  Bankruptcy Courts make it possible for a Debtor to make sure that only the RPI can foreclose upon them.  With this additional oversight, they can avoid having their property converted as so many before them in recent years have.

> TITLED HOME OWNERSHIP OVERCOMES BY LAW, POLICY AND EQUITY THE FACT THAT THOSE THAT SEEK TO STEAL THOSE HOMES ARE FINANCIAL INSTITUTIONS AND OTHER CORPORATIONS EVEN THOUGH CONSERVATIVE PREJUDICE TENDS TO FAVOR LARGE INSTITUTIONS, THE WEALTHY AND THE POWERFUL OVER ORDINARY PEOPLE

Assuming Debtor's premise that there remains no Real Party in Interest and that Debtor would be entitles as a matter of law to their home without a debt, Servicing Companies and Pool Administrators have been taking advantage of the fact such valuable information regarding family homes have been systematically and institutionally kept secret from them, the public and the Courts, by stealing Debtor's homes from them. THIS IS NOT WHAT THE PHRASE "COLORABLE CLAIM WAS EVER INTENDED TO MEAN. Debtors allege that Servicing Companies and Trustees of MBS Pools,[20] have been in effect pocketing mortgage payments, foreclosure proceeds and 3rd Party Source funds, and have been doing so for years, with or without the aid of related institutions, such as Special Purpose Vehicles ("SPV"), subsidiary corporations, shell companies or other financial institutions in collaboration with them. In a balancing test between these institutional opportunists seeking fraudulent personal gain at the expense of Debtor's fundamental property rights, there is no contest in which direction the scales of justice and equity would tip.

SOME ESTABLISHED EXAMPLES OF HOW HOMEOWNERS WERE VICTIMIZED DURING HOME LOAN AND REFINANCE FRENZY DURING THE DREADFUL YEARS

For some reason, it continues to be extremely difficult to get some Courts to see that the borrowers during the Securitization Years could be victims of the mortgage loan

---

[20] Or entities acting in concert with them, such as subsidiaries, shell companies, Special Purpose Vehicles, and other conspirators. The MBS Pools are not real "Trusts" through that is what they are called by the creators thereof. They are "bond administrations" that have been handled far different from the way they led the Investors to believe they would be during marketing. The only thing that can be" trusted" is that those that acted in concert to create and administer the Pools will continue to try to get away with everything they can. The BH purchased "mortgage bonds" and by definition, bonds establish a debt relationship, not a trust relationship.

31

obligations they entered into.  The prevailing attitude seems to be that there is noone else to blame if they cannot make their payments, because they voluntarily signed the note and the loan was funded.  They sometimes seem to think that if someone is not making their mortgage payments it is due to a lack of personal responsibility or some other sort of moral defect.  This is often subconscious.  If one wants to understand how borrowers have been harmed in loans during the Dreadful Years, when they voluntarily borrowed money and did not pay it back, these harms include:

A)   The fact that Borrowers paid as much as double what the homes were actually worth, due to a real estate market that was artificially inflated because of the wealth of investment dollars looking for a home following the bursting of the dot.com bubble, followed by what amounts to an economic depression for the working poor.  Borrowers can't afford the payments and they are losing their homes, and the unbelievable abundance of foreclosures shows the extent to which any defect in character they may have is common to large numbers of persons.  Appraisal values were often over-inflated even above the artificially high values provided by the market and appraisers were advised they would not receive further business unless they cooperated.

B)   Borrowers were mislead as to what the monthly payments would be a few years into the loans.

C)   In more extreme cases, Borrowers were often offered teaser rates that they qualified for, but which greatly increased within a very short period of time.

D)   There was so much investment money looking for someone to borrow it that could sign a note during this time, that loans were pushed at people with persuasive and high pressure tactics;

E)   Borrowers were advised that they could afford much more home then they really could.  It appears hard to resist a home that is much nicer than one thought they could afford, when someone that appears to be a reputable professional assures them they can afford.  Optimism and wishful thinking overpower reason.

F)   Loan brokers were pushed to offer loans that were on worse terms than the borrower could qualify for.  Sometimes they received higher commissions, often in secret, for getting people to take out loans on terms that were less beneficial then a loan that Borrowers would have qualified for.  And sometimes the only loan products that loan brokers had available to them were those containing unfavorable terms.

G)   Borrowers were advised that they did not have to worry about the payments being unaffordable in the future, because they would be definitely be able to

32

refinance again at that point, because the market was so solid.

H)   Underwriters were pushed by supervisors to pass through bad loans, many of which were obviously doomed to fail from the start.

I)   Last but not least, due to the widespread and multifaceted fraud and conversion that occurred as part of the GSMFCS, the ramifications, consequences and complexities have led to a situation where the ordinary person is legally entitled to their home, but the MBN is attempting to steal it from them. The borrowers did not dream up nor in anyway cause the GSMFCS, the MWSP and other members of the MBN did and in return they were given billions and billions of taxpayer dollars. If for once the ordinary person is to get something out of the deal, to finally get a larger slice of the pie, it is good. The ordinary person never wins anything substantial, but this time they do.

Besides the billions and billions of dollars that were taken by fraud and conversion by the WSIBFs and the other members of the MBN, it has thrown the economy into a depression for many people in the middle and bottom income levels. The reason Debtor stopped making their mortgage payments to begin with, which is likely the reason they sought bankruptcy protection in the first place, was because they could no longer afford them. If much time passes without the Stay lifting it is not because Debtors are abusing the legal process, it is because these Claimants cannot prove themselves to be the Real Party in Interest. The reason Claimants have not had the stay lifted is because they cannot prove they are the RPI. And the reason they cannot prove it is because they are not.

WHAT THE PROBLEM IS, HOW BAD IT IS AND WHAT CAUSED IT

The undersigned Attorney and many experts and other investigators have discovered to their satisfaction the following facts (and as a mental exercise, one might want to ask, "Why does this happen to be the case?") 1) Almost no Note that was securitized can be enforced, because none can prove they have standing and RPI status, if the law is properly applied and evidence is not fabricated. 2) The reason for #1 is

33

because the Wall Street Investment Bank and its masterminds, that are behind and continue to manage in actuality, almost all MBS Trusts, intentionally made certain that no person or entity was responsible for nor performed the obligations that are within the PSA's and in federal REMIC law. All that had to be done was to comply with the terms of PSA that are clearly spelled out, and that written as such to match REMIC law. But they never were. When something like this is never done that would have been so easy, the only rational explanation is that it was intentional. 3) The Wall Street Investment Bank and its masterminds intentionally made certain that nearly every MBS Trust Pool created during the relevant time frame would surely "fail," as the term is defined by "trigger events" in Swap and other agreements, by intentionally selling to borrowers and including enough toxic subprime loans, that were doomed to fail from the start, in each Pool that these failures would be enough to cause the Pool to "fail" as defined, without doubt. This also had to be intentional because it was found in nearly every Pool to be the case, and an Underwriter would have had to have lost her or his mind to pass these loans through. This could happen once or twice, but when it happens in huge numbers in nearly every Pool, the only rational explanation that can be drawn is that it was intentional.

A key point to keep in mind is that it was pivotal to the underlying scheme, created by the WSIBF, that enough subprime loans doomed to fail from the start had to be included in each and every MBS Trust Pool that they would cause the entire Pool to also be doomed to fail from the start. It follows that it was predictable that they would find people that they could scam into taking out these toxic loans. Accordingly, it seems that it must be part of human nature that people will borrow money to purchase more home then they can afford

34

if there is someone that seems to be an established successful person willing to arrange

for the loan that tells them they can afford it. The point is that if the WSIBF had to rely upon

finding a large number of people that would enter into doomed notes then it seems wrong

to judge these borrowers harshly. If the WSIB could predict such loans would be made,

then taking them out seems almost normal or natural, especially since many of them did

not really know what they were getting into.

Respectfully submitted,
/s/ Ronald Ryan
Ronald Ryan, Debtor's Counsel

### CERTIFICATE OF SERVICE

    I certify that a true copy of the forgoing was emailed to: Chapter 13 Trustee; Attorneys for AURORA LOAN SERVICES, through Jessica Kenney, McCarthy, Holthus & Levine; and Debtor on June 7, 2010.

/s/ Ronald Ryan
Ronald Ryan

Case 4:09-bk-09703-EWH    Doc 65    Filed 06/16/10    Entered 06/16/10 21:57:01    Desc
Main Document    Page 35 of 35