# APPENDIX TO
# NEIL F GARFIELD DECLARATION

**From Prospectus**

**QUALIFICATIONS OF ORIGINATORS AND MORTGAGE LOAN SELLERS**
Each originator will be required to satisfy the qualifications set
forth in this paragraph. Each originator must be an institution experienced in
originating conventional mortgage loans in ***accordance with customary and
reasonable practices and the mortgage loan seller's or the depositor's
guidelines***, and must maintain satisfactory facilities to originate those loans.
Each originator must be a HUD-approved mortgagee or an institution the deposit
accounts in which are insured by the Bank Insurance Fund or Savings Association
Insurance Fund of the FDIC. In addition, with respect to FHA loans or VA loans,
each originator must be approved to originate the mortgage loans by the FHA or
VA, as applicable. Each originator and mortgage loan seller must also satisfy
criteria as to financial stability evaluated on a case by case basis by the
depositor.

LENDING ACTIVITIES AND LOAN SALES. Ameriquest Mortgage Company
currently originates real estate loans through its network of retail branches
and purchases retail and wholesale sub-prime mortgage loans from its four
affiliates, Argent Mortgage Company, LLC (wholesale), Town & Country Credit
Corp. (retail), Olympus Mortgage Company (wholesale) and Bedford Home Loans,
Inc. (retail Alt-A). Ameriquest also participates in secondary market activities
by originating and selling mortgage loans while continuing to service the
majority of the loans sold. In other cases Ameriquest's whole loan sale
agreements provide for the transfer of servicing rights.
Ameriquest's primary lending activity is funding loans to enable
mortgagors to purchase or refinance residential real property, which loans are
secured by first or second liens on the related real property. Ameriquest's
single-family real estate loans are predominantly *"conventional"* mortgage loans,
meaning that they are not insured by the Federal Housing Administration or
partially guaranteed by the U.S. Department of Veterans Affairs.

Depositor...................... **Argent Securities Inc**. (the *"Depositor"*), a **direct wholly-owned
subsidiary of Argent Mortgage Company, LLC and an affiliate of the Originators, the
Seller and the Master Servicer.** The Depositor will deposit the mortgage loans into the trust.
See *"The Depositor"* in the prospectus.
PMI Insurer................... Radian Guaranty Inc., a Pennsylvania corporation. Certain of the
mortgage loans are covered by primary mortgage insurance provided by the PMI Insurer, ***which
may provide limited protection to the trust in
the event such mortgage loans default***. See *"Description of the Certificates--The PMI Policy"* in
this prospectus supplement.

24

will represent senior or mezzanine interests in the trust and will receive distributions from the assets of the trust;
o will receive monthly distributions commencing in June 2004; and
o will have credit enhancement in the form of excess interest,
subordination, overcollateralization and a primary mortgage insurance policy.

NIMS Insurer.................. One or more insurance companies (together, the *"NIMS Insurer"*) ***may issue a financial guaranty insurance policy covering certain payments to be made on net interest margin securities to be issued by a separate trust and secured by, among other things, all or a portion of the Class CE, the Class P and/or the Residual Certificates.***

**Deutsche Bank National Trust Company** (the *"Trustee"*), a national banking association, will be the Trustee of the trust, will perform administrative functions with respect to the certificates and will act as the custodian, initial paying agent and certificate registrar. See *"Pooling and Servicing Agreement--The Trustee"*

**THE TRUST**
The Depositor will establish a trust relating to the Series 2004-W8 certificates pursuant to a pooling and servicing agreement dated as of May 1, 2004 (the *"Pooling and Servicing Agreement"*) among the Depositor, the Master Servicer and
the Trustee. The trust will issue twenty classes of certificates. **The certificates will represent in the aggregate the entire beneficial ownership interest in the trust**. **Distributions of interest and/or principal on the Class A
and Mezzanine Certificates will be made only from payments received in connection with the mortgage loans held in the trust and the Net WAC Rate *Carryover Reserve Account*.**

On the ***Closing Date***, the ***trust will acquire a pool of mortgage loans consisting of fixed-rate and adjustable- rate mortgage loans (the "Mortgage Loans"). The Mortgage Loans will have been originated by the Seller's wholesale lending affiliates, Argent Mortgage Company, LLC and Olympus Mortgage Company.***

References to percentages of the mortgage loans in this prospectus supplement are based on the Collateral Selection Date Mortgage Loans with the aggregate scheduled principal balance of such Mortgage Loans as specified in the amortization schedule at the ***Cut-off Date after application of all amounts allocable to unscheduled payments of principal received prior to the Collateral Selection Date***.

Prior to the issuance of the certificates, ***up to 10% of the Collateral Selection Date Mortgage Loans will be removed from the mortgage pool*** as a result of incomplete documentation or otherwise and ***any Collateral Selection Date Mortgage Loans that prepay or default will be removed***. *Other mortgage loans will be included in the mortgage pool prior to the issuance* of the *certificates*. Additional mortgage loans, that will have an ***aggregate principal balance as of the Cut-off Date*** of approximately $34,999,995, will also be included in the mortgage pool prior to the issuance of the certificates. The removal and inclusion of such other mortgage loans and additional mortgage loans will not materially alter the characteristics of the Mortgage Loans as described in this prospectus supplement, although the

25

range of mortgage rates and maturities and certain other characteristics of the Mortgage Loans will vary.

## ASSIGNMENT OF TRUST FUND ASSETS; REVIEW OF FILES BY TRUSTEE

At the time of issuance of any series of securities, the depositor will cause the pool of mortgage assets to be included in the related trust fund to be assigned to the trustee, together with all principal and interest received by or on behalf of the depositor on or with respect to the mortgage assets after the related cut-off date, other than principal and interest due on or before the cut-off date and other than any retained interest. The trustee will, concurrently with the assignment of mortgage assets, deliver the securities to the depositor in exchange for the trust fund assets. Each mortgage asset will be identified in a schedule appearing as an exhibit to the related agreement. The schedule of mortgage assets will include detailed information as to the mortgage asset included in the related trust fund, including the outstanding principal balance of each mortgage asset after application of payments due on the cut-off date, information regarding the interest rate on the mortgage asset, the interest rate net of the sum of the rates at which the servicing fees and the retained interest, if any, are calculated, the retained interest, if any, the current scheduled monthly payment of principal and interest, the maturity of the mortgage note, the value of the mortgaged property, the loan-to-value ratio at origination and other information with respect to the mortgage assets.
If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.
The depositor will, with respect to each mortgage asset, deliver or cause to be delivered to the trustee, or to the custodian hereinafter referred to:
o With respect to each mortgage loan, (1) the mortgage note endorsed, without recourse, to the order of the trustee or in blank, (2) the original Mortgage with evidence of recording indicated thereon and an assignment of the Mortgage to the trustee or in blank, in recordable form. If, however, a mortgage loan has not yet been returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the Mortgage together with its certificate that the original of the Mortgage was delivered to the recording office.
-26-

*424B5 152nd Page of 272* TOC 1st Previous Next Bottom Just 152nd

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Bac... Page 183 of 305

26

http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009
The depositor will promptly cause the assignment of each
related mortgage loan to be recorded in the appropriate public
office for real property records, except for Mortgages held
under the MERS(R) System and except in the State of California
or in other states where, in the opinion of counsel acceptable
to the trustee, recording of the assignment is not required to
protect the trustee's interest in the mortgage loan against
the claim of any subsequent transferee or any successor to or
creditor of the depositor, the master servicer, the relevant
mortgage loan seller or any other prior holder of the mortgage
loan. If the depositor uses the MERS(R) System, it will
deliver evidence that the Mortgage is held for the trustee
through the MERS(R) System instead of an assignment of the
Mortgage in recordable form.

The master servicer will deposit or cause to be deposited in the
collection account for each trust fund including mortgage loans, the following
payments and collections received, or advances made, by the master servicer or
on its behalf subsequent to the cut-off date, other than payments due on or
before the cut-off date and exclusive of any retained interest, unless otherwise
specified in the related prospectus supplement:
(1) all payments on account of principal, including principal
prepayments, on the mortgage assets;
(2) all payments on account of interest on the mortgage assets,
net of any portion retained by the master servicer or by a
sub-servicer as its servicing compensation and net of any
retained interest;
-30-

services for its participants, some of which directly or indirectly own
DTC. In accordance with its normal procedures, DTC is expected to record the
positions held by each DTC participant in the book- entry certificates, whether
held for its own account or as a nominee for another person. In general,
beneficial ownership of book-entry certificates will be subject to the DTC
rules, as in effect from time to time.
Clearstream, 67 Bd Grande-Duchesse Charlotte, L-1331 Luxembourg, was
incorporated in 1970 as a limited company under Luxembourg law. Clearstream is
owned by banks, securities dealers and financial institutions, and currently has
about 100 shareholders, including U.S. financial institutions or their
subsidiaries. No single entity may own more than five percent of Clearstream's
stock.
Clearstream is registered as a bank in Luxembourg, and therefore is
subject to regulation by the Institute Monetaire Luxembourgeois or *"IML"*, the
Luxembourg Monetary Authority, which supervises Luxembourg banks.
Clearstream holds securities for its customers, which are referred to

in this prospectus supplements as Clearstream participants, and facilitates the clearance and settlement of securities transactions by electronic book-entry transfers between their accounts. Clearstream provides various services, including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream also deals with domestic securities markets in several countries through established depository and custodial relationships. Clearstream has established an electronic bridge with Euroclear Bank SA/NV as the Euroclear operator in Brussels to facilitate settlement of trades between systems. Clearstream currently accepts over 70,000 securities issues on its books. Clearstream's customers are world-wide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Clearstream's United States customers are limited to securities brokers and dealers and banks. Currently, Clearstream has approximately 3,000 customers located in over 60 countries, including all major European countries, Canada, and the United States. Indirect access to Clearstream is available to other institutions which clear through or maintain a custodial relationship with an account holder of Clearstream.

The Euroclear system was created in 1968 to hold securities for its participants which are referred to in this prospectus supplement as Euroclear participants and to clear and settle transactions between Euroclear participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in any of 29 currencies, including United States dollars. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries similar to the arrangements for cross-market transfers with DTC

-36-

***424B5 162nd Page of 272*** TOC 1st Previous Next Bottom Just 162nd

described above. Euroclear is operated by Euroclear Bank SA/NV, which is referred to in this prospectus supplement as the Euroclear operator, under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation, or simply, the Cooperative. All operations are conducted by the Euroclear operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear participants. Euroclear participants include banks, central banks, securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear participant, either directly or indirectly.

***424B5 156th Page of 272*** TOC 1st Previous Next Bottom Just 156th

(3) all proceeds of the hazard insurance policies and any special hazard insurance policy, other than amounts to be not applied to the restoration or repair of the property or released to the mortgagor in accordance with the normal servicing procedures of the master servicer or the related sub-servicer, subject to the terms and conditions of the related Mortgage and mortgage note, any primary mortgage insurance policy, any FHA insurance policy, any VA guarantee, any bankruptcy bond and any mortgage pool insurance policy and all other amounts received and retained in connection with the liquidation of defaulted mortgage loans, by foreclosure or otherwise, together with the net proceeds on a monthly basis with respect to any mortgaged properties acquired for the benefit of securityholders by foreclosure or by deed in lieu of foreclosure or otherwise;

(4) any amounts required to be paid under any letter of credit, as described below under *"Description of Credit Support--Letter of Credit"*;

(5) any advances made as described below under *"Advances by the Master Servicer in respect of Delinquencies on the Trust Funds Assets"*;

(6) if applicable, all amounts required to be transferred to the collection account from a reserve fund, as described below under *"Description of Credit Support--Reserve Funds"*;

(7) any buydown funds, and, if applicable, investment earnings thereon, required to be deposited in the collection account as described in the first paragraph below;

(8) all proceeds of any mortgage loan or property in respect of the mortgage asset purchased by the master servicer, the depositor, any sub-servicer or any mortgage loan seller as described under *"The Depositor's Mortgage Loan Purchase Program-Representations by or on behalf of Mortgage Loan Sellers; Remedies for Breach of Representations"* or *"--Assignment of Trust Fund Assets; Review of Files by Trustee"* above, exclusive of the retained interest, if any, in respect of the mortgage asset;

(9) all proceeds of any mortgage loan repurchased as described under *"--Termination"* below;

(10) all payments required to be deposited in the collection account with respect to any deductible clause in any blanket insurance policy described under *"Description of Primary Insurance Policies--Primary Hazard Insurance Policies"*; and

(11) any amount required to be deposited by the master servicer in connection with net losses realized on investments for the benefit of the master servicer of funds held in the collection

account.

## CREDIT ENHANCEMENT

The credit enhancement provided for the benefit of the holders of the Class A and Mezzanine Certificates consists of excess interest, subordination, overcollateralization and a primary mortgage insurance policy, each as described below and under *"Description of the Certificates--Credit Enhancement"* and *"--Overcollateralization Provisions"* in this prospectus supplement.

EXCESS INTEREST. The Mortgage Loans bear interest each month in an amount that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the Class A and Mezzanine Certificates and to pay certain fees and expenses of the trust. Any excess interest from the Mortgage Loans each month will be available to absorb realized losses on the Mortgage Loans and to maintain or restore overcollateralization at required levels.

**SUBORDINATION.** The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates.

In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions in respect of the Mortgage Loans will be subordinated to the rights of holders of Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions in respect of the Mortgage Loans will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described under *"Description of the Certificates--Allocation of Losses; Subordination"* in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the Mortgage Loans.

**OVERCOLLATERALIZATION.** The aggregate principal balance of the Mortgage Loans as of the Cut-off Date is expected to exceed the aggregate certificate principal balance of the Class A, Mezzanine and Class P Certificates on the Closing Date by an amount equal to the initial amount of overcollateralization required to be provided by the mortgage pool under the Pooling and Servicing Agreement. The amount of overcollateralization will be available to absorb realized losses on the Mortgage Loans. See *"Description of the Certificates--Overcollateralization Provisions"* in this prospectus supplement.

ALLOCATION OF LOSSES. On any Distribution Date, realized losses on the Mortgage Loans will first reduce the excess interest and second the overcollateralization for such Distribution Date. If on any Distribution Date the amount of overcollateralization is reduced to zero, any additional realized losses will be allocated to reduce the Certificate Principal Balance of the Mezzanine Certificates in reverse numerical order until the Certificate Principal Balance of each such class has been reduced to zero. The Pooling and Servicing Agreement does not permit the allocation of realized losses on the Mortgage Loans to the

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 7 of 76

Class A Certificates or the Class P Certificates; however, investors in the Class A Certificates should realize that under certain loss scenarios there may not be enough principal and interest on the Mortgage Loans to distribute to the Class A Certificates all principal and interest amounts to which such certificates are then entitled. See *"Description of the Certificates --Allocation of Losses; Subordination"* in this prospectus supplement. Once realized losses are allocated to the Mezzanine Certificates, such realized losses will not be reinstated (except in the case of subsequent recoveries) nor will such certificates accrue interest on any allocated realized loss amounts. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of those certificates according to the priorities set forth under *"Description of the Certificates--Overcollateralization Provisions"* in this prospectus supplement. PRIMARY MORTGAGE INSURANCE. Approximately 63.09% of the Group I Collateral Selection Date Mortgage Loans and approximately 49.38% of the Group II Collateral Selection Date Mortgage Loans (in each case, by aggregate principal balance of the related loan groups as of the Cut-off Date), will be insured by an insurance policy issued by the PMI Insurer. However, such policy will provide only limited protection against losses on defaulted mortgage loans which are covered by the policy. See *"Description of the Certificates--The PMI Policy"* in this prospectus supplement.

***424B5 7th Page of 272*** TOC 1st Previous Next Bottom Just 7th

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Backe... Page 15 of 305
http://

## ADVANCES

The Master Servicer is required to advance delinquent payments of principal and interest on the Mortgage Loans, subject to the limitations described in this prospectus supplement. The Master Servicer is entitled to be reimbursed for such advances, and therefore such advances are not a form of credit enhancement. See *"Description of the Certificates --Advances"* in this prospectus supplement and *"Distributions on the Securities--Advances by Master Servicer in Respect of Delinquencies on the Trust Fund Assets"* in the prospectus.

**OPTIONAL TERMINATION**

At its option, the Master Servicer may purchase all of the Mortgage Loans, together with any properties in respect thereof acquired on behalf of the trust, and thereby effect termination and early retirement of the certificates, after the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) remaining in the trust has been reduced to an amount less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date. If the Master Servicer fails to exercise its option, the NIMS Insurer, if any, may exercise that option. See *"Pooling and Servicing Agreement--Termination"* in this prospectus supplement and *"Distributions on the Securities--Termination of the Trust Fund and Disposition of Trust Fund Assets"* in the prospectus. FEDERAL INCOME TAX CONSEQUENCES One or more elections will be made to treat designated portions of the trust

(exclusive of the Net WAC Rate Carryover Reserve Account and the Cap Contracts, as described more fully herein) as real estate mortgage investment conduits for federal income tax purposes. See *"Federal Income Tax Consequences--REMICs"* in the prospectus.

For further information regarding the federal income tax consequences of investing in the Class A and Mezzanine Certificates, see *"Federal Income Tax Consequences"* in this prospectus supplement and in the prospectus.

## LEGAL INVESTMENT

The Class A, Class M-1, Class M-2 and Class M-3 Certificates will constitute *"mortgage related securities"* for purposes of the Secondary Mortgage Market Enhancement Act of 1984 (*"SMMEA"*) for so long as they are rated not lower than the second highest rating category by one or more nationally recognized statistical rating organizations and, as such, will be legal investments for certain entities to the extent provided in SMMEA and applicable state laws. The Mezzanine Certificates (other than the Class M-1, Class M-2 and Class M-3 Certificates) will not constitute *"mortgage related securities"* for purposes of SMMEA. See *"Legal Investment"* in this prospectus supplement and in the prospectus.

As a result of such underwriting standards, the Mortgage Loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner. To the extent the credit enhancement features described in this prospectus supplement are insufficient to cover such losses, holders of the related Certificates may suffer a loss on their investment.

Appraisal Values: Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. See *"The Mortgage Pool--Underwriting Standards of the Originators"* in this prospectus supplement.

Mortgage Loan had a loan-to-value ratio exceeding 95% at origination. An overall decline in the residential real estate market, a rise in interest rates over a period of time and the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the appraised value at the time the Mortgage Loan was originated. If there is a reduction in value of the mortgaged property, the loan-to-value ratio may increase over what it was at the time of origination. Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan. There can be no assurance that the loan-to-value ratio of any Mortgage Loan determined at any time after origination is less than

or equal to its original loan-to-value ratio. **Additionally, the Originators' determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.** See *"The Mortgage Pool--General"* in this prospectus supplement.

None of the Collateral Selection Date Mortgage Loans are delinquent in their monthly payments as of the Collateral Selection Date. Investors should note, however, that certain of the Collateral Selection Date Mortgage Loans will have a first payment date occurring after the Collateral Selection Date and, therefore, such Collateral Selection Date Mortgage Loans could not have been delinquent in any monthly payment as of the Collateral Selection Date.

## FINANCIAL GUARANTEE INSURANCE

Financial guarantee insurance, if any, with respect to a series of securities will be provided by one or more insurance companies. The financial guarantee insurance will guarantee, with respect to one or more classes of securities of a series, timely distributions of interest only, timely distributions of interest and ultimate distribution of principal or timely distributions of interest and distributions of principal on the basis of a schedule of principal distributions set forth in or determined in the manner specified in the related prospectus supplement. If so specified in the related prospectus supplement, the financial guarantee insurance will also guarantee against any payment made to a securityholder that is subsequently recovered as a voidable preference payment under federal bankruptcy law. A copy of the financial guarantee insurance policy for a series, if any, will be filed with the Commission as an exhibit to a Current Report on Form 8-K to be filed with the Commission within 15 days of issuance of the securities of the related series.

## RESERVE FUND

If so provided in the related prospectus supplement, the depositor will deposit or cause to be deposited in an account, a reserve fund, any combination of cash, one or more irrevocable letters of credit or one or more permitted investments in specified amounts, or any other instrument satisfactory to the rating agency or agencies, which will be applied and maintained in the manner and under the conditions specified in the prospectus supplement. In the alternative or in addition to a deposit, the prospectus supplement for a Senior/Subordinate Series may provide that, a reserve fund be funded through application of all or a portion of amounts otherwise payable on the subordinate securities. Amounts in a reserve fund may be distributed to securityholders, or applied to reimburse the master servicer for outstanding advances, or may be used for other purposes, in the manner specified in the related prospectus supplement. A reserve fund will typically not be deemed to be part of the related trust fund.

Amounts deposited in any reserve fund for a series will be invested in permitted investments by, or at the direction of, the master servicer or any

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 10 of 76

other person named in the related prospectus supplement.

## OVERCOLLATERALIZATION

If so specified in the related prospectus supplement, interest collections on the mortgage assets may exceed interest payments on the securities for the related distribution date. The excess interest may be deposited into a reserve fund or applied as an additional payment of principal on one or more classes of the securities of the related series. If excess interest is applied as principal payments on the securities, the effect will be to reduce the principal balance of the securities relative to the outstanding balance of the mortgage loans, thereby creating overcollateralization and additional protection to the securityholders, as specified in the related prospectus supplement. If so provided in the related prospectus supplement, overcollateralization may also be provided on the date of issuance of the securities by the issuance of securities in an initial aggregate principal amount which is less than the aggregate principal amount of the mortgage assets in the related trust fund.

-64-

***424B5 190th Page of* 272** TOC 1st Previous Next Bottom Just 190th

## CROSS-SUPPORT FEATURES

If the trust fund assets for a series are divided into separate asset groups, the beneficial ownership of which is evidenced by a separate class or classes of a series, credit support may be provided by a cross-support feature which requires that distributions be made on senior securities evidencing the beneficial ownership of one asset group prior to distributions on subordinate securities evidencing the beneficial ownership interest in another asset group within the trust fund. The related prospectus supplement for a series which includes a cross-support feature will describe the manner and conditions for applying that cross-support feature. As to any trust fund that includes a cross-support feature, only assets of the trust fund will be used to provide cross-support, and cross- support will be provided only to securities issued by the trust fund. A trust fund will not provide a cross-support feature that benefits securities issued by any other trust fund, and a trust fund will not receive cross-support from any other trust fund.

## OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES SWAPS AND YIELD SUPPLEMENT AGREEMENTS

The trustee on behalf of a trust fund may enter into interest rate swaps and related caps, floors and collars to minimize the risk of securityholders from adverse changes in interest rates, which are collectively referred to as swaps, and other yield supplement agreements or similar yield maintenance arrangements that do not involve swap agreements or other notional principal contracts, which are collectively referred to as yield supplement agreements.

An interest rate swap is an agreement between two parties to exchange a stream of interest payments on an agreed hypothetical or *"notional"* principal

34

amount. No principal amount is exchanged between the counterparties to an interest rate swap. In the typical swap, one party agrees to pay a fixed rate on a notional principal amount, while the counterparty pays a floating rate based on one or more reference interest rates including the London Interbank Offered Rate, or LIBOR, a specified bank's prime rate or U.S. Treasury Bill rates. Interest rate swaps also permit counterparties to exchange a floating rate obligation based upon one reference interest rate, such as LIBOR, for a floating rate obligation based upon another referenced interest rate, such as U.S. Treasury Bill rates.

Yield supplement agreements may be entered into to supplement the interest rate or other rates on one or more classes of the securities of any series. Additionally, agreements relating to other types of derivative products that are designed to provide credit enhancement to the related series may be entered into by a trustee and one or more counterparties. The terms of any derivative product agreement and any counterparties will be described in the accompanying prospectus supplement.

There can be no assurance that the trustee will be able to enter into or offset swaps or enter into yield supplement agreements or derivative product agreements at any specific time or at prices or on other terms that are advantageous. In addition, although the terms of the swaps and yield supplement agreements may provide for termination under various circumstances, there can be no assurance that the trustee will be able to terminate a swap or yield supplement agreement when it would be economically advantageous to the trust fund to do so.

## PURCHASE OBLIGATIONS

Some types of trust assets and some classes of securities of any series, as specified in the accompanying prospectus supplement, may be subject to a purchase obligation that would become applicable on one or more specified dates, or upon the occurrence of one or more specified events, or on demand made

-65-

*424B5 191st Page of 272* TOC 1st Previous Next Bottom Just 191st

by or on behalf of the applicable securityholders. A purchase obligation may be in the form of a conditional or unconditional purchase commitment, liquidity facility, remarketing agreement, maturity guaranty, put option or demand feature. The terms and conditions of each purchase obligation, including the purchase price, timing and payment procedure, will be described in the accompanying prospectus supplement. A purchase obligation relating to trust assets may apply to those trust assets or to the related securities. Each purchase obligation may be a secured or unsecured obligation of the provider thereof, which may include a bank or other financial institution or an insurance company. Each purchase obligation will be evidenced by an instrument delivered to the trustee for the benefit of the applicable securityholders of the related series. As specified in the accompanying prospectus supplement, each purchase obligation relating to trust assets will be payable solely to the trustee for

35

the benefit of the securityholders of the related series. Other purchase obligations may be payable to the trustee or directly to the holders of the securities to which that obligation relate.

## DESCRIPTION OF PRIMARY INSURANCE POLICIES

Each mortgage loan will be covered by a primary hazard insurance policy and, if so specified in the prospectus supplement, a primary mortgage insurance policy.

## PRIMARY MORTGAGE INSURANCE POLICIES

Although the terms and conditions of primary mortgage insurance policies differ, each primary mortgage insurance policy will generally cover losses up to an amount equal to the excess of the unpaid principal amount of a defaulted mortgage loan, plus accrued and unpaid interest thereon and approved expenses, over a specified percentage of the value of the related mortgaged property.

As conditions to the filing or payment of a claim under a primary mortgage insurance policy, the insured will typically be required, in the event of default by the borrower, to:

o advance or discharge (1) hazard insurance premiums and (2) as necessary and approved in advance by the insurer, real estate taxes, property protection and preservation expenses and foreclosure and related costs,

o in the event of any physical loss or damage to the mortgaged property, have the mortgaged property restored to at least its condition at the effective date of the primary mortgage insurance policy, ordinary wear and tear excepted, and

o tender to the insurer good and merchantable title to, and possession of, the mortgaged property.

Multifamily loans, commercial loans and mixed-use loans will not be covered by primary mortgage insurance policies, regardless of the related loan-to-value ratio.

## PRIMARY HAZARD INSURANCE POLICIES

Each servicing agreement will require the master servicer to cause the borrower on each mortgage loan to maintain a primary hazard insurance policy providing for coverage of the standard form of fire insurance policy with extended coverage customary in the state in which the mortgaged property is located. The primary hazard coverage will be in general in an amount equal to the lesser of the principal balance owing on the mortgage loan and the amount necessary to fully compensate for any damage or loss to the improvements on the mortgaged property on a replacement cost basis, but in either case not less than the

-66-

***424B5 192nd Page of 272*** TOC 1st Previous Next Bottom Just 192nd

amount necessary to avoid the application of any co-insurance clause contained in the hazard insurance policy. The ability of the master servicer to assure

that hazard insurance proceeds are appropriately applied may be dependent upon its being named as an additional insured under any primary hazard insurance policy and under any flood insurance policy referred to in the paragraph below, and upon the borrower furnishing information to the master servicer in respect of a claim. All amounts collected by the master servicer under any primary hazard insurance policy, except for amounts to be applied to the restoration or repair of the mortgaged property or released to the borrower in accordance with the master servicer's normal servicing procedures, and subject to the terms and conditions of the related Mortgage and mortgage note, will be deposited in the collection account. The agreement will provide that the master servicer may satisfy its obligation to cause each borrower to maintain a hazard insurance policy by the master servicer's maintaining a blanket policy insuring against hazard losses on the mortgage loans. If the blanket policy contains a deductible clause, the master servicer will deposit in the collection account all sums that would have been deposited in the collection account but for that clause. The master servicer also is required to maintain a fidelity bond and errors and omissions policy with respect to its officers and employees that provides coverage against losses that may be sustained as a result of an officer's or employee's misappropriation of funds or errors and omissions in failing to maintain insurance, subject to limitations as to amount of coverage, deductible amounts, conditions, exclusions and exceptions.

In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of the improvements of the property by fire, lightning, explosion, smoke, windstorm and hail, and riot, strike and civil commotion, subject to the conditions and exclusions specified in each policy. Although the policies relating to the mortgage loans will be underwritten by different insurers under different state laws in accordance with different applicable state forms, and therefore will not contain identical terms and conditions, the basic terms thereof are dictated by respective state laws, and most hazard insurance policies typically do not cover any physical damage resulting from the following: war, revolution, governmental actions, floods and other water-related causes, earth movement, including earthquakes, landslides and mudflows, nuclear reactions, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, in some cases, vandalism. This list is merely indicative of the kinds of uninsured risks and is not intended to be all-inclusive. When a mortgaged property is located at origination in a federally designated flood area and flood insurance is available, each agreement will require the master servicer to cause the borrower to acquire and maintain flood insurance in an amount equal in general to the lesser of (1) the amount necessary to fully compensate for any damage or loss to the improvements which are part of the mortgaged property on a replacement cost basis and (2) the maximum amount of insurance available under the federal flood insurance program, whether or not the area is participating in the program.

The hazard insurance policies covering the mortgaged properties typically contain a co- insurance clause that in effect requires the insured at all times to carry insurance of a specified percentage, generally 80% to 90%, of

37

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 14 of 76

the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, the co-insurance clause generally provides that the insurer's liability in the event of partial loss does not exceed the lesser of (1) the replacement cost of the improvements less physical depreciation and (2) the proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of the improvements. The master servicer will not require that a hazard or flood insurance policy be maintained for any cooperative loan. Generally, the cooperative is responsible for maintenance of hazard insurance for the property owned by the cooperative, and the tenant-stockholders of that cooperative do not maintain individual hazard insurance policies. However, if a cooperative and the related borrower on a cooperative note do not maintain hazard insurance or do not maintain adequate coverage or any insurance proceeds are not applied to the restoration of the damaged property, damage to the related borrower's cooperative

-67-

***424B5 193rd Page of 272* TOC 1st Previous Next Bottom Just 193rd

apartment or the cooperative's building could significantly reduce the value of the collateral securing the cooperative note.

Since the amount of hazard insurance the master servicer will cause to be maintained on the improvements securing the mortgage loans declines as the principal balances owing thereon decrease, and since residential properties have historically appreciated in value over time, hazard insurance proceeds collected in connection with a partial loss may be insufficient to restore fully the damaged property. The terms of the mortgage loans provide that borrowers are required to present claims to insurers under hazard insurance policies maintained on the mortgaged properties. The master servicer, on behalf of the trustee and securityholders, is obligated to present or cause to be presented claims under any blanket insurance policy insuring against hazard losses on mortgaged properties. However, the ability of the master servicer to present or cause to be presented these claims is dependent upon the extent to which information in this regard is furnished to the master servicer by borrowers.

## FHA INSURANCE

The Federal Housing Administration is responsible for administering various federal programs, including mortgage insurance, authorized under The Housing Act and the United States Housing Act of 1937, as amended. If so provided in the related prospectus supplement, a number of the mortgage loans will be insured by the FHA.

There are two primary FHA insurance programs that are available for multifamily mortgage loans. Sections 221(d)(3) and (d)(4) of the Housing Act allow HUD to insure mortgage loans that are secured by newly constructed and substantially rehabilitated multifamily rental projects. Section 244 of the Housing Act provides for co-insurance of such mortgage loans made under Sections

38

221 (d)(3) and (d)(4) by HUD/FHA and a HUD-approved co-insurer. Generally the term of such a mortgage loan may be up to 40 years and the ratio of the loan amount to property replacement cost can be up to 90%.

Section 223(f) of the Housing Act allows HUD to insure mortgage loans made for the purchase or refinancing of existing apartment projects which are at least three years old. Section 244 also provides for co-insurance of mortgage loans made under Section 223(f). Under Section 223(f), the loan proceeds cannot be used for substantial rehabilitation work, but repairs may be made for up to, in general, the greater of 15% of the value of the project or a dollar amount per apartment unit established from time to time by HUD. In general the loan term may not exceed 35 years and a loan to value ratio of no more than 85% is required for the purchase of a project and 70% for the refinancing of a project. HUD has the option, in most cases, to pay insurance claims in cash or in debentures issued by HUD. Presently, claims are being paid in cash, and claims have not been paid in debentures since 1965. HUD debentures issued in satisfaction of FHA insurance claims bear interest at the applicable HUD debenture interest rate. The master servicer will be obligated to purchase any debenture issued in satisfaction of a defaulted FHA insured mortgage loan serviced by it for an amount equal to the principal amount of that debenture. The master servicer will be required to take steps as are reasonably necessary to keep FHA insurance in full force and effect.

Some of the mortgage loans contained in a trust fund may be Title I loans as described below and in the related prospectus supplement. The regulations, rules and procedures promulgated by the FHA under Title I contain the requirements under which lenders approved for participation in the Title I Program may obtain insurance against a portion of losses incurred with respect to eligible loans that have been originated

-68-

**424B5 194th Page of 272** TOC 1st Previous Next Bottom Just 194th

and serviced in accordance with FHA regulations, subject to the amount of insurance coverage available in such Title I lender's FHA reserve, as described below and in the related prospectus supplement. In general, an insurance claim against the FHA may be denied or surcharged if the Title I loan to which it relates does not strictly satisfy the requirements of the National Housing Act and FHA regulations but FHA regulations permit the Secretary of the Department of Housing and Urban Development, subject to statutory limitations, to waive a Title I Lender's noncompliance with FHA regulations if enforcement would impose an injustice on the lender.

Unless otherwise specified in the related prospectus supplement, the master servicer will either serve as or contract with the person specified in the prospectus supplement to serve as the administrator for FHA claims pursuant to an FHA claims administration agreement. The FHA claims administrator will be responsible for administering, processing and submitting FHA claims with respect to the Title I loans. The securityholders will be dependent on the FHA claims

39

administrator to (1) make claims on the Title I loans in accordance with FHA regulations and (2) remit all FHA insurance proceeds received from the FHA in accordance with the related agreement. The securityholders' rights relating to the receipt of payment from and the administration, processing and submission of FHA claims by any FHA claims administrator is limited and governed by the related agreement and the FHA claims administration agreement and these functions are obligations of the FHA claims administrator, but not the FHA. Under Title I, the FHA maintains an FHA insurance coverage reserve account for each Title I lender. The amount in each Title I lender's FHA reserve is a maximum of 10% of the amounts disbursed, advanced or expended by a Title I lender in originating or purchasing eligible loans registered with the FHA for Title I insurance, with certain adjustments permitted or required by FHA regulations. The balance of such FHA reserve is the maximum amount of insurance claims the FHA is required to pay to the related Title I lender. Mortgage loans to be insured under Title I will be registered for insurance by the FHA. Following either the origination or transfer of loans eligible under Title I, the Title I lender will submit such loans for FHA insurance coverage within its FHA reserve by delivering a transfer of note report or by an electronic submission to the FHA in the form prescribed under the FHA regulations. The increase in the FHA insurance coverage for such loans in the Title I lender's FHA reserve will occur on the date following the receipt and acknowledgment by the FHA of the transfer of note report for such loans. The insurance available to any trust fund will be subject to the availability, from time to time, of amounts in each Title I lender's FHA reserve, which will initially be limited to the amount specified in the related prospectus supplement.

If so provided in the related prospectus supplement the trustee or FHA claims administrator may accept an assignment of the FHA reserve for the related Title I loans, notify FHA of such assignment and request that the portion of the depositor's FHA reserves allocable to the Title I loans be transferred to the trustee or the FHA claims administrator on the closing date. Alternatively, in the absence of such provision, the FHA reserves may be retained by the depositor and, upon an insolvency and receivership of the depositor, the related trustee will notify FHA and request that the portion of the depositor's FHA reserves allocable to the Title I loans be transferred to the trustee or the FHA claims administrator. Although each trustee will request such a transfer of reserves, FHA is not obligated to comply with such a request, and may determine that it is not in FHA's interest to permit a transfer of reserves. In addition, FHA has not specified how insurance reserves would be allocated in a transfer, and there can be no assurance that any reserve amount, if transferred to the trustee or the FHA claims administrator, as the case may be, would not be substantially less than 10% of the outstanding principal amount of the related Title I loans. It is likely that the depositor, the trustee or the FHA claims administrator would be the lender of record on other Title I loans, so that any FHA reserves that are retained, or permitted to be transferred, would become commingled with FHA reserves available for other Title I loans. FHA also reserves the right to transfer reserves with *"earmarking"* (segregating reserves so that they will not

be commingled with the reserves of the transferee) if it is in FHA's interest to do so.

-69-

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Bac... Page 226 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009

Under Title I, the FHA will reduce the insurance coverage available in a Title I lender's FHA reserve with respect to loans insured under that Title I lender's contract of insurance by (1) the amount of FHA insurance claims approved for payment related to those loans and (2) the amount of reduction of the Title I lender's FHA reserve by reason of the sale, assignment or transfer of loans registered under the Title I lender's contract of insurance. The FHA insurance coverage also may be reduced for any FHA insurance claims previously disbursed to the Title I lender that are subsequently rejected by the FHA.

Unlike certain other government loan insurance programs, loans under Title I (other than loans in excess of $25,000) are not subject to prior review by the FHA. The FHA disburses insurance proceeds with respect to defaulted loans for which insurance claims have been filed by a Title I lender prior to any review of those loans. A Title I lender is required to repurchase a Title I loan from the FHA that is determined to be ineligible for insurance after insurance claim payments for such loan have been paid to the lender. Under the FHA regulations, if the Title I lender's obligation to repurchase the Title I loan is unsatisfied, the FHA is permitted to offset the unsatisfied obligation against future insurance claim payments owed by the FHA to such lender. FHA regulations permit the FHA to disallow an insurance claim with respect to any loan that does not qualify for insurance for a period of up to two years after the claim is made and to require the Title I lender that has submitted the insurance claim to repurchase the loan.

The proceeds of loans under the Title I Program may be used only for permitted purposes, including the alteration, repair or improvement of residential property, the purchase of a manufactured home or lot (or cooperative interest therein) on which to place the home or the purchase of both a manufactured home and the lot (or cooperative interest therein) on which the home is placed.

Subject to certain limitations described below, eligible Title I loans are generally insured by the FHA for 90% of an amount equal to the sum of

o the net unpaid principal amount and the uncollected interest earned to the date of default,

o interest on the unpaid loan obligation from the date of default to the date of the initial submission of the insurance claim, plus 15 calendar days (the total period not to exceed nine months) at a rate of 7% per annum,

o uncollected court costs,

o title examination costs,

o fees for required inspections by the lenders or its agents, up to $75, and

41

o origination fees up to a maximum of 5% of the loan amount.
Accordingly if sufficient insurance coverage is available in such FHA
reserve, then the Title I lender bears the risk of losses on a Title I loan for
which a claim for reimbursement is paid by the FHA of at least 10% of the unpaid
principal, uncollected interest earned to the date of default, interest from the
date of default to the date of the initial claim submission and certain
expenses.

In general, the FHA will insure home improvement contracts up to
$25,000 for a single family property, with a maximum term of 20 years. The FHA
will insure loans of up to $17,500 for manufactured homes which qualify as real
estate under applicable state law and loans of up to $12,000 per unit for a
$48,000 limit for four units for owner-occupied multifamily homes. If the loan
amount is $15,000 or more, the FHA requires a drive-by appraisal, the current
tax assessment value, or a full Uniform Residential

-70-

***424B5 196th Page of 272* TOC 1st Previous Next Bottom Just 196th

Appraisal Report dated within 12 months of the closing to verify the property's
value. The maximum loan amount on transactions requiring an appraisal is the
amount of equity in the property shown by the market value determination of the
property.

With respect to Title I loans, the FHA regulations do not require that
a borrower obtain title or fire and casualty insurance. However, if the related
mortgaged property is located in a flood hazard area, flood insurance in an
amount at least equal to the loan amount is required. In addition, the FHA
regulations do not require that the borrower obtain insurance against physical
damage arising from earth movement (including earthquakes, landslides and
mudflows). Accordingly, if a mortgaged property that secures a Title I loan
suffers any uninsured hazard or casualty losses, holders of the related series
of securities that are secured in whole or in part by such Title I loan may bear
the risk of loss to the extent that such losses are not recovered by foreclosure
on the defaulted loans or from any FHA insurance proceeds. Such loss may be
otherwise covered by amounts available from the credit enhancement provided for
the related series of securities, if specified in the related prospectus
supplement.

Following a default on a Title I loan insured by the FHA, the master
servicer may, subject to certain conditions and mandatory loss mitigation
procedures, either commence foreclosure proceedings against the improved
property securing the loan, if applicable, or submit a claim to FHA, but may
submit a claim to FHA after proceeding against the improved property only with
the prior approval of the Secretary of HUD. The availability of FHA Insurance
following a default on a Title I loan is subject to a number of conditions,
including strict compliance with FHA regulations in originating and servicing
the Title I loan. Failure to comply with FHA regulations may result in a denial
of or surcharge on the FHA insurance claim. Prior to declaring a Title I loan in

default and submitting a claim to FHA, the master servicer must take certain steps to attempt to cure the default, including personal contact with the borrower either by telephone or in a meeting and providing the borrower with 30 days' written notice prior to declaration of default. FHA may deny insurance coverage if the borrower's nonpayment is related to a valid objection to faulty contractor performance. In such event, the master servicer or other entity as specified in the related prospectus supplement will seek to obtain payment by or a judgment against the borrower, and may resubmit the claim to FHA following such a judgment.

**VA GUARANTEES**

The United States Department of Veterans Affairs is an Executive Branch Department of the United States, headed by the Secretary of Veterans Affairs. The VA currently administers a variety of federal assistance programs on behalf of eligible veterans and their dependents and beneficiaries. The VA administers a loan guaranty program under which the VA guarantees a portion of loans made to eligible veterans. If so provided in the prospectus supplement, a number of the mortgage loans will be guaranteed by the VA.

Under the VA loan guaranty program, a VA loan may be made to any eligible veteran by an approved private sector mortgage lender. The VA guarantees payment to the holder of that loan of a fixed percentage of the loan indebtedness, up to a maximum dollar amount, in the event of default by the veteran borrower. When a delinquency is reported to the VA and no realistic alternative to foreclosure is developed by the loan holder or through the VA's supplemental servicing of the loan, the VA determines, through an economic analysis, whether the VA will (a) authorize the holder to convey the property securing the VA loan to the Secretary of Veterans Affairs following termination or (b) pay the loan guaranty amount to the holder. The decision as to disposition of properties securing defaulted VA loans is made on a case-by-case basis using the procedures set forth in 38 U.S.C. Section 3732(c), as amended.

-71-

***424B5 197th Page of 272*** TOC 1st Previous Next Bottom Just 197th

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Bac... Page 228 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009

The master servicer will be required to take steps as are reasonably necessary to keep the VA guarantees in full force and effect.


**THERE WILL BE VARIATIONS IN THE MORTGAGE LOANS FROM THE CHARACTERISTICS**
**DESCRIBED IN THIS PROSPECTUS SUPPLEMENT**

The pool of mortgage loans used to derive the statistical information herein includes mortgage loans the characteristics of which will vary from the specific characteristics reflected in the final pool of Mortgage Loans, although the extent of such variance is not expected to be material. A detailed description of the Mortgage Loans actually delivered on the Closing Date will be available on the Closing Date and will be filed with the Securities and Exchange Commission by the Depositor on Form 8-K within 15 days after the Closing Date.

**LOANS**

Applicable state laws generally regulate interest rates and other
charges, require certain disclosure, and require licensing of the Originators.
In addition, other state laws, public policy and general principles of equity
relating to the protection of consumers, unfair and deceptive practices and debt
collection practices may apply to the origination, servicing and collection of
the Mortgage Loans.

The Mortgage Loans are also subject to federal laws, including:
o the Federal Truth-in-Lending Act and Regulation Z promulgated
thereunder, which require certain disclosures to the borrowers
regarding the terms of the Mortgage Loans;
o the Equal Credit Opportunity Act and Regulation B promulgated
thereunder, which prohibit discrimination on the basis of age, race,
color, sex, religion, marital status, national origin, receipt of
public assistance or the exercise of any right under the Consumer
Credit Protection Act, in the extension of credit;
o the Fair Credit Reporting Act, which regulates the use and reporting of
information related to the borrower's credit experience;
o the Depository Institutions Deregulation and Monetary Control Act of
1980, which preempts certain state usury laws; and
o the Alternative Mortgage Transaction Parity Act of 1982, which preempts
certain state lending laws which regulate alternative mortgage
transactions.

***Violations of certain provisions of these federal and state laws may
limit the ability of the Master Servicer to collect all or part of the principal
of or interest on the Mortgage Loans and in addition could subject the trust to
damages and administrative enforcement and could result in the mortgagors
rescinding such Mortgage Loans whether held by the trust*** <span style="color:red">***or subsequent holders
of the Mortgage Loans.***</span>
**The Seller will represent that as of the Closing Date, each Mortgage
Loan is in compliance with applicable federal and state laws and regulations. In
the event of a breach of such representation, the Seller will be obligated to
cure such breach or repurchase or replace the affected Mortgage Loan in the
manner described in the prospectus. If the Seller is unable or otherwise fails
to satisfy such obligations, the yield on the Class A and Mezzanine Certificates
may be materially and adversely affected.**

ALLOCATION TO SECURITYHOLDERS OF LOSSES ON THE TRUST FUND ASSETS.
With
respect to any defaulted mortgage loan that is finally liquidated, through
foreclosure sale or otherwise, the amount of the realized loss incurred in
connection with liquidation will equal the excess, if any, of the unpaid
principal balance of the liquidated loan immediately prior to liquidation, over
the aggregate amount of Liquidation Proceeds derived from liquidation remaining
after application of the proceeds to unpaid accrued interest on the liquidated

loan and to reimburse the master servicer or any sub- servicer for related unreimbursed servicing expenses. With respect to mortgage loans the principal balances of which have been reduced in connection with bankruptcy proceedings, the amount of that reduction also will be treated as a realized loss. As to any series of securities,

-40-

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Bac... Page 197 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009

other than a Senior/Subordinate Series, any realized loss not covered as described under *"Description of Credit Support"* will be allocated among all of the securities on a PRO RATA basis. As to any Senior/Subordinate Series, realizes losses will be allocated first to the most subordinate class of securities as described below under *"Description of Cred*

**CONFLICTS OF INTEREST BETWEEN THE MASTER SERVICER AND THE TRUST**
The Master Servicer will initially own all or a portion of the Class M-11, Class CE, Class P and Residual Certificates. The timing of Mortgage Loan foreclosures and sales of the related mortgaged properties, which will be under the control of the Master Servicer, may affect the weighted average lives and yields of the certificates. You should consider that the timing of such foreclosures or sales may not be in the best interests of all certificate holders and that no formal policies or guidelines have been established to resolve or minimize such a conflict of interest.

minimize such a conflict of interest.
**THE DIFFERENCE BETWEEN THE PASS-THROUGH RATES ON THE CLASS A AND MEZZANINE CERTIFICATES AND THE MORTGAGE RATES ON THE MORTGAGE LOANS MAY AFFECT THE YIELD ON SUCH CERTIFICATES**
Each class of Adjustable-Rate Certificates accrues interest at a pass-through rate based on a one-month LIBOR index plus a specified margin, but such pass-through rate is subject to a limit. The limit on the pass-through rate for each class of Group I Certificates is based on the weighted average of the mortgage rates of the Group I Mortgage Loans, net of certain fees and expenses of the trust. The limit on the pass-through rate for each class of Group II Certificates is based on the weighted average of the mortgage rates of the Group II Mortgage Loans, net of certain fees and expenses of the trust. The limit on the pass-through rate for each class of the Mezzanine Certificates is based on the weighted average (weighted on the basis of the results of subtracting from the aggregate principal balance of each loan group the current Certificate Principal Balance of the related Class A Certificates) of (i) the weighted average of the mortgage rates of the Group I Mortgage Loans, net of certain fees and expenses of the trust and (ii) the weighted average of the mortgage rates of the Group II Mortgage Loans, net of certain fees and expenses of the trust. The

adjustable-rate Mortgage Loans have mortgage rates that adjust based on a six-month LIBOR index, have periodic and lifetime limitations on adjustments to their mortgage rates, and have the first adjustment to their mortgage rates two or three years after the origination thereof. The fixed-rate Mortgage Loans have mortgage rates that do not adjust. As a result of the limits on the pass-through rates on the Adjustable-Rate Certificates, such certificates may accrue less interest than they would accrue if their pass-through rates were based solely on the one-month LIBOR index plus the specified margin.

A variety of factors could limit the pass-through rates and adversely affect the yields to maturity on the Adjustable-Rate Certificates. Some of these factors are described below.

o The pass-through rates for the Adjustable-Rate Certificates may adjust monthly while the mortgage rates on the adjustable-rate Mortgage Loans adjust less frequently and the mortgage rates on the fixed-rate Mortgage Loans do not adjust at all. Furthermore, all of the adjustable-rate Mortgage Loans will have the first adjustment to their mortgage rates two or three years after their origination. Consequently, the limits on the pass-through rates on the Adjustable-Rate Certificates may prevent any increases in the pass-through rate on one or more classes of such certificates for extended periods in a rising interest rate environment.

o If prepayments, defaults and liquidations occur more rapidly on the applicable Mortgage Loans with relatively higher mortgage rates than on the Mortgage Loans with relatively lower mortgage rates, the pass-through rate on one or more classes of Adjustable-Rate Certificates is more likely to be limited.

o The mortgage rates on the adjustable-rate Mortgage Loans may respond to different economic and market factors than does one-month LIBOR. It is possible that the mortgage rates on the adjustable-rate Mortgage Loans may decline while the pass-through rates on the Adjustable-Rate Certificates are stable or rising. It is also possible that the mortgage rates on the adjustable-rate Mortgage Loans and the pass-through rates on the Adjustable-Rate Certificates may both decline or increase during the same period, but that the pass-through rates on the Adjustable-Rate Certificates may decline more slowly or increase more rapidly.

*424B5 13th Page of 272* TOC 1st Previous Next Bottom Just 13th

If the pass-through rate on any class of Class A or Mezzanine Certificates is limited for any Distribution Date, the resulting basis risk shortfalls may be recovered by the holders of the certificates on the same Distribution Date or on future Distribution Dates, to the extent that on such Distribution Date or future Distribution Dates there are any available funds remaining after certain other distributions on the Class A Certificates and

46

Mezzanine Certificates and the payment of certain fees and expenses of the trust. The ratings on the Offered Certificates will not address the likelihood of any such recovery of basis risk shortfalls by holders of the Class A and Mezzanine Certificates.

Amounts used to pay such shortfalls on the Adjustable-Rate Certificates (other than the Class A-1 Certificates) will be supplemented by any amount received by the Trustee under the related Cap Contract, pursuant to which the **counterparty thereunder will be obligated to make payments to the Trustee when one-month LIBOR exceeds the percentage set forth in the related Cap Contract, subject to the maximum rate as set forth in such Cap Contract. However, the amount received under any Cap Contract may be insufficient to pay the holders of the applicable certificates the full amount of interest which they would have received absent the limitations of the rate cap.**


## POTENTIAL INADEQUACY OF CREDIT ENHANCEMENT FOR THE CLASS A AND MEZZANINE CERTIFICATES

The credit enhancement features described in this prospectus supplement are intended to increase the likelihood that holders of the Class A and Mezzanine Certificates will receive regular distributions of interest and principal. If delinquencies or defaults occur on the Mortgage Loans, neither the Master Servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are deemed non-recoverable. If substantial losses occur as a result of defaults and delinquent payments on the Mortgage Loans, you may suffer losses. Furthermore, although loan-level primary mortgage insurance coverage has been acquired on behalf of the trust from the PMI Insurer with respect to approximately 63.09% of the Group I Collateral Selection Date Mortgage Loans and approximately 49.38% of the Group II Collateral Selection Date Mortgage Loans, in each case, by aggregate principal balance of the related loan group as of the Cut-off Date, such coverage will provide only limited protection against losses on defaulted covered Mortgage Loans. Unlike a financial guaranty policy, coverage under the mortgage insurance policy is subject to certain limitations and exclusions including, for example, losses resulting from fraud and physical damage to the mortgaged property and to certain conditions precedent to payment, such as notices and reports. As a result, coverage may be denied or limited on covered Mortgage Loans. In addition, since the amount of coverage depends on the loan-to-value ratio at the time of origination of the covered Mortgage Loan, a decline in the value of a mortgaged property will not result in increased coverage, and the trust may still suffer a loss on a covered Mortgage Loan. The PMI Insurer also may affect the timing and conduct of foreclosure proceedings and other servicing decisions regarding defaulted mortgage loans covered by the policy.

**INTEREST GENERATED BY THE MORTGAGE LOANS MAY BE INSUFFICIENT TO MAINTAIN OR**

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 24 of 76

## RESTORE OVERCOLLATERALIZATION

The Mortgage Loans are expected to generate more interest than is
needed to distribute interest owed on the Class A and Mezzanine Certificates and
to pay certain fees and expenses of the trust. Any remaining interest generated
by the Mortgage Loans will first be used to absorb losses that occur on the

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Backe... Page 26 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009
Mortgage Loans and will then be used to

**S-15**
SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Backe... Page 27 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009
maintain or restore overcollateralization. We cannot assure you, however, that
enough excess interest will be generated to maintain or restore the required
level of overcollateralization. The factors described below will affect the
amount of excess interest that the Mortgage Loans will generate.
o Each time a Mortgage Loan is prepaid in full, liquidated, written off
or repurchased, excess interest may be reduced because the Mortgage
Loan will no longer be outstanding and generating interest or, in the
case of a partial prepayment, will be generating less interest.
o If the rates of delinquencies, defaults or losses on the Mortgage Loans
are higher than expected, excess interest will be reduced by the amount
necessary to compensate for any shortfalls in cash available to make
required distributions on the Class A and Mezzanine Certificates.
o The adjustable-rate Mortgage Loans have mortgage rates that adjust less
frequently than, and on the basis of an index that is different from,
the index used to determine the pass-through rates on the
Adjustable-Rate Certificates, and the fixed-rate Mortgage Loans have
mortgage rates that do not adjust. As a result, the pass- through rates
on the Adjustable-Rate Certificates may increase relative to mortgage
rates on the applicable Mortgage Loans, requiring that a greater
portion of the interest generated by those Mortgage Loans be applied to
cover interest on the Adjustable-Rate Certificates.

Further, because such certificates might not receive any principal if certain
delinquency levels described under *"Description of the Certificates--Principal
Distributions on the Class A and Mezzanine Certificates"* in this prospectus
supplement are exceeded, it is possible for such certificates to receive no
principal distributions on a particular distribution date even if no losses have
occurred on the mortgage pool.

## REIMBURSEMENT OF ADVANCES BY THE MASTER SERVICER COULD DELAY DISTRIBUTIONS ON
## THE CERTIFICATES

Under the Pooling and Servicing Agreement, the Master Servicer will
make cash advances to cover delinquent payments of principal and interest to the

48

extent it reasonably believes that the cash advances are recoverable from future payments on the Mortgage Loans. The Master Servicer may make such advances from amounts held for future distribution. In addition, the Master Servicer may withdraw from the collection account funds that were not included in available funds for the preceding Distribution Date to reimburse itself for advances previously made. Any such amounts withdrawn by the Master Servicer in reimbursement of advances previously made are generally required to be replaced by the Master Servicer on or before the next Distribution Date, subject to subsequent withdrawal. To the extent that the Master Servicer is unable to replace any amounts withdrawn in reimbursement of advances previously made, there could be a delay in distributions on the Class A and Mezzanine Certificates. Furthermore, the Master Servicer's right to reimburse itself for advances previously made from funds held for future distribution could lead to amounts required to be restored to the collection account by the Master Servicer that are higher, and potentially substantially higher, than one month's advance obligation.

**THE CERTIFICATES ARE OBLIGATIONS OF THE TRUST ONLY**
The certificates will not represent an ownership interest in or obligation of the Depositor, the Master Servicer, the Seller, the Originators, the Trustee or any of their respective affiliates. Neither the certificates nor the underlying Mortgage Loans will be guaranteed or insured by any governmental agency or instrumentality, or by the Depositor, the Master Servicer, the Seller, the Originators, the Trustee or any of their respective affiliates. Proceeds of the assets included in the trust will be the sole source of distributions on the Class A and Mezzanine Certificates, and there will be no recourse to the Depositor, the Master Servicer, the Seller, the Originators, the Trustee or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all distributions provided for under the Class A and Mezzanine Certificates.

**THE CAP CONTRACTS ARE SUBJECT TO COUNTERPARTY RISK**
The assets of the Trust include the Cap Contracts which will require the counterparty thereunder to make certain payments for the benefit of the holders of the Adjustable-Rate Certificates (other than the Class A-1 Certificates).


**RIGHTS OF THE NIMS INSURER MAY NEGATIVELY IMPACT THE CLASS A AND MEZZANINE CERTIFICATES**
Pursuant to the terms of the Pooling and Servicing Agreement, unless there exists a continuance of any failure by the NIMS Insurer, if any, to make a required payment under the policy insuring the net interest margin securities (such event, a *"NIMS Insurer Default"*), the NIMS Insurer, if any, will be entitled to exercise, among others, the following rights of the holders of the Class A and Mezzanine Certificates, without the consent of such holders, and the

Case 4:09-bk-09703-EWH   Doc 70-1   Filed 06/21/10   Entered 06/21/10 21:49:21   Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD   Page 26 of 76

holders of the Class A and Mezzanine Certificates may exercise such rights only with the prior written consent of the NIMS Insurer, if any: (i) the right to provide notices of Master Servicer defaults and the right to direct the Trustee to terminate the rights and obligations of the Master Servicer under the Pooling and Servicing Agreement in the event of a default by the Master Servicer; (ii) the right to remove the Trustee or any co-trustee or custodian pursuant to the Pooling and Servicing Agreement; and (iii) the right to direct the Trustee to make investigations and take actions pursuant to the Pooling and Servicing Agreement. In addition, unless a NIMS Insurer Default exists, such NIMS Insurer's consent will be required prior to, among other things, (i) the removal and replacement of the Master Servicer, any successor master servicer or the Trustee, (ii) the appointment or termination of any subservicer or co-trustee or (iii) any amendment to the Pooling and Servicing Agreement.

**INVESTORS IN THE CLASS A AND MEZZANINE CERTIFICATES SHOULD NOTE THAT:**

o any insurance policy issued by the NIMS Insurer, if any, will not cover, and will not benefit, in any manner whatsoever, the Class A Certificates or the Mezzanine Certificates;

o the rights to be granted to the NIMS Insurer, if any, are extensive;

o the interests of the NIMS Insurer, if any, may be inconsistent with, and adverse to, the interests of the holders of the Class A and Mezzanine Certificates and the NIMS Insurer, if any, has no obligation or duty to consider the interests of the Class A and Mezzanine Certificates in connection with the exercise or non-exercise of such NIMS Insurer's rights;

**ALLOCATION OF LOSSES; SUBORDINATION**

Any Realized Losses on the Mortgage Loans incurred during a Due Period will, first, reduce the Net Monthly Excess Cash Flow for the related Distribution Date and second, reduce the Overcollateralized Amount for such Distribution Date. If after all distributions are made by the Trustee on a Distribution Date, the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates exceeds the sum of the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period, the amount of such excess will be allocated to reduce the Certificate Principal Balances of the Mezzanine Certificates in reverse numerical order, beginning with the class of Mezzanine Certificates then outstanding with the highest numerical class designation, until the Certificate Principal Balance of each such class has been reduced to zero. The Pooling and Servicing Agreement does not permit the allocation of any Realized Losses to the Class A Certificates or the Class P Certificates. Investors in such classes of Certificates should note, however, that although Realized Losses cannot be allocated to such Certificates, under certain loss scenarios there may not be enough principal and interest on the Mortgage Loans to distribute to the holders of the Class A Certificates all principal and interest amounts to which they are then entitled.

50

*"Subsequent Recoveries"* are unanticipated amounts received on a liquidated Mortgage Loan that resulted in a Realized Loss in a prior month. If Subsequent Recoveries are received, they will be included as part of the Principal Remittance Amount for the following Distribution Date and distributed in accordance with the priorities described in this prospectus supplement. In addition, after giving effect to all distributions on a Distribution Date, if any Allocated Realized Loss Amounts are outstanding, the Allocated Realized Loss Amount for the class of Mezzanine Certificates then outstanding with the highest distribution priority will be decreased by the amount of such Subsequent Recoveries until reduced to zero (with any remaining Subsequent Recoveries applied to reduce the Allocated Realized Loss Amount of the class with the next highest distribution priority), and the Certificate Principal Balance of such class or classes

**DEFINITIONS**

An *"Allocated Realized Loss Amount"* with respect to (**x**) any class of the Mezzanine Certificates and any Distribution Date will be an amount equal to the sum of any Realized Loss allocated to that class of Certificates on the Distribution Date as described above in *"--Allocation of Losses; Subordination"* and any Allocated Realized Loss Amount for that class remaining undistributed from the previous Distribution Date minus (y) the amount of the increase in the related Certificate Principal Balance due to the receipt of Subsequent Recoveries.

The *"Available Funds"* for any Distribution Date will be equal to the sum, net of amounts reimbursable or payable therefrom to the Master Servicer or the Trustee, of (i) the aggregate amount of scheduled monthly payments on the Mortgage Loans due on the related Due Date and received on or prior to the related Determination Date, after deduction of the Servicing Fee, the Trustee Fee and the PMI Insurer Fee, if applicable, for such Distribution Date, (ii) unscheduled payments in respect of the Mortgage Loans, including prepayments, insurance proceeds, liquidation proceeds, Subsequent Recoveries and proceeds from repurchases of and substitutions for the Mortgage Loans occurring during the related Prepayment Period, (iii) proceeds from the repurchase of the Mortgage Loans due to the optional termination of the Trust, (iv) all Advances with respect to the Mortgage Loans received for such Distribution Date and (v) any Compensating Interest paid by the Master Servicer. The holders of the Class P Certificates will be entitled to all prepayment charges received on the Mortgage Loans and such amounts will not be available for distribution to the Class A and Mezzanine Certificates.

**ADVANCES**

Subject to the following limitations, the Master Servicer will be obligated to advance or cause to be advanced on or before each Distribution Date from its own funds (or from funds in the distribution account that are not included in the Available Funds for such Distribution Date or a combination of

51

both) an amount equal to the aggregate of all payments of principal and interest (net of the Servicing Fee) that were due during the related Due Period on the Mortgage Loans and that were delinquent on the related Determination Date, plus certain amounts representing assumed payments not covered by any current net income on the Mortgaged Properties acquired by foreclosure or deed in lieu of foreclosure (any such advance, an *"Advance"* and together, the *"Advances"*). Advances are required to be made only to the extent they are deemed by the Master Servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds and liquidation proceeds. The purpose of making such Advances is to maintain a regular cash flow to the Certificateholders, rather than to guarantee or insure against losses. The Master Servicer will not be required, however, to make any Advances with respect to reductions in the amount of the monthly payments on the Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act. Subject to the recoverability standard above, the Master Servicer's obligation to make Advances as to any Mortgage Loan will continue until the Mortgage Loan is paid in full or until the recovery of all Liquidation Proceeds thereon.

All Advances will be reimbursable to the Master Servicer from late collections, insurance proceeds, condemnation proceeds and liquidation proceeds from the Mortgage Loan as to which such unreimbursed Advance was made.

## ASSIGNMENT OF THE MORTGAGE LOANS

The Depositor will deliver to the Trustee (or to a custodian on the Trustee's behalf) with respect to each Mortgage Loan (i) the mortgage note endorsed without recourse in blank to reflect the transfer of the Mortgage Loan, (ii) the original mortgage with evidence of recording indicated thereon and (iii) an assignment of the mortgage in recordable form endorsed in blank without recourse, reflecting the transfer of the Mortgage Loan. The Depositor will not cause to be recorded any Assignment which relates to a Mortgage Loan in any jurisdiction (except with respect to any mortgage loan located in the State of Maryland) unless such failure to record would result in a withdrawal or a downgrading by any Rating Agency of the rating on any class of Certificates; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded, or submitted for recording by the Seller, at the Seller's expense (or, if the Seller is unable to pay the cost of recording the assignments of mortgage, such expense will be paid by the Trustee, which expense will be reimbursed by the Trust) as set forth in the Pooling and Servicing Agreement. The Seller will make certain representations and warranties as of the Closing Date as to the accuracy in all material respects of certain information furnished to the Trustee with respect to each Mortgage Loan (e.g., the Principal Balance and the Mortgage Rate). In addition, the Seller will represent and warrant, among other things that at the time of transfer to the Depositor: (i) the Seller has transferred or assigned all of its right, title and interest in each Mortgage Loan and the related documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects

with applicable state and/or federal laws; (iii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iv) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies as part of the origination of, or as a condition to closing, such Mortgage Loan; (v) the Master Servicer for such Mortgage Loan has accurately and fully reported and will continue to accurately and fully report its mortgagor credit files to each of the credit repositories in a timely manner;

LENDING ACTIVITIES AND LOAN SALES. Ameriquest Mortgage Company currently originates real estate loans through its network of retail branches and purchases retail and wholesale sub-prime mortgage loans from its four affiliates, Argent Mortgage Company, LLC (wholesale), Town & Country Credit Corp. (retail), Olympus Mortgage Company (wholesale) and Bedford Home Loans, Inc. (retail Alt-A). Ameriquest also participates in secondary market activities by originating and selling mortgage loans while continuing to service the majority of the loans sold. In other cases Ameriquest's whole loan sale agreements provide for the transfer of servicing rights.
Ameriquest's primary lending activity is funding loans to enable mortgagors to purchase or refinance residential real property, which loans are secured by first or second liens on the related real property. Ameriquest's single-family real estate loans are predominantly *"conventional"* mortgage loans, meaning that they are not insured by the Federal Housing Administration or partially guaranteed by the U.S. Department of Veterans Affairs.

## TERMINATION

The circumstances under which the obligations created by the Pooling and Servicing Agreement will terminate in respect of the Certificates are described in *"Description of the Securities--Termination of the Trust Fund and Disposition of Trust Fund Assets"* in the prospectus. The Master Servicer, or if the Master Servicer fails to exercise such option, the NIMS Insurer, if any, will have the right to purchase all remaining Mortgage Loans and any properties acquired in respect thereof and thereby effect early retirement of the Certificates on any Distribution Date following the Due Period during which the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) remaining in the Trust at the time of purchase is reduced to an amount less than 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date. In the event the Master Servicer or the NIMS Insurer, if any, exercises such option, the purchase price payable in connection therewith generally will be equal to the fair market value of the Mortgage Loans and such properties, plus accrued interest for each Mortgage Loan at the related Mortgage Rate to but not including the first day of the month in which such repurchase price is distributed, together with any amounts due to the Master Servicer for servicing compensation at the Servicing Fee Rate and any unreimbursed Advances and servicing advances. However, this option may be exercised only if (i) the

53

fair market value of the Mortgage Loans and REO Properties is at least equal to the aggregate principal balance of the Mortgage Loans and the appraised value of

***424B5 74th Page of* 272** TOC 1st Previous Next Bottom Just 74th

the

**S-74**

REO Properties and (ii) the termination price is sufficient to pay all interest accrued on, as well as amounts necessary to retire the principal balance of, the notes guaranteed by the NIMS Insurer, if any, and any amounts owed to the NIMS Insurer, if any, at the time the option is exercised. Proceeds from such repurchase will be included in Available Funds and will be distributed to the holders of the Certificates in accordance with the Pooling and Servicing Agreement.

In the event the Master Servicer or the NIMS Insurer, if any, exercises such option, the portion of the purchase price allocable to the Class A and Mezzanine Certificates of each class will be, to the extent of available funds:

(i) 100% of the then outstanding Certificate Principal Balance of the Class A and Mezzanine Certificates, plus

(ii) one month's interest on the then outstanding Certificate Principal Balance thereof at the then applicable Pass-Through Rate for such class, plus

(iii) any previously accrued but undistributed interest thereon to which the holders of such Certificates are entitled are entitled, together with the amount of any Net WAC Rate Carryover Amounts (payable to and from the Net WAC Rate Carryover Reserve Account), plus

(iv) in the case of the Mezzanine Certificates, any previously undistributed Allocated Realized Loss Amount.

The holders of the Residual Certificates will pledge any amount received by such holders in a termination in excess of par to the holders of the Class CE Certificates. In no event will the Trust created by the Pooling and Servicing Agreement continue beyond the expiration of 21 years from the death of the survivor of the persons named in the Pooling and Servicing Agreement. See *"Description of the Securities--Termination of the Trust Fund and Disposition of Trust Fund Assets"* in the prospectus.

**SERVICING OF DELINQUENT MORTGAGE LOANS**

The Master Servicer will be required to act with respect to delinquent Mortgage Loans in accordance with procedures set forth in the Pooling and Servicing Agreement. These procedures, as followed with respect to any delinquent Mortgage Loan, may, among other things, result in (i) foreclosing on such Mortgage Loan, (ii) accepting the deed to the related mortgaged property in lieu of foreclosure, (iii) granting the borrower under such Mortgage Loan a modification or forbearance or (iv) accepting payment from the borrower under

54

such Mortgage Loan of an amount less than the Principal Balance of such Mortgage Loan in final satisfaction of such Mortgage Loan. HOWEVER, FOLLOWING THESE **PROCEDURES MAY NOT LEAD TO THE ALTERNATIVE THAT WOULD RESULT IN THE RECOVERY BY**
**THE TRUST OF THE HIGHEST NET PRESENT VALUE OF PROCEEDS ON SUCH MORTGAGE LOAN OR**
**OTHERWISE TO THE ALTERNATIVE THAT IS IN THE BEST INTERESTS OF THE CERTIFICATEHOLDERS.**
**OPTIONAL PURCHASE OF DELINQUENT MORTGAGE LOANS**
As to any Mortgage Loan which is delinquent in payment by 90 days or more, the NIMS Insurer, if any, may, at its option and in accordance with the terms of the Pooling and Servicing Agreement, purchase such Mortgage Loan from the Trust at a purchase price for such Mortgage Loan generally equal to par plus accrued interest. In addition, the Master Servicer will have the option to purchase from the Trust Mortgage Loans that are delinquent in payment 90 days or more at a purchase price for such Mortgage Loan generally equal to par plus accrued interest, under certain circumstances set forth in the Pooling and Servicing Agreement and, with respect to each such delinquent Mortgage Loan, during certain prescribed time periods relating to the length of time such Mortgage Loan has been delinquent, in each case as set forth in the Pooling and Servicing Agreement.

**FEDERAL INCOME TAX CONSEQUENCES**
One or more elections will be made to treat designated portions of the Trust (exclusive of the Net WAC Rate Carryover Reserve Account and the Cap Contracts) as a real estate mortgage investment conduit (a *"REMIC"*) for federal income tax purposes. Upon the issuance of the Class A and Mezzanine Certificates, Thacher Proffitt & Wood LLP, counsel to the Depositor, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the Pooling and Servicing Agreement, for federal income tax purposes, each REMIC elected by the Trust will qualify as a REMIC under Sections 860A through 860G of the Internal Revenue Code of 1986 (the *"Code"*).
**S-75**

*424B5 75th Page of 272* TOC 1st Previous Next Bottom Just 75th
For federal income tax purposes, (i) the Residual Certificates will consist of components, each of which will represent the sole class of *"residual interests"* in each REMIC elected by the Trust and (ii) the Class A and Mezzanine Certificates (exclusive of any right of the holder of the Class A and Mezzanine Certificates to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount), the Class CE Certificates and the Class P Certificates will represent the *"regular interests"* in, and generally will be treated as debt instruments of, a REMIC. See *"Federal Income Tax Consequences--REMICs"* in the prospectus.
For federal income tax reporting purposes, the Class M-9 Certificates, the Class M-10 Certificates and the Class M-11 Certificates will, the Class A

Certificates will not, and the remaining classes of Mezzanine Certificates may
be treated as having been issued with original issue discount. The prepayment
assumption that will be used in determining the rate of accrual of original
issue discount, premium and market discount, if any, for federal income tax
purposes will be based on the assumption that subsequent to the date of any
determination the Mortgage Loans will prepay at the Prepayment Assumption. No
representation is made that the Mortgage Loans will prepay at such rate or at
any other rate. See *"Federal Income Tax Consequences--REMICs"* in the prospectus.
The Internal Revenue Service (the *"IRS"*) has issued regulations (the
*"OID Regulations"*) under Sections 1271 to 1275 of the Code generally addressing
the treatment of debt instruments issued with original issue discount. See
*"Federal Income Tax Consequences--REMICs"* in the prospectus.
Each holder of a Class A or Mezzanine Certificate is deemed to own an
undivided beneficial ownership interest in a REMIC regular interest and the
right to receive payments from the Net WAC Rate Carryover Reserve Account in
respect of the Net WAC Rate Carryover Amount. The Net WAC Rate Carryover Reserve
Account is not an asset of any REMIC.
The treatment of amounts received by a holder of a Class A or Mezzanine
Certificate under such holder's right to receive the Net WAC Rate Carryover
Amount, will depend on the portion, if any, of such holder's purchase price
allocable thereto. Under the REMIC Regulations, each holder of a Class A or
Mezzanine Certificate must allocate its purchase price for the Class A or
Mezzanine Certificate among its undivided interest in the regular interest of
the related REMIC and its undivided interest in the right to receive payments
from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate
Carryover Amount in accordance with the relative fair market values of each
property right. The Trustee will, as required, treat payments made to the
holders of the Class A and Mezzanine Certificates with respect to the Net WAC
Rate Carryover Amount, as includible in income based on the regulations relating
to notional principal contracts (the *"Notional Principal Contract Regulations"*).
The OID Regulations provide that the Trust's allocation of the issue price is
binding on all holders unless the holder explicitly discloses on its tax return
that its allocation is different from the Trust's allocation. For tax reporting
purposes, the Trustee may, as required, treat the right to receive payments from
the Net WAC Rate Carryover Reserve Account in respect of Net WAC Rate Carryover
Amounts with respect to the Class A and Mezzanine Certificates as having more
than a DE MINIMIS value. Upon request, the Trustee will make available
information regarding such amounts as has been provided to it. Under the REMIC
Regulations, the Trustee is required to account for the REMIC regular interest,
the right to receive payments from the Net WAC Rate Carryover Reserve Account in
respect of the Net WAC Rate Carryover Amount as discrete property rights.
Holders of the Class A and Mezzanine Certificates are advised to consult their
own tax advisors regarding the allocation of issue price, timing, character and
source of income and deductions resulting from the ownership of such
Certificates. Treasury regulations have been promulgated under Section 1275 of
the Code generally providing for the integration of a *"qualifying debt*

56

*instrument"* with a hedge if the combined cash flows of the components are substantially equivalent to the cash flows on a variable rate debt instrument. However, such regulations specifically disallow integration of debt instruments subject to Section 1272(a)(6) of the Code. Therefore, holders of the Class A and Mezzanine Certificates will be unable to use the integration method provided for under such regulations with respect to those Certificates. If the Trustee's treatment of payments of the Net WAC Rate Carryover Amount is respected, ownership of the right to the Net WAC Rate Carryover Amount will entitle the owner to amortize the price paid for the right to the Net WAC Rate Carryover Amount under the Notional Principal Contract Regulations.

Upon the sale of a Class A or a Mezzanine Certificate the amount of the sale allocated to the selling certificateholder's right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount would be considered a *"termination payment"* under the Notional Principal Contract Regulations allocable to the related Class A Certificate or Mezzanine Certificate, as the case may be. A holder of a Class A or a Mezzanine Certificate will have gain or loss from such a termination of the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount equal to (i) any termination payment it

***424B5 76th Page of* 272 TOC 1st Previous Next Bottom Just 76th

received or is deemed to have received minus (ii) the unamortized portion of any amount paid

**S-76**

(or deemed paid) by the certificateholder upon entering into or acquiring its interest in the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount. Gain or loss realized upon the termination of the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount will generally be treated as capital gain or loss. Moreover, in the case of a bank or thrift institution, Code Section 582(c) would likely not apply to treat such gain or loss as ordinary.

It is possible that the right to receive payments in respect of the Net WAC Rate Carryover Amounts could be treated as a partnership among the holders of all of the Certificates, in which case holders of such Certificates potentially would be subject to different timing of income and foreign holders of such Certificates could be subject to withholding in respect of any related Net WAC Rate Carryover Amount. Holders of the Class A and Mezzanine Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of their Certificates.

With respect to the Class A and Mezzanine Certificates, this paragraph is relevant to such Certificates exclusive of the rights of the holders of such

Certificates to receive certain payments in respect of the related Net WAC Rate Carryover Amount. The Class A and Mezzanine Certificates will be treated as assets described in Section 7701(a)(19)(C) of the Code and *"real estate assets"* under Section 856(c)(4)(A) of the Code, generally in the same proportion that the assets in the Trust would be so treated. In addition, interest on the Class A and Mezzanine Certificates will be treated as *"interest on obligations secured by mortgages on real property"* under Section 856(c)(3)(B) of the Code, generally to the extent that the Class A and Mezzanine Certificates are treated as *"real estate assets"* under Section 856(c)(4)(A) of the Code. The Class A and Mezzanine Certificates will also be treated as *"qualified mortgages"* under Section 860G(a)(3) of the Code. See *"Federal Income Tax Consequences--REMICs"* in the prospectus.

Because the Net WAC Rate Carryover Amount is treated as separate rights of the Class A and Mezzanine Certificates not payable by any REMIC elected by the Trust, such rights will not be treated as qualifying assets for any certificateholder that is a mutual savings bank, domestic building and loan association, real estate investment trust, or REMIC. In addition, any amounts received from the Net WAC Rate Carryover Reserve Account will not be qualifying real estate income for real estate investment trusts or qualifying income for REMICs.

It is not anticipated that any REMIC elected by the Trust will engage in any transactions that would subject it to the prohibited transactions tax as defined in Section 860F(a)(2) of the Code, the contributions tax as defined in Section 860G(d) of the Code or the tax on net income from foreclosure property as defined in Section 860G(c) of the Code. However, in the event that any such tax is imposed on any REMIC elected by the Trust, such tax will be borne (i) by the Trustee, if the Trustee has breached its obligations with respect to REMIC compliance under the Pooling and Servicing Agreement, (ii) by the Master Servicer, if the Master Servicer has breached its obligations with respect to REMIC compliance under the Pooling and Servicing Agreement and (iii) **otherwise by the Trust, with a resulting reduction in amounts otherwise distributable to holders of the Class A and Mezzanine Certificates.** See *"Description of the Securities"* and *"Federal Income Tax Consequences REMICs"* in the prospectus. The responsibility for filing annual federal information returns and other reports will be borne by the Trustee. See *"Federal Income Tax Consequences--REMICs"* in the prospectus.

## DESCRIPTION OF THE TRUST FUNDS

The trust fund for each series will be held by the trustee for the benefit of the related securityholders. Each trust fund will consist of:
o a segregated pool of various types of first and junior lien mortgage loans, cooperative apartment loans, manufactured housing conditional sales contracts and installment loan agreements or home improvement installment sales contracts and installment loan agreements as are subject to the related agreement governing the trust fund;

58

o amounts on deposit in the distribution account, pre-funding
account, if applicable, or any other account maintained for
the benefit of the securityholders;
-7-

SEC Info - Argent Securities Inc - 424B5 - Argent Securities Inc Asset-Bac... Page 164 of 305
http://www.secinfo.com/dqTm6.1tp.htm 12/24/2009

o property acquired on behalf of securityholders by foreclosure,
deed in lieu of foreclosure or repossession and any revenues
received on the property;
o the rights of the depositor under any hazard insurance
policies, FHA insurance policies, VA guarantees and primary
mortgage insurance policies to be included in the trust fund,
each as described under *"Description of Primary Insurance
Policies"*;
o the rights of the depositor under the agreement or agreements
under which it acquired the mortgage loans to be included in
the trust fund;
o the rights of the trustee in any cash advance reserve fund or
surety bond to be included in the trust fund, each as
described under *"Advances by Master Servicer in Respect of
Delinquencies on the Trust Fund Assets"*; and
o any letter of credit, mortgage pool insurance policy, special
hazard insurance policy, bankruptcy bond, financial guarantee
insurance policy, reserve fund, currency or interest rate
exchange agreement or guarantee, each as described under
*"Description of Credit Support."*
To the extent specified in the related prospectus supplement, a portion
of the interest received on a mortgage loan may not be included in the trust for
that series. Instead, the retained interest will be retained by or payable to
the originator, servicer or seller (or a designee of one of the foregoing) of
the loan, free and clear of the interest of securityholders under the related
agreement.

**DESCRIPTION OF THE MORTGAGE ASSETS TO BE INCLUDED IN A TRUST
FUND**

Each mortgage asset will be originated by a person other than the
depositor.

**LOANS**

The agreement governing the trust fund may provide for the transfer by
the mortgage loan seller of additional mortgage assets to the related trust fund
after the date of initial issuance of the securities. In that case, the trust
fund will include a pre-funding account, into which all or a portion of the
proceeds of the sale of one or more classes of securities of the related series
will be deposited to be released as additional mortgage assets are transferred.
Additional mortgage assets will be required to conform to the requirements set

59

forth in the related agreement or other agreement providing for the transfer, and will be underwritten to the same standards as the mortgage assets initially included in the trust fund. A pre-funding account will be required to be maintained as an eligible account under the related agreement and the amount held in the pre-funding account shall at no time exceed 50% of the aggregate outstanding principal balance of the securities. The related agreement providing for the transfer of additional mortgage assets will provide that all transfers must be made within 3 months, if a REMIC election has been made with respect to the trust, or within 6 months after the date on which the related securities were issued, and that amounts set aside to fund the transfers, whether in a pre-funding account or otherwise, and not so applied within the required period of time will be deemed to be principal prepayments and applied in the manner set forth in the related prospectus supplement.

The depositor will be required to provide data regarding the additional mortgage assets to the rating agencies and the security insurer, if any, sufficiently in advance of the scheduled transfer to permit review by the rating agencies and the security insurer. Transfer of the additional mortgage assets will be further conditioned upon confirmation by the rating agencies that the addition of mortgage assets to the trust fund will not result in the downgrading of the securities or, in the case of a series guaranteed or supported by a security insurer, will not adversely affect the capital requirements of the security insurer. Finally, a legal opinion to the effect that the conditions to the transfer of the additional mortgage assets have been satisfied will be required.


## USE OF PROCEEDS

*The net proceeds to be received from the sale of the securities will be applied by the depositor to the purchase of trust fund assets or will be used by the depositor for general corporate purposes.* The depositor expects that it will make additional sales of securities similar to the securities from time to time, but the timing and amount of offerings of securities will depend on a number of factors, including the volume of mortgage assets acquired by the depositor, prevailing interest rates, availability of funds and general market conditions.
-14-

*424B5 140th Page of* 272 TOC 1st Previous Next Bottom Just 140th

**YIELD AND MATURITY CONSIDERATIONS**

The yield on any offered security will depend on the following:

o the price paid by the securityholder,

o the rate at which interest accrued on the security,

o the receipt and timing of receipt of distributions on the security,

o the weighted average life of the mortgage assets in the related trust fund,

o liquidations of mortgage assets following mortgagor defaults,

o purchases of mortgage assets in the event of optional
termination of the trust fund or breaches of representations
made in respect of such mortgage assets by the depositor, the
master servicer and others, and

o in the case of securities evidencing interests in ARM Loans,
by changes in the interest rates or the conversions of ARM
Loans to a fixed interest rate.

SECURITY INTEREST RATE. Securities of any class within a series may
have fixed, variable or adjustable security interest rates, which may or may not
be based upon the interest rates borne by the mortgage assets in the related
trust fund. The prospectus supplement with respect to any series of securities
will specify the security interest rate for each class of securities or, in the
case of a variable or adjustable security interest rate, the method of
determining the security interest rate. Holders of Stripped Interest Securities
or a class of securities having a security interest rate that varies based on
the weighted average interest rate of the underlying mortgage assets will be
affected by disproportionate prepayments and repurchases of mortgage assets
having higher interest rates than the average interest rate.

TIMING OF PAYMENT OF INTEREST AND PRINCIPAL. The effective yield to
securityholders entitled to payments of interest will be slightly lower than the
yield otherwise produced by the applicable security interest rate because, while
interest on the mortgage assets may accrue from the first day of each month, the
distributions of such interest will not be made until the distribution date
which may be as late as the 25th day of the month following the month in which
interest accrues on the mortgage assets. On each distribution date, a payment of
interest on the securities, or addition to the principal balance of a class of
Accrual Securities, will include interest accrued during the interest accrual
period described in the related prospectus supplement for that remittance date.
If the interest accrual period ends on a date other than a remittance date for
the related series, the yield realized by the holders of the securities may be
lower than the yield that would result if the interest accrual period ended on
the remittance date. In addition, if so specified in the related prospectus
supplement, interest accrued for an interest accrual period for one or more
classes of securities may be calculated on the assumption that distributions of
principal, and additions to the principal balance of Accrual Securities, and
allocations of losses on the mortgage assets may be made on the first day of the
interest accrual period for a remittance date and not on the remittance date.
This method would produce a lower effective yield than if interest were
calculated on the basis of the actual principal amount outstanding during an
interest accrual period.

When a principal prepayment in full is made on a mortgage loan, the
borrower is charged interest only for the period from the due date of the
preceding monthly payment up to the date of the prepayment, instead of for a
full month. When a partial prepayment is made on a mortgage loan, the mortgagor
is not

-15-

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 38 of 76

charged interest on the amount of the prepayment for the month in which the
prepayment is made. Accordingly, the effect of principal prepayments in full
during any month will be to reduce the aggregate amount of interest collected
that is available for distribution to securityholders. The mortgage loans in a
trust fund may contain provisions limiting prepayments or requiring the payment
of a prepayment charge upon prepayment in full or in part. If so specified in
the related prospectus supplement, a prepayment charge collected may be applied
to offset the above-described shortfalls in interest collections on the related
distribution date. Otherwise, prepayment charges collected may be available for
distribution only to a specific class of securities or may not be a part of the
related trust at all, and, therefore not available for distribution to any class
of securities. Full and partial principal prepayments collected during the
prepayment period set forth in a prospectus supplement will be available for
distribution to securityholders on the related distribution date. Neither the
trustee nor the depositor will be obligated to fund shortfalls in interest
collections resulting from prepayments. The prospectus supplement for a series
of securities may specify that the master servicer will be obligated to pay from
its own funds, without reimbursement, those interest shortfalls attributable to
full and partial prepayments by mortgagors but only up to an amount equal to its
servicing fee for the related due period. See *"Description of the Securities."*
In addition, if so specified in the related prospectus supplement, a
holder of a non-offered class of securities will have the right, solely at its
discretion, to terminate the related trust fund on any distribution date after
the 12th distribution date following the date of initial issuance of the related
series of securities and until the date as the Clean-up Call becomes exercisable
and thereby effect early retirement of the securities of the series. Any call of
this type will be of the entire trust fund at one time; multiple calls with
respect to any series of securities will not be permitted. Early termination
would result in the concurrent retirement of all outstanding securities of the
related series and would decrease the average lives of the terminated
securities, perhaps significantly. The earlier after the date of the initial
issuance of the securities that the termination occurs, the greater would be the
effect.
PRINCIPAL PREPAYMENTS. The yield to maturity on the securities will be
affected by the rate of principal payments on the mortgage assets, including
principal prepayments, curtailments, defaults and liquidations. The rate at
which principal prepayments occur on the mortgage assets will be affected by a
variety of factors, including, without limitation, the following:
o the terms of the mortgage assets,
o the level of prevailing interest rates,
o the availability of mortgage credit,
o in the case of multifamily loans and commercial loans, the
quality of management of the mortgaged properties, and

62

o economic, demographic, geographic, tax, legal and other
factors.

In general, however, if prevailing interest rates fall significantly
below the interest rates on the mortgage assets included in a particular trust
fund, those mortgage assets are likely to be the subject of higher principal
prepayments than if prevailing rates remain at the rates borne by those mortgage
assets. Conversely, if prevailing interest rates rise significantly above the
interest rates on the mortgage assets included in a particular trust fund, those
mortgage assets are likely to be the subject of lower principal prepayments than
if prevailing rates remain at the rates borne by those mortgage assets. The rate
of principal payments on some or all of the classes of securities of a series
will correspond to the rate of principal payments on the mortgage assets
included in the related trust fund and is likely to be affected by the existence
of prepayment premium

All of the representations and warranties made by or on behalf of a
mortgage loan seller in respect of a mortgage loan will have been made as of the
date on which the mortgage loan seller sold the mortgage loan to or on behalf of
the depositor. A substantial period of time may have elapsed between the date
the representation or warranty was made to or on behalf of the depositor and the
date of initial issuance of the series of securities evidencing an interest in
the related mortgage loan. In the event of a breach of any representation or
warranty made by a mortgage loan seller, the mortgage loan seller will be
obligated to cure the breach or repurchase or replace the affected mortgage loan
as described in the second following paragraph. Since the representations and
warranties made by or on behalf of a mortgage loan seller do not address events
that may occur following the sale of a mortgage loan by that mortgage loan
seller, it will have a cure, repurchase or substitution obligation in connection
with a breach of a representation and warranty only if the relevant event that
causes the breach occurs prior to the date of the sale to or on behalf of the
depositor. A mortgage loan seller would have no repurchase or substitution
obligations if the relevant event that causes the breach occurs after the date
of the sale to or on behalf of the depositor. However, the depositor will not
include any mortgage loan in the trust fund for any series of securities if
anything has come to the depositor's attention that would cause it to believe
that the representations and warranties made in
-23-

***424B5 149th Page of 272*** TOC 1st Previous Next Bottom Just 149th

respect of a mortgage loan will not be accurate and complete in all material
respects as of the date of initial issuance of the related series of securities.

## DESCRIPTION OF THE SECURITIES

The securities will be issued in series. Each series of certificates
evidencing interests in a trust fund consisting of mortgage loans will be issued

in accordance with a pooling and servicing agreement among the depositor, the master servicer and the trustee named in the prospectus supplement. Each series of notes evidencing indebtedness of a trust fund consisting of mortgage loans will be issued in accordance with an indenture between the related issuer and the trustee named in the prospectus supplement. The issuer of notes will be the depositor or an owner trust established under an owner trust agreement between the depositor and the owner trustee for the purpose of issuing a series of notes. Where the issuer is an owner trust, the ownership of the trust fund will be evidenced by equity certificates issued under the owner trust agreement. The provisions of each agreement will vary depending upon the nature of the securities to be issued thereunder and the nature of the related trust fund. Various forms of pooling and servicing agreement, servicing agreement, owner trust agreement, trust agreement and indenture have been filed as exhibits to the

-24-

***424B5 150th Page of** *272* TOC 1st Previous Next Bottom Just 150th

registration statement of which this prospectus is a part. The following summaries describe specific provisions which will appear in each agreement. The prospectus supplement for a series of securities will describe additional provisions of the agreement relating to a series. This prospectus together with the prospectus supplement will describe the material terms of the agreement governing the trust fund related to a series of securities. As used in this prospectus supplement with respect to any series, the term certificate or the term note refers to all of the certificates or notes of that series, whether or not offered by this prospectus and by the related prospectus supplement, unless the context otherwise requires.

**FORM OF REPORTS TO SECURITYHOLDERS**
With each distribution to holders of any class of securities of a series, the master servicer or the trustee, will forward or cause to be forwarded to each securityholder, to the depositor and to those other parties as may be specified in the related servicing agreement, a statement setting forth the following as of the distribution date:
(1) the amount of the distribution to holders of securities of that class applied to reduce the principal balance of the securities;
(2) the amount of the distribution to holders of securities of that class allocable to interest;
(3) the amount of related administration or servicing compensation received by the trustee or the master servicer and any sub-servicer and any other customary information as the master servicer deems necessary or desirable, or that a securityholder reasonably requests, to enable securityholders to prepare their tax returns;

64

-41-

(4) if applicable, the aggregate amount of advances included in
the distribution, and the aggregate amount of unreimbursed
advances at the close of business on that distribution date;

(5) the aggregate principal balance of the mortgage loans at the
close of business on that distribution date;

(6) the number and aggregate principal balance of mortgage loans
(a) delinquent one month, (b) delinquent two or more months,
and (c) as to which foreclosure proceedings have been
commenced;

(7) with respect to any mortgaged property acquired on behalf of
securityholders through foreclosure or deed in lieu of
foreclosure during the preceding calendar month, the principal
balance of the related mortgage loan as of the close of
business on the distribution date in that month;

(8) the aggregate principal balance of each class of securities
(including any class of securities not offered hereby) at the
close of business on that distribution date, separately
identifying any reduction in the principal balance due to the
allocation of any realized loss;

(9) the amount of any special hazard realized losses allocated to
the subordinate securities, if any, at the close of business
on that distribution date;

(10) the aggregate amount of principal prepayments made and
realized losses incurred during the related Prepayment Period;

(11) the amount deposited in the reserve fund, if any, on that
distribution date;

(12) the amount remaining in the reserve fund, if any, as of the
close of business on that distribution date;

(13) the aggregate unpaid accrued interest, if any, on each class
of securities at the close of business on that distribution
date;

(14) in the case of securities that accrue interest at the variable
rate, the security interest rate applicable to that
distribution date, as calculated in accordance with the method
specified in the related prospectus supplement; and

(15) as to any series which includes credit support, the amount of
coverage of each instrument of credit support included in the
trust fund as of the close of business on that distribution
date.

In the case of information furnished under subclauses (1) through (3)
above, the amounts shall be expressed as a dollar amount per minimum
denomination of securities or for other specified portion thereof. With respect

65

to each series of certificates or notes, securityholders will be referred to as
the certificateholders or the noteholders, respectively.

Within a reasonable period of time after the end of each calendar year,
the master servicer or the trustee, as provided in the related prospectus
supplement, shall furnish to each person who at any time during the calendar
year was a holder of a security a statement containing the information set forth
in subclauses

-42-

***424B5 168th Page of 272*** TOC 1st Previous Next Bottom Just 168th

(1) through (3) above, aggregated for that calendar year or the applicable
portion thereof during which that person was a securityholder. The obligation of
the master servicer or the trustee shall be deemed to have been satisfied to the
extent that substantially comparable information shall be provided by the master
servicer or the trustee in accordance with any requirements of the Code as are
from time to time in force.

## COLLECTION AND OTHER SERVICING PROCEDURES EMPLOYED BY THE MASTER SERVICER

The master servicer, directly or through sub-servicers, will make
reasonable efforts to collect all scheduled payments under the mortgage loans
and will follow or cause to be followed the collection procedures as it would
follow with respect to mortgage assets that are comparable to the mortgage
assets and held for its own account, provided these procedures are consistent
with the related servicing agreement and any related insurance policy,
bankruptcy bond, letter of credit or other insurance instrument described under
*"Description of Primary Insurance Policies"* or *"Description of Credit Support."*
Consistent with this servicing standard, the master servicer may, in its
discretion, waive any late payment charge in respect of a late mortgage loan
payment and, only upon determining that the coverage under any related insurance
instrument will not be affected, extend or cause to be extended the due dates
for payments due on a mortgage note for a period not greater than 180 days.
In instances in which a mortgage asset is in default, or if default is
reasonably foreseeable, and if determined by the master servicer to be in the
best interests of the related securityholders, the master servicer may permit
modifications of the mortgage asset rather than proceeding with foreclosure. In
making that determination, the estimated realized loss that might result if the
mortgage asset were liquidated would be taken into account. Modifications may
have the effect of reducing the interest rate on the mortgage asset, forgiving
the payment of principal or interest or extending the final maturity date of the
mortgage asset. Any modified mortgage asset may remain in the related trust
fund, and the reduction in collections resulting from the modification may
result in reduced distributions of interest, or other amounts, on, or may extend
the final maturity of, one or more classes of the related securities.
In connection with any significant partial prepayment of a mortgage
asset, the master servicer, to the extent not inconsistent with the terms of the

66

mortgage note and local law and practice, may permit the mortgage asset to be reamortized so that the monthly payment is recalculated as an amount that will fully amortize the remaining principal amount of the mortgage asset by the original maturity date based on the original interest rate. Reamortization will not be permitted if it would constitute a modification of the mortgage asset for federal income tax purposes.

In any case in which property securing a mortgage asset, other than an ARM Loan, multifamily loan or commercial loan, has been, or is about to be, conveyed by the borrower, or in any case in which property securing a multifamily loan or commercial loan has been, or is about to be, encumbered by the borrower, the master servicer will exercise or cause to be exercised on behalf of the related trust fund the lender's rights to accelerate the maturity of the mortgage asset under any due-on-sale or due-on-encumbrance clause applicable to that mortgage asset. The master servicer will only exercise these rights only if the exercise of any these rights is permitted by applicable law and will not impair or threaten to impair any recovery under any related insurance instrument. If these conditions are not met or if the master servicer reasonably believes it is unable under applicable law to enforce a due-on-sale or due-on-encumbrance clause, the master servicer will enter into or cause to be entered into an assumption and modification agreement with the person to whom the property has been or is about to be conveyed or encumbered, under which that person becomes liable under the mortgage note, cooperative note, manufactured housing contract or home improvement contract and, to the extent permitted by applicable law, the borrower remains liable thereon. The original mortgagor may be released from liability on a mortgage asset if the master servicer shall have determined in good faith that a release will not adversely affect the collectability of the mortgage asset. An ARM Loan

-43-

***424B5 169th Page of 272* TOC 1st Previous Next Bottom Just 169th

may be assumed if the ARM Loan is by its terms assumable and if, in the reasonable judgment of the master servicer, the proposed transferee of the related mortgaged property establishes its ability to repay the loan and the security for the ARM Loan would not be impaired by the assumption. If a mortgagor transfers the mortgaged property subject to an ARM Loan without consent, that ARM Loan may be declared due and payable. Any fee collected by or on behalf of the master servicer for entering into an assumption agreement will be retained by or on behalf of the master servicer as additional servicing compensation. In connection with any assumption, the terms of the related mortgage asset may not be changed except in the instance where an assumption is related to a defaulted cure. See *"Legal Aspects of Assets--Enforceability of Provisions."*

In the case of multifamily loans, commercial loans or mixed-use loans, a mortgagor's failure to make scheduled payments may mean that operating income is insufficient to service the mortgage debt, or may reflect the diversion of

67

that income from the servicing of the mortgage debt. In addition, a mortgagor under a multifamily loan, commercial loan or mixed-use loan that is unable to make scheduled payments may also be unable to make timely payment of all required taxes and otherwise to maintain and insure the related mortgaged property. In general, the master servicer will be required to monitor any multifamily loan, commercial loan or mixed-use loan that is in default, evaluate whether the causes of the default can be corrected over a reasonable period without significant impairment of the value of the related mortgaged property, initiate corrective action in cooperation with the mortgagor if cure is likely, inspect the related mortgaged property and take such other actions as are consistent with the related servicing agreement. A significant period of time may elapse before the servicer is able to assess the success of any such corrective action or the need for additional initiatives. The time within which the master servicer can make the initial determination of appropriate action, evaluate the success of corrective action, develop additional initiatives, institute foreclosure proceedings and actually foreclose (or accept a deed to a mortgaged property in lieu of foreclosure) on behalf of the securityholders of the related series may vary considerably depending on the particular multifamily loan, commercial loan or mixed-use loan, the mortgaged property, the mortgagor, the presence of an acceptable party to assume the multifamily loan, commercial loan or mixed-use loan and the laws of the jurisdiction in which the mortgaged property is located.

If a mortgagor files a bankruptcy petition, the servicer may not be permitted to accelerate the maturity of the related mortgage asset or to foreclose on the mortgaged property for a considerable period of time. See *"Legal Aspects of Mortgage Assets."*

## DESCRIPTION OF SUB-SERVICING

Any master servicer may delegate its servicing obligations in respect of the mortgage assets to third-party servicers, but the master servicer will remain obligated under the related servicing agreement. Each sub-servicer will be required to perform the customary functions of a servicer of comparable assets,

If an event of default with respect to the notes of any series occurs and is continuing, the trustee or the holders of a majority of the then aggregate outstanding amount of the notes of the series may declare the principal amount, or, if the notes of that series are Accrual Securities, the portion of the principal amount as may be specified in the terms of that series, as provided in the related prospectus supplement, of all the notes of the series to be due and payable immediately. That declaration may, under the circumstances set forth in the indenture, be rescinded and annulled by the holders of a majority in aggregate outstanding amount of the related notes.

If following an event of default with respect to any series of notes, the notes of the series have been declared to be due and payable, the trustee may, in its discretion, notwithstanding the acceleration, elect to maintain possession of the collateral securing the notes of the series and to continue to

apply payments on the collateral as if there had been no declaration of acceleration if the collateral continues to provide sufficient funds for the payment of principal of and interest on the notes of the series as they would have become due if there had not been a declaration. In addition, the trustee may not sell or otherwise liquidate the collateral securing the notes of a series following an event of default, unless

o the holders of 100% of the then aggregate outstanding amount of the notes of the series consent to the sale,

o accrued interest, due and unpaid, on the outstanding notes of the series at the date of the sale, or

o the trustee determines that the collateral would not be sufficient on an ongoing basis to make all payments on the notes as the payments would have become due if the notes had not been declared due and payable, and the trustee obtains the consent of the holders of 66 2/3% of the then aggregate outstanding amount of the notes of the series.

If the trustee liquidates the collateral in connection with an event of default, the indenture may provide that the trustee will have a prior lien on the proceeds of any liquidation for unpaid fees and expenses. As a result, upon the occurrence of an event of default, the amount available for payments to the noteholders would be less than would otherwise be the case. However, the trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the indenture for the benefit of the noteholders after the occurrence of an event of default.

## DESCRIPTION OF CREDIT SUPPORT

For any series of securities, credit support may be provided with respect to one or more classes thereof or the related mortgage assets. Credit support may be in the form of the subordination of one or more classes to other classes in a series of securities, letters of credit, insurance policies, surety bonds, guarantees, the establishment of one or more reserve funds, cross-collateralization, overcollateralization or another method of credit support described in the related prospectus supplement, or any combination of the foregoing. If so provided in the related prospectus supplement, any form of credit support may be structured so as to be drawn upon by more than one series of securities.

The credit support provided for a series of securities will in most cases not provide protection against all risks of loss and will not guarantee repayment of the entire principal balance of the securities and interest thereon. If losses or shortfalls occur that exceed the amount covered by credit support or that are not covered by credit support, securityholders will bear their allocable share of deficiencies. Also, if a form of credit support covers more than one pool of mortgage assets in a trust fund or more than one series of securities, holders of securities evidencing interests in any of the covered pools or covered trusts will be subject to the risk that the credit support will be exhausted by the claims of other covered pools or covered trusts prior to

69

that covered pool or covered trust receiving any of its intended share of the coverage.

If credit support is provided with respect to one or more classes of securities of a series, or the related mortgage assets, the related prospectus supplement will include a description of:

-56-

o the nature and amount of coverage under such credit support,

o any conditions to payment thereunder not otherwise described in this prospectus,

o the conditions under which the amount of coverage under the credit support may be reduced, terminated or replaced, and

o the material provisions relating to the credit support.

Additionally, the related prospectus supplement will set forth certain information with respect to the credit support provider, including:

o a brief description of its principal business activities,

o its principal place of business, place of incorporation and the jurisdiction under which it is chartered or licensed to do business,

o if applicable, the identity of regulatory agencies that exercise primary jurisdiction over the conduct of its business, and

o its total assets and its stockholders' or policyholders' surplus, if applicable, as of the date specified in the prospectus supplement.

A copy of the policy or agreement, as applicable, governing the applicable credit support will be filed with the Commission as an exhibit to a Current Report on Form 8-K to be filed within 15 days of issuance of the related series.

## SUBORDINATION

One or more classes of securities may be subordinate securities. In the event of any realized losses on mortgage assets not in excess of the limitations described in the following paragraph, the rights of the subordinate securityholders to receive distributions with respect to the mortgage loans will be subordinate to the rights of the senior securityholders to the extent described in the related prospectus supplement.

All realized losses will be allocated to the subordinate securities of the related series, or, if the series includes more than one class of subordinate securities, to the outstanding class of subordinate securities having the first priority for allocation of realized losses and then to additional outstanding classes of subordinate securities, if any, until the principal balance of the applicable subordinate securities has been reduced to zero. Any additional realized losses will be allocated to the senior securities or, if the series includes more than one class of senior securities, either on a

70

PRO RATA basis among all of the senior securities in proportion to their respective outstanding principal balances or as otherwise provided in the related prospectus supplement. However, with respect to realized losses that are attributable to physical damage to mortgaged properties of a type that is not covered by standard hazard insurance policies, the amount thereof that may be allocated to the subordinate securities of the related series may be limited to an amount specified in the related prospectus supplement. If so, any realized losses of this type in excess of the amount allocable to the subordinate securities will be allocated among all outstanding classes of securities of the related series, on a PRO RATA basis in proportion to their respective outstanding principal balances, regardless of whether any subordinate securities remain outstanding, or as otherwise provided in the related prospectus supplement. Any allocation of a realized loss to a security will be made by reducing the principal balance thereof as of the distribution date following the Prepayment Period in which the realized loss was incurred.

-57-

*424B5 183rd Page of 272* TOC 1st Previous Next Bottom Just 183rd

As set forth under *"Description of the Securities--Distributions of Principal of the Securities"*, the rights of holders of the various classes of securities of any series to receive distributions of principal and interest is determined by the aggregate principal balance of each class. The principal balance of any security will be reduced by all amounts previously distributed on that security in respect of principal, and by any realized losses allocated to that security. If there were no realized losses or prepayments of principal on any of the mortgage loans, the respective rights of the holders of securities of any series to future distributions would not change. However, to the extent so provided in the related prospectus supplement, holders of senior securities may be entitled to receive a disproportionately larger amount of prepayments received, which will have the effect of accelerating the amortization of the senior securities and increasing the respective percentage interest in future distributions evidenced by the subordinate securities in the related trust fund, with a corresponding decrease in the senior percentage, as well as preserving the availability of the subordination provided by the subordinate securities. In addition, as set forth in the paragraph above, realized losses will be first allocated to subordinate securities by reduction of the principal balance thereof, which will have the effect of increasing the respective interest in future distributions evidenced by the senior securities in the related trust fund.

If so provided in the related prospectus supplement, amounts otherwise payable on any distribution date to holders of subordinate securities may be deposited into a reserve fund. Amounts held in any reserve fund may be applied as described below under *"--Reserve Funds"* and in the related prospectus supplement.

With respect to any Senior/Subordinate Series, the terms and provisions

71

of the subordination may vary from those described in the preceding paragraphs
and any variation will be described in the related prospectus supplement.
If so provided in the related prospectus supplement, the credit support
for the senior securities of a Senior/Subordinate Series may include, in
addition to the subordination of the subordinate securities of the series and
the establishment of a reserve fund, any of the other forms of credit support
described in this prospectus supplement. If any of the other forms of credit
support described below is maintained solely for the benefit of the senior
securities of a Senior/Subordinate Series, then that coverage described may be
limited to the extent necessary to make required distributions on the senior
securities or as otherwise specified in the related prospectus supplement. If so
provided in the related prospectus supplement, the obligor on any other forms of
credit support maintained for the benefit of the senior securities of a
Senior/Subordinate Series may be reimbursed for amounts paid thereunder out of
amounts otherwise payable on the subordinate securities.

**LETTER OF CREDIT**

As to any series of securities to be covered by a letter of credit, a
bank will deliver to the trustee an irrevocable letter of credit. The master
servicer or trustee will exercise its best reasonable efforts to keep or cause
to be kept the letter of credit in full force and effect, unless coverage
thereunder has been exhausted through payment of claims. The master servicer
will agree to pay the fees for the letter of credit on a timely basis unless, as
described in the related prospectus supplement, the payment of those fees is
otherwise provided for.

The master servicer or the trustee will make or cause to be made draws
on the letter of credit bank under each letter of credit. Subject to any
differences as will be described in the related prospectus supplement, letters
of credit may cover all or any of the following amounts, in each case up to a
maximum amount set forth in the letter of credit:

-58-

*424B5 184th Page of 272* TOC 1st Previous Next Bottom Just 184th

(1) For any mortgage asset that became a liquidated asset during
the related Prepayment Period, other than mortgage assets as
to which amounts paid or payable under any related hazard
insurance instrument, including the letter of credit as
described in (2) below, are not sufficient either to restore
the mortgaged property or to pay the outstanding principal
balance of the mortgage asset plus accrued interest, an amount
which, together with all Liquidation Proceeds, Insurance
Proceeds, and other collections on the liquidated loan, net of
amounts payable or reimbursable therefrom to the master
servicer for related unpaid servicing fees and unreimbursed
servicing expenses, will equal the sum of (A) the unpaid
principal balance of the liquidated asset, plus accrued

72

interest at the applicable interest rate net of the rates at
which the servicing fee and retained interest are calculated,
plus (B) the amount of related servicing expenses, if any, not
reimbursed to the master servicer from Liquidation Proceeds,
Insurance Proceeds and other collections on the liquidation
asset, which shall be paid to the master servicer;
(2) For each mortgage asset that is delinquent and as to which the
mortgaged property has suffered damage, other than physical
damage caused by hostile or warlike action in time of war or
peace, by any weapons of war, by any insurrection or
rebellion, or by any nuclear reaction or nuclear radiation or
nuclear contamination whether controlled or uncontrolled, or
by any action taken by any governmental authority in response
to any of the foregoing, and for which any amounts paid or
payable under the related primary hazard insurance policy or
any special hazard insurance policy are not sufficient to pay
either of the following amounts, an amount which, together
with all Insurance Proceeds paid or payable under the related
primary hazard insurance policy or any special hazard
insurance policy, net, if the proceeds are not to be applied
to restore the mortgaged property, of all amounts payable or
reimbursable therefrom to the master servicer for related
unpaid servicing fees and unreimbursed servicing expenses,
will be equal to the lesser of (A) the amount required to
restore the mortgaged property and (B) the sum of (1) the
unpaid principal balance of the mortgage asset plus accrued
interest at the applicable interest rate net of the rates at
which the servicing fees and retained interest, if any, are
calculated, plus (2) the amount of related servicing expenses,
if any, not reimbursed to the master servicer from Insurance
Proceeds paid under the related primary hazard insurance
policy or any special hazard insurance policy; and
(3) For any mortgage asset that has been subject to bankruptcy
proceedings as described above, the amount of any debt service
reduction or the amount by which the principal balance of the
mortgage asset has been reduced by the bankruptcy court.
If the related prospectus supplement so provides, upon payment by the
letter of credit bank with respect to a liquidated asset, or a payment of the
full amount owing on a mortgage asset as to which the mortgaged property has
been damaged, as described in (2)(B) above, the liquidated asset will be removed
from the related trust fund in accordance with the terms set forth in the
related prospectus supplement and will no longer be subject to the agreement.
Unless otherwise provided in the related prospectus supplement, mortgage assets
that have been subject to bankruptcy proceedings, or as to which payment under
the letter of credit has been made for the purpose of restoring the related
mortgaged property, as described in (2)(A) above, will remain part of the

Case 4:09-bk-09703-EWH   Doc 70-1 Filed 06/21/10   Entered 06/21/10 21:49:21   Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD   Page 50 of 76

related trust fund. The maximum dollar coverages provided under any letter of
credit will each be reduced to the extent of related unreimbursed draws
thereunder.
In the event that the bank that has issued a letter of credit ceases
to be a duly organized commercial bank, or its debt obligations are rated lower
than the highest rating on any class of the securities on the date of issuance
by the rating agency or agencies, the master servicer or trustee will use its
best reasonable efforts

-59-

***424B5 185th Page of* 272 TOC 1st Previous Next Bottom Just 185th

to obtain or cause to be obtained, as to each letter of credit, a substitute
letter of credit issued by a commercial bank that meets these requirements and
providing the same coverage; provided, however, that, if the fees charged or
collateral required by the successor bank shall be more than the fees charged or
collateral required by the predecessor bank, each component of coverage
thereunder may be reduced proportionately to a level as results in the fees and
collateral being not more than the fees then charged and collateral then
required by the predecessor bank.

**MORTGAGE POOL INSURANCE POLICY**

As to any series of securities to be covered by a mortgage pool
insurance policy with respect to any realized losses on liquidated loans, the
master servicer will exercise its best reasonable efforts to maintain or cause
to be maintained the mortgage pool insurance policy in full force and effect,
unless coverage thereunder has been exhausted through payment of claims. The
master servicer will agree to pay the premiums for each mortgage pool insurance
policy on a timely basis unless, as described in the related prospectus
supplement, the payment of those fees is otherwise provided.
The master servicer will present or cause to be presented claims to the
insurer under each mortgage pool insurance policy. Mortgage pool insurance
policies, however, are not blanket policies against loss, since claims
thereunder may be made only upon satisfaction of certain conditions, as
described in the next paragraph and, if applicable, in the related prospectus
supplement.
Mortgage pool insurance policies do not cover losses arising out of the
matters excluded from coverage under the primary mortgage insurance policy, or
losses due to a failure to pay or denial of a claim under a primary mortgage
insurance policy, irrespective of the reason therefor.
Mortgage pool insurance policies in general provide that no claim may
validly be presented thereunder with respect to a mortgage loan unless:
o an acceptable primary mortgage insurance policy, if the
initial loan-to-value ratio of the mortgage loan exceeded 80%,
has been kept in force until the loan-to-value ratio is
reduced to 80%;
o premiums on the primary hazard insurance policy have been paid

by the insured and real estate taxes and foreclosure,
protection and preservation expenses have been advanced by or
on behalf of the insured, as approved by the insurer;
o if there has been physical loss or damage to the mortgaged
property, it has been restored to its physical condition at
the time the mortgage loan became insured under the mortgage
pool insurance policy, subject to reasonable wear and tear;
and
o the insured has acquired good and merchantable title to the
mortgaged property, free and clear of all liens and
encumbrances, except permitted encumbrances, including any
right of redemption by or on behalf of the mortgagor, and if
required by the insurer, has sold the property with the
approval of the insurer.
Assuming the satisfaction of these conditions, the insurer has the
option to either (a) acquire the property securing the defaulted mortgage loan
for a payment equal to the principal balance of the defaulted mortgage loan plus
accrued and unpaid interest at the interest rate on the mortgage loan to the
date of acquisition and expenses described above advanced by or on behalf of the
insured, on condition that the insurer must be provided with good and
merchantable title to the mortgaged property, unless the property
-60-

*424B5 186th Page of 272* TOC 1st Previous Next Bottom Just 186th

has been conveyed under the terms of the applicable primary mortgage insurance
policy, or (b) pay the amount by which the sum of the principal balance of the
defaulted mortgage loan and accrued and unpaid interest at the interest rate to
the date of the payment of the claim and the expenses exceed the proceeds
received from a sale of the mortgaged property which the insurer has approved.
In both (a) and (b), the amount of payment under a mortgage pool insurance
policy will be reduced by the amount of the loss paid under the primary mortgage
insurance policy.
Unless earlier directed by the insurer, a claim under a mortgage pool
insurance policy must be filed (a) in the case when a primary mortgage insurance
policy is in force, within a specified number of days (typically, 60 days) after
the claim for loss has been settled or paid thereunder, or after acquisition by
the insured or a sale of the property approved by the insurer, whichever is
later, or (b) in the case when a primary mortgage insurance policy is not in
force, within a specified number of days (typically, 60 days) after acquisition
by the insured or a sale of the property approved by the insurer. A claim must
be paid within a specified period (typically, 30 days) after the claim is made
by the insured.
The amount of coverage under each mortgage pool insurance policy will
generally be reduced over the life of the securities of any series by the
aggregate dollar amount of claims paid less the aggregate of the net amounts

75

realized by the insurer upon disposition of all acquired properties. The amount of claims paid includes certain expenses incurred by the master servicer as well as accrued interest on delinquent mortgage loans to the date of payment of the claim. Accordingly, if aggregate net claims paid under a mortgage pool insurance policy reach the applicable policy limit, coverage thereunder will be exhausted and any further losses will be borne by securityholders of the related series. See *"Legal Aspects of Mortgage Assets--Foreclosure on Mortgages"* and *"--Repossession with Respect to Manufactured Housing Contracts."*

If an insurer under a mortgage pool insurance policy ceases to be a private mortgage guaranty insurance company duly qualified as such under applicable laws and approved as an insurer by Freddie Mac or Fannie Mae and having a claims-paying ability acceptable to the rating agency or agencies, the master servicer will use its best reasonable efforts to obtain or cause to be obtained from another qualified insurer a replacement insurance policy comparable to the mortgage pool insurance policy with a total coverage equal to the then outstanding coverage of the mortgage pool insurance policy; provided, however, that if the cost of the replacement policy is greater than the cost of the original mortgage pool insurance policy, the coverage of the replacement policy may be reduced to the level that its premium rate does not exceed the premium rate on the original mortgage pool insurance policy. However, if the insurer ceases to be a qualified insurer solely because it ceases to be approved as an insurer by Freddie Mac or Fannie Mae, the master servicer will review, or cause to be reviewed, the financial condition of the insurer with a view towards determining whether recoveries under the mortgage pool insurance policy are jeopardized for reasons related to the financial condition of the insurer. If the master servicer determines that recoveries are so jeopardized, it will exercise its best reasonable efforts to obtain from another qualified insurer a replacement policy, subject to the same cost limitation.

Because each mortgage pool insurance policy will require that the property subject to a defaulted mortgage loan be restored to its original condition prior to claiming against the insurer, the policy will not provide coverage against hazard losses. As set forth in the immediately following paragraph, the primary hazard insurance policies covering the mortgage loans typically exclude from coverage physical damage resulting from a number of causes and, even when the damage is covered, may afford recoveries that are significantly less than the full replacement cost of the losses. Further, a special hazard insurance policy, or a letter of credit that covers special hazard realized losses, will not cover all risks, and the coverage thereunder will be limited in amount. These hazard risks will, as a result, be uninsured and will therefore be borne by securityholders.

-61-

*424B5 187th Page of 272* TOC 1st Previous Next Bottom Just 187th

**SPECIAL HAZARD INSURANCE POLICY**

As to any series of securities to be covered by an insurance instrument

that does not cover losses that are attributable to physical damage to the mortgaged properties of a type that is not covered by standard hazard insurance policies, in other words, special hazard realized losses, the related prospectus supplement may provide that the master servicer will exercise its best reasonable efforts to maintain or cause to be maintained a special hazard insurance policy in full force and effect covering the special hazard amount, unless coverage thereunder has been exhausted through payment of claims; provided, however, that the master servicer will be under no obligation to maintain the policy if any insurance instrument covering the series as to any realized losses on liquidated loans is no longer in effect. The master servicer will agree to pay the premiums on each special hazard insurance policy on a timely basis unless, as described in the related prospectus supplement, payment of those premiums is otherwise provided for.

Each special hazard insurance policy will, subject to the limitations described in the next paragraph, protect holders of securities of the related series from

o loss by reason of damage to mortgaged properties caused by certain hazards, including earthquakes and mudflows, not insured against under the primary hazard insurance policies or a flood insurance policy if the property is in a designated flood area, and

o loss from partial damage caused by reason of the application of the co-insurance clause contained in the primary hazard insurance policies.

Special hazard insurance policies usually will not cover losses occasioned by normal wear and tear, war, civil insurrection, governmental actions, errors in design, nuclear or chemical reaction or contamination, faulty workmanship or materials, flood, if the property is located in a designated flood area, and other risks.

Subject to the foregoing limitations, each special hazard insurance policy will provide that, when there has been damage to property securing a defaulted mortgage asset acquired by the insured and to the extent the damage is not covered by the related primary hazard insurance policy or flood insurance policy, the insurer will pay the lesser of:

(1) the cost of repair to the property and

(2) upon transfer of the property to the insurer, the unpaid principal balance of the mortgage asset at the time of acquisition of the property by foreclosure, deed in lieu of foreclosure or repossession, plus accrued interest to the date of claim settlement and expenses incurred by or on behalf of the master servicer with respect to the property.

The amount of coverage under the special hazard insurance policy will be reduced by the sum of (a) the unpaid principal balance plus accrued interest and certain expenses paid by the insurer, less any net proceeds realized by the insurer from the sale of the property, plus (b) any amount paid as the cost of repair of the property.

Restoration of the property with the proceeds described under clause
(1) of the immediately preceding paragraph will satisfy the condition under an
insurance instrument providing coverage as to credit, or other non-hazard risks,
that the property be restored before a claim thereunder may be validly presented
with respect to the defaulted mortgage asset secured by the property. The
payment described under clause (2) of the immediately preceding paragraph will
render unnecessary presentation of a claim in respect of the mortgage loan under
an insurance instrument providing coverage as to credit, or other non-hazard
risks, as

-62-

***424B5 188th Page of 272*** TOC 1st Previous Next Bottom Just 188th

to any realized losses on a liquidated loan. Therefore, so long as the insurance
instrument providing coverage as to credit, or other non-hazard risks, remains
in effect, the payment by the insurer of either of the above alternative amounts
will not affect the total insurance proceeds paid to securityholders, but will
affect the relative amounts of coverage remaining under any special hazard
insurance policy and any credit insurance instrument.

The sale of a mortgaged property must be approved by the insurer under
any special hazard insurance policy and funds received by the insured in excess
of the unpaid principal balance of the mortgage asset plus interest thereon to
the date of sale plus expenses incurred by or on behalf of the master servicer
with respect to the property, not to exceed the amount actually paid by the
insurer, must be refunded to the insurer and, to that extent, coverage under the
special hazard insurance policy will be restored. If aggregate claim payments
under a special hazard insurance policy reach the policy limit, coverage
thereunder will be exhausted and any further losses will be borne by
securityholders.

A claim under a special hazard insurance policy generally must be filed
within a specified number of days, typically 60 days, after the insured has
acquired good and merchantable title to the property, and a claim payment is
payable within a specified number of days, typically 30 days, after a claim is
accepted by the insurer. Special hazard insurance policies provide that no claim
may be paid unless primary hazard insurance policy premiums, flood insurance
premiums, if the property is located in a federally designated flood area, and,
as approved by the insurer, real estate property taxes, property protection and
preservation expenses and foreclosure or repossession costs have been paid by or
on behalf of the insured, and unless the insured has maintained the primary
hazard insurance policy and, if the property is located in a federally
designated flood area, flood insurance, as required by the special hazard
insurance policy.

If a special hazard insurance policy is canceled or terminated for any
reason, other than the exhaustion of total policy coverage, the master servicer
will use its best reasonable efforts to obtain or cause to be obtained from
another insurer a replacement policy comparable to that special hazard insurance

policy with a total coverage that is equal to the then existing coverage of the replaced special hazard insurance policy; provided, however, that if the cost of the replacement policy is greater than the cost of that special hazard insurance policy, the coverage of the replacement policy may be reduced to a level so that its premium rate does not exceed the premium rate on that special hazard insurance policy.

Since each special hazard insurance policy is designed to permit full recoveries as to any realized losses on liquidated loans under a credit insurance instrument in circumstances in which recoveries would otherwise be unavailable because property has been damaged by a cause not insured against by a primary hazard insurance policy and thus would not be restored, each agreement governing the trust fund will provide that, if the related credit insurance instrument shall have lapsed or terminated or been exhausted through payment of claims, the master servicer will be under no further obligation to maintain the special hazard insurance policy

CHARACTERIZATION OF INVESTMENTS IN REMIC CERTIFICATES. Except as provided in the following sentence, the REMIC Certificates will be real estate assets within the meaning of Section 856(c)(4)(A) of the Code and assets described in Section 7701(a)(19)(C) of the Code in the same proportion as the assets of the REMIC underlying the certificates. If 95% or more of the assets of the REMIC qualify for either of the treatments described in the previous sentence at all times during a calendar year, the REMIC Certificates will qualify for the corresponding status in their entirety for that calendar year. Interest, including original issue discount, on the REMIC Regular Certificates and income allocated to the class of REMIC Residual Certificates will be interest described in Section 856(c)(3)(B) of the Code to the extent that the certificates are treated as real estate assets within the meaning of Section 856(c)(4)(A) of the Code. In addition, the REMIC Regular Certificates will be qualified mortgages within the meaning of Section 860G(a)(3) of the Code if transferred to another REMIC on its startup day in exchange for regular or residual interests of that REMIC. The determination as to the percentage of the REMIC's assets that constitute assets described in these sections of the Code will be made for each calendar quarter based on the average adjusted basis of each category of the assets held by the REMIC during the calendar quarter. The trustee will report those determinations to certificateholders in the manner and at the times required by Treasury regulations.

REALIZED LOSSES. Under Section 166 of the Code, both corporate holders of the REMIC Regular Certificates and noncorporate holders of the REMIC Regular Certificates that acquire the certificates in connection with a trade or business should be allowed to deduct, as ordinary losses, any losses sustained during a taxable year in which their certificates become wholly or partially worthless as the result of one or more realized losses on the mortgage loans. However, it appears that a noncorporate holder that does not acquire a REMIC Regular Certificate in connection with a trade or business will not be entitled

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 56 of 76

to deduct a loss under Section 166 of the Code until the holder's certificate becomes wholly worthless, i.e., until its outstanding principal balance has been reduced to zero, and that the loss will be characterized as a short-term capital loss.

FROM PSA

Page 7: The Depositor intends to sell pass-through certificates (collectively, the *"Certificates"*), to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest in each REMIC (as defined herein) created hereunder. The Trust Fund will consist of a segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement.

Page 12: *"Affiliate"*: With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, *"control"* when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing.

Page 12: *"Assignment"*: An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form (excepting therefrom if applicable, the mortgage recordation information which has not been returned by the applicable recorder's office and/or the assignee's name), which is sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage.

Page 14: *"Certificateholder"* or *"Holder"*: The Person in whose name a Certificate is registered in the Certificate Register, except that a Disqualified Organization or a Non-United States Person shall not be a Holder of a Residual Certificate for any purposes hereof and, solely for the purposes of giving any consent pursuant to this Agreement, any Certificate registered in the name of the Depositor or the Master Servicer or any Affiliate thereof shall be deemed not to be outstanding and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent has been obtained, except as otherwise provided in Section 11.01. The Trustee and the NIMS Insurer may conclusively rely upon a certificate of the Depositor or the Master Servicer in determining whether a Certificate is held by an Affiliate thereof. All references herein to *"Holders"* or *"Certificateholders"* shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee and the NIMS Insurer shall be required to recognize as a *"Holder"* or *"Certificateholder"* only the Person in whose name a Certificate is registered in the Certificate Register.

Page 15: *"Certificate Owner"*: With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate as reflected on the books of the Depository or on the books of a Depository Participant or on the

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 57 of 76

books of an indirect participating brokerage firm for which a Depository Participant acts as agent.

Page 15: *"Certificate Principal Balance"*: With respect to each Class A Certificate, Mezzanine Certificate or Class P Certificate as of any date of determination, the Certificate Principal Balance of such Certificate on the Distribution Date immediately prior to such date of determination minus all distributions allocable to principal made thereon on such Distribution Date and, in the case of a Mezzanine Certificate, Realized Losses allocated thereto on such immediately prior Distribution Date plus, with respect to each Mezzanine Certificate, any increase in the Certificate Principal Balance of such Certificate pursuant to Section 4.01 due to the receipt of Subsequent Recoveries (or, in the case of any date of determination up to and including the first Distribution Date, the initial Certificate Principal Balance of such Certificate, as stated on the face thereof). With respect to each Class CE Certificate as of any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate times the excess, if any, of (A) the then aggregate Uncertificated Balances of the REMIC I Regular Interests over (B) the then aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates then outstanding.

Page 24: *"Corporate Trust Office"*: The principal corporate trust office of the Trustee at which at any particular time its corporate trust business in connection with this Agreement shall be administered, which office at the date of the execution of this instrument is located at 1761 East St. Andrew Place, Santa Ana, California 92705-4934, or at such other address as the Trustee may designate from time to time by notice to the Certificateholders, the Depositor and the Master Servicer.

Page 25: *"Credit Enhancement Percentage"*: For any Distribution Date and Class of Offered Certificates, will be the percentage equivalent of a fraction, calculated after taking into account distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount to the Certificates then entitled to distributions of principal on such Distribution Date, the numerator of which is the sum of the aggregate Certificate Principal Balances of the Classes of Certificates with a lower distribution priority than such Class, and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

Page 25: Cutoff Date May 1, 2004

*Page 26: "Deleted Mortgage Loan"*: A Mortgage Loan replaced or to be replaced by a Qualified Substitute Mortgage Loan

Page 28: *"Excess Overcollateralized Amount"*: With respect to the Class A Certificates and the Mezzanine Certificates and any Distribution Date, the excess, if any, of (i) the Overcollateralized Amount for such Distribution Date (calculated for this purpose only after assuming that 100% of the Principal Remittance Amount on such Distribution Date has been distributed) over (ii) the

Overcollateralization Target Amount for such Distribution Date.

Page 31: *"Independent"*: When used with respect to any specified Person, any such Person who (a) is in fact independent of the Depositor, the Master Servicer, the Seller and their respective Affiliates, (b) does not have any direct financial interest in or any material indirect financial interest in the Depositor, the Seller, the Master Servicer or any Affiliate thereof and (c) is not connected with the Depositor, the Seller, the Master Servicer or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions; provided, however, that a Person shall not fail to be Independent of the Depositor, the Seller, the Master Servicer or any Affiliate thereof merely because such Person is the beneficial owner of 1% or less of any class of securities issued by the Depositor or the Master Servicer or any Affiliate thereof, as the case may be.

*"Independent Contractor"*: Either (i) any Person (other than the Master Servicer) that would be an *"independent contractor"* with respect to REMIC I within the meaning of Section 856(d)(3) of the Code if such REMIC were a real estate investment trust

Page 32: *"Insurance Proceeds"*: Proceeds of any title policy, hazard policy or other insurance policy, including the PMI Policy, covering a Mortgage Loan, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account, subject to the terms and conditions of the related Mortgage Note and Mortgage.

Page 33: *"Late Collections"*: With respect to any Mortgage Loan and any Due Period, all amounts received subsequent to the Determination Date immediately following such Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds, Subsequent Recoveries or otherwise, which represent late payments or collections of principal and/or interest due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) but delinquent for such Due Period and not previously recovered.

*"Liquidation Event"*: With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made as to such Mortgage Loan; or (iii) such Mortgage Loan is removed from REMIC I by reason of its being purchased, sold or replaced pursuant to or as contemplated by Section 2.03, Section 3.16(a) or Section 9.01. With respect to any REO Property, either of the following events: (i) a Final Recovery Determination is made as to such REO Property; or (ii) such REO Property is removed from REMIC I by reason of its being purchased pursuant to Section 9.01.

*"Liquidation Proceeds"*: The amount (other than Insurance Proceeds or amounts received in respect of the rental of any REO Property prior to REO Disposition) received by the Master Servicer in connection with (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or condemnation, (ii) the liquidation of a defaulted Mortgage

Case 4:09-bk-09703-EWH   Doc 70-1   Filed 06/21/10   Entered 06/21/10 21:49:21   Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD   Page 59 of 76

Loan through a trustee's sale, foreclosure sale or otherwise or (iii) the repurchase, substitution or sale of a Mortgage Loan or an REO Property pursuant to or as contemplated by Section 2.03, Section 3.13, Section 3.16(a) or Section 9.01.

Page 33: *"Loan-to-Value Ratio"*: As of any date of determination, the fraction, expressed as a percentage, the numerator of which is the Stated Principal Balance of the related Mortgage Loan at such date and the denominator of which is the Value of the related Mortgaged Property.

Page 34: *"Lost Note Affidavit"*: With respect to any Mortgage Loan as to which the original Mortgage Note has been permanently lost, misplaced or destroyed and has not been replaced, an affidavit from the Seller certifying that the original Mortgage Note has been lost, misplaced or destroyed (together with a copy of the related Mortgage Note) and indemnifying the Trust Fund against any loss, cost or liability resulting from the failure to deliver the original Mortgage Note in the form of Exhibit B hereto.

Page 37: *"Mortgage"*: The mortgage, deed of trust or other instrument creating a first lien on, or first priority security interest in, a Mortgaged Property securing a Mortgage Note.

*"Mortgage File"*: The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

*"Mortgage Loan"*: Each mortgage loan transferred and assigned to the Trustee pursuant to Section 2.01 or Section 2.03(d) of this Agreement, as held from time to time as a part of REMIC I, the Mortgage Loans so held being identified in the Mortgage Loan Schedule.

*"Mortgage Loan Purchase Agreement"*: The agreement between the Seller and the Depositor, regarding the transfer of the Mortgage Loans by the Seller to or at the direction of the Depositor, substantially in the form of Exhibit D annexed hereto.

*"Mortgage Loan Schedule"*: As of any date, the list of Mortgage Loans included in REMIC I on such date, separately identifying the Group I Mortgage Loans and the Group II Mortgage Loans, attached hereto as Schedule 1. The Mortgage Loan Schedule shall set forth the following information with respect to each Mortgage Loan:

(1) the Seller's Mortgage Loan identifying number;
(2) [reserved];
(3) the state and zip code of the Mortgaged Property;
(4) a code indicating whether the Mortgaged Property is owner-occupied;
(5) the type of Residential Dwelling constituting the Mortgaged Property;
(6) the original months to maturity;
(7) the Loan-to-Value Ratio at origination;
(8) the Mortgage Rate in effect immediately following the Cut-off Date;
(9) the date on which the first Monthly Payment was due on the

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 60 of 76

Mortgage Loan;

(10) the stated maturity date;

(11) the amount of the Monthly Payment due on the first Due Date after the Cut- off Date;

(12) the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance;

(13) the original principal amount of the Mortgage Loan;

(14) the Scheduled Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date;

(15) with respect to the Adjustable-Rate Mortgage Loans, the Gross Margin;

(16) a code indicating the purpose of the Mortgage Loan (I.E., purchase, refinance debt consolidation cashout, or refinance debt consolidation no cashout);

(17) with respect to the Adjustable-Rate Mortgage Loans, the Maximum Mortgage Rate;

(18) with respect to the Adjustable-Rate Mortgage Loans, the Minimum Mortgage Rate;

(19) the Mortgage Rate at origination;

(20) with respect to the Adjustable-Rate Mortgage Loans, the Periodic Rate Cap and the maximum first Adjustment Date Mortgage Rate adjustment;

(21) a code indicating the documentation program (I.E., Full Documentation, Limited Documentation or Stated Income);

(22) with respect to the Adjustable-Rate Mortgage Loans, the first Adjustment Date immediately following the Cut-off Date;

(23) the risk grade;

(24) the Value of the Mortgaged Property;

(25) the sale price of the Mortgaged Property, if applicable;

(26) the FICO score of the primary Mortgagor; and

(27) whether the Mortgage Loan is covered under the PMI Policy.

The Mortgage Loan Schedule shall set forth the following information with respect to the Mortgage Loans by Loan Group and in the aggregate as of the Cut-off Date: (1) the number of Mortgage Loans; (2) the current Stated Principal Balance of the Mortgage Loans; (3) the weighted average Mortgage Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans. <u>The Mortgage Loan Schedule shall be amended from time to time by the Depositor in accordance with the provisions of this Agreement. With respect to any Qualified Substitute Mortgage Loan, the Cut-off Date shall refer to the related Cut-off Date for such Mortgage Loan, determined in accordance with the definition of Cut-off Date herein.</u>

Page 39: *"Mortgage Note"*: The original executed note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

*"Mortgage Pool"*: The pool of Mortgage Loans, identified on Schedule 1 from time to time, and any REO Properties acquired in respect

thereof.

Page 41: *"NIMS Insurer"*: Any insurer that is guaranteeing certain payments under notes secured by collateral which includes, among other things, all or a portion of the Class CE Certificates, the Class P Certificates and/or the Residual Certificates.

*"Nonrecoverable Advance"*: Any Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the Master Servicer, will not or, in the case of a proposed Advance, would not be ultimately recoverable from related Late Collections, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein.

Page 42: *"Officers' Certificate"*: With respect to the Depositor, a certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President or a vice president (however denominated), and by the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries. With respect to the Master Servicer, any officer who is authorized to act for the Master Servicer in matters relating to this Agreement, and whose action is binding upon the Master Servicer, initially including those individuals whose names appear on the list of authorized officers delivered at the closing.

Page 46: *"Percentage Interest"*: With respect to any Class of Certificates (other than the Residual Certificates), the undivided percentage ownership in such Class evidenced by such Certificate, expressed as a percentage, the numerator of which is the initial Certificate Principal Balance or Notional Amount represented by such Certificate and the denominator of which is the aggregate initial Certificate Principal Balance or Notional Amount of all of the Certificates of such Class. The Class A Certificates and the Mezzanine Certificates (other than the Class M-11 Certificates) are issuable only in minimum Percentage Interests corresponding to minimum initial Certificate Principal Balances of $25,000 and integral multiples of $1.00 in excess thereof. The Class M-11 Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Certificate Principal Balances of $50,000 and integral multiples of $1.00 in excess thereof. The Class P Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Certificate Principal Balances of $20 and integral multiples thereof. The Class CE Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Notional Amount of $10,000 and integral multiples of $1.00 in excess thereof; provided, however, that a single Certificate of such Class of Certificates may be issued having a Percentage Interest corresponding to the remainder of the aggregate initial Certificate Principal Balance or Notional Amount of such Class or to an otherwise authorized denomination for such Class plus such remainder. With respect to any Residual Certificate, the undivided percentage ownership in such Class evidenced by such Certificate, as set forth on the face of such Certificate. The Residual Certificates are issuable in Percentage Interests of 20% and multiples thereof.

Page 49: *"Purchase Price"*: With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section

3.16(a) or Section 9.01, and as confirmed by an Officers' Certificate from the Master Servicer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 9.01), (ii) in the case of (**x**) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer, which payment or advance had as of the date of purchase been distributed pursuant to Section 4.01, through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 4.01, (iii) any unreimbursed Servicing Advances and Advances and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property, (iv) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan or REO Property pursuant to Sections 3.05(a)(v) and 3.16(a), and (v) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses reasonably incurred or to be incurred by the Master Servicer, the NIMS Insurer or the Trustee in respect of the breach or defect giving rise to the purchase obligation, as well as any costs and damages incurred by the Trust Fund in connection with any violation by such loan of any predatory or abusive lending law.

Page 50: *"Qualified Substitute Mortgage Loan"*: A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding Stated Principal Balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Scheduled Principal Balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Deleted Mortgage Loan, (iii) with respect to any Adjustable-Rate Mortgage Loan, have a Maximum Mortgage Rate not less than the Maximum Mortgage Rate on the Deleted Mortgage Loan, (iv) with respect to any Adjustable-Rate Mortgage Loan, have a Minimum Mortgage Rate not less than Minimum Mortgage Rate of the Deleted Mortgage Loan, (v) with respect to Adjustable-Rate Mortgage Loan, have a Gross Margin equal to the Gross Margin of the Deleted Mortgage Loan, (vi) with respect to any Adjustable-Rate Mortgage Loan, have a next Adjustment Date not more than two months later than the next Adjustment Date on the Deleted Mortgage Loan, (vii) have a remaining term to

86

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 63 of 76

maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (viii) have the same Due Date as the Due Date on the Deleted Mortgage Loan, (ix) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (**x**) have a risk grading determined by the Seller at least equal to the risk grading assigned on the Deleted Mortgage Loan, (xi) have been underwritten or reunderwritten by the Seller in accordance with the same underwriting criteria and guidelines as the Deleted Mortgage Loan, (xii) have a Prepayment Charge provision at least equal to the Prepayment Charge provision of the Deleted Mortgage Loan, (xiii) not be more than 59 or more days delinquent or any additional days delinquent than the Deleted Mortgage Loan, (xiv) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement applicable to the Deleted Mortgage Loan and (xv) be covered by the PMI Policy if the Deleted Mortgage Loan was covered by the PMI Policy. In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate Stated Principal Balances, the Mortgage Rates described in clause (ii) hereof shall be determined on the basis of weighted average Mortgage Rates, the terms described in clause (vii) hereof shall be determined on the basis of weighted average remaining terms to maturity, the Loan- to-Value Ratios described in clause (ix) hereof shall be satisfied as to each such mortgage loan, the risk gradings described in clause (**x**) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (xiv) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be.

Page 51: *"Realized Loss"*: With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid Stated Principal Balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan pursuant to Section 3.05(a)(v) and Section 3.12(c), minus (iv) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the Master Servicer with respect to such Mortgage Loan pursuant to Section 3.05(a)(ii).

If the Master Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are applied to

principal distributions on any Distribution Date.

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid Stated Principal Balance of the related Mortgage Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Mortgage Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, plus (iv) any amounts previously withdrawn from the Collection Account in respect of the related Mortgage Loan pursuant to Section 3.05(a)(v) and Section 3.12(c), minus (v) the aggregate of all Advances made by the Master Servicer in respect of such REO Property or the related Mortgage Loan for which the Master Servicer has been or, in connection with such Final Recovery Determination, shall be reimbursed pursuant to Section 3.13 out of rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property, minus (vi) the total of all net rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property that has been, or in connection with such Final Recovery Determination, shall be transferred to the Distribution Account pursuant to Section 3.13.

With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the Stated Principal Balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the Stated Principal Balance of the Mortgage Loan as reduced by the Deficient Valuation.

With respect to each Mortgage Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

Page 52: *"Reference Banks"*: Deutsche Bank, Barclay's Bank PLC, The Tokyo Mitsubishi Bank and National Westminster Bank PLC and their successors in interest; provided, however, that if any of the foregoing banks are not suitable to serve as a Reference Bank, then any leading banks selected by the Trustee (after consultation with the NIMS Insurer) which are engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) not controlling, under the control of or under common control with the Depositor or any Affiliate thereof and (iii) which have been designated as such by the Trustee.

Page 53: *"REMIC I"*: The segregated pool of assets subject hereto,

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 65 of 76

constituting the primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made, consisting of: (i) such Mortgage Loans and Prepayment Charges as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof, (ii) any REO Property, together with all collections thereon and proceeds thereof, (iii) the Trustee's rights with respect to the Mortgage Loans under all insurance policies, including the PMI Policy, required to be maintained pursuant to this Agreement and any proceeds thereof, (iv) the Depositor's rights under the Mortgage Loan Purchase Agreement (including any security interest created thereby) to the extent conveyed pursuant to Section 2.01 and (v) the Collection Account (other than any amounts representing any Master Servicer Prepayment Charge Payment Amounts), the Distribution Account (other than any amounts representing any Master Servicer Prepayment Charge Payment Amounts) and any REO Account and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, REMIC I specifically excludes any Master Servicer Prepayment Charge Payment Amounts, the Net WAC Rate Carryover Reserve Account, the Cap Contracts, all payments and other collections of principal and interest due on the Mortgage Loans on or before the Cut-off Date and all Prepayment Charges payable in connection with Principal Prepayments made before the Cut-off Date.

Page 59: *"Remittance Report"*: A report in form and substance that is acceptable to the Trustee and the NIMS Insurer on a magnetic disk or tape prepared by the Master Servicer pursuant to Section 4.03 with such additions, deletions and modifications as agreed to by the Trustee and the Master Servicer.

Page 60: *"Residential Dwelling"*: Any one of the following: (i) an attached or detached one- family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a condominium project or (iv) a detached or attached one-family dwelling in a planned unit development, none of which is a co-operative, mobile or manufactured home (unless such mobile or manufactured home is defined as real property under applicable state law).

Page 60: *"Responsible Officer"*: When used with respect to the Trustee, any director, any vice president, any assistant vice president, any associate, any assistant secretary, any trust officer or any other officer of the Trustee, customarily performing functions similar to those performed by any of the above designated officers and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

Page 61: *"Seller"*: Ameriquest Mortgage Company, or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

Page 66: *"Underwriters"*: Each of Greenwich Capital Markets, Inc., Banc of America Securities LLC, Goldman, Sachs & Co., Deutsche Bank Securities Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

*"Underwriters' Exemption"*: An individual exemption issued by the United States Department of Labor on September 6, 1990 as Prohibited

Case 4:09-bk-09703-EWH   Doc 70-1   Filed 06/21/10   Entered 06/21/10 21:49:21   Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD   Page 66 of 76

Transaction Exemption 90-59 at 55 F.R. 36724, to Greenwich Capital Markets, Inc., for specific offerings in which Greenwich Capital Markets, Inc. or any person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with Greenwich Capital Markets, Inc. is an underwriter, placement agent or a manager or co-manager of the underwriting syndicate or selling group

Page 67: *"Value"*: With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan; provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 or, subject to the applicable Originator's underwriting guidelines, an insured automated valuation model.

Page 70: substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance of which is less than or equal to 2.00% of the Pool Balance as of the Cut- off Date;

(ii) the original Mortgage with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(iii) an original Assignment of the Mortgage assigned in blank, without recourse;

(iv) the original recorded assignment and chain…

Page 71: (v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(vi) the original lenders's title insurance policy or an attorney's opinion of title or similar guarantee of title acceptable to mortgage lenders generally in the jurisdiction where the Mortgaged Property is located, together with all endorsements or riders which were issued with or subsequent to the issuance of such policy, or in the event such original title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

If any of the documents referred to in Sections 2.01(ii), (iii) or (iv) above has as of the Closing Date been submitted for recording but either (**x**) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Depositor to deliver such documents shall

90

be deemed to be satisfied upon (1) delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, of a copy of each such document certified by the applicable Originator in the case of (**x**) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the applicable Originator, delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof of either the original or a copy of such document certified by the applicable public recording office to be a true and complete copy of the original. If the original lender's title insurance policy was not delivered pursuant to Section 2.01(vi) above, the Depositor shall deliver or cause to be delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly after receipt thereof, the original lender's title insurance policy. The Depositor shall deliver or cause to be delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

The Seller shall promptly (and in no event later than thirty (30) Business Days, subject to extension upon a mutual agreement between the Seller and the Trustee, following the later of (i) the Closing Date, (ii) the date on which the Seller receives the Assignment from the Custodian and (iii) the date of receipt by the Seller of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to the Trust Fund or the Trustee, in the appropriate public office for real property records, each <u>Assignment referred to in Sections 2.01(iii) and (iv) above and shall execute each original Assignment referred to in section 2.01(iii) above in the following form: *"Deutsche Bank National Trust Company, as Trustee under the applicable agreement."* In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Seller shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded.</u>

Page 73: The Trustee agrees, for the benefit of the Certificateholders, to review (or cause a Custodian on its behalf to review) each Mortgage Note within 45 days of the Closing Date and to certify in substantially the form attached hereto as Exhibit C-1 (or cause the Custodian to certify in the form of the Initial Certification attached to the Custodial Agreement) that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents constituting part of such Mortgage File (other than such documents described in Section 2.01(v)) required to be delivered to it pursuant to this Agreement are in its possession, (ii) such documents have been reviewed by it or such Custodian and are not mutilated, torn or defaced unless initialed by the related borrower and relate to such Mortgage Loan, (iii) based on its or the

Case 4:09-bk-09703-EWH   Doc 70-1   Filed 06/21/10   Entered 06/21/10 21:49:21   Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD   Page 68 of 76

Custodian's examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (1) through (3), (6), (9), (10), (13), (15) and (19) of the definition of *"Mortgage Loan Schedule"* accurately reflects information set forth in the Mortgage File. It is herein acknowledged that, in conducting such review, the Trustee or such Custodian was under no duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine whether they are genuine, enforceable, or appropriate for the represented purpose or whether they have actually been recorded or that they are other than what they purport to be on their face or (ii) to determine whether any Mortgage File should include any of the documents specified in clause (v) of Section 2.01.

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee or any Custodian finds any document or documents constituting a part of a Mortgage File to be missing, mutilated, torn or defaced or does not conform to the requirements identified above, at the conclusion of its review the Trustee (or a Custodian on behalf of the Trustee) shall so notify the Depositor, the NIMS Insurer and the Master Servicer. In addition, upon the discovery by the Depositor, the NIMS Insurer, the Master Servicer or the Trustee of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

Page 75: As to any Deleted Mortgage Loan for which the Seller or the Depositor substitutes a Qualified Substitute Mortgage Loan or Loans, such substitution shall be effected by the Seller or the Depositor, as the case may be, delivering to the Trustee (or a Custodian on behalf of the Trustee), for such Qualified Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2.01, together with an Officers' Certificate providing that each such Qualified Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Shortfall Amount (as described below), if any, in connection with such substitution.

Page 79: It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.05 shall survive delivery of the Mortgage Files to the Trustee or to a Custodian, as the case may be, and shall inure to the benefit of the Trustee, the Depositor and the Certificateholders.

Page 80: The interests evidenced by the Class R-I Interest, together with the REMIC I Regular Interests, constitute the entire beneficial ownership interest in REMIC I. The rights of the Class R Certificateholders and REMIC II (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC I in respect of the Class R-I Interest and the REMIC I Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class

92

R-I Interest and the REMIC I Regular Interests, shall be as set forth in this
Agreement.
Page 81: The Master Servicer shall service and administer the Mortgage
Loans on behalf of the Trustee and in the best interests of and for the benefit
of the Certificateholders (as determined by the Master Servicer in its
reasonable judgment) in accordance with (i) the terms of the respective Mortgage
Loans and any insurance policies related thereto, (ii) all Applicable
Regulations, (iii) the terms of this Agreement, (iv) the Loss Mitigation Action
Plan, if applicable, and (v) to the extent consistent with the preceding
requirements, in the same manner in which it services and administers similar
mortgage loans for its own portfolio, giving due consideration to customary and
usual standards of practice of prudent mortgage lenders and loan servicers
administering similar mortgage loans…

*Subject only to the above-described servicing standards and
the terms of this Agreement and of the respective Mortgage Loans, the Master
Servicer shall have full power and authority, acting alone or through
Sub-Servicers as provided in Section 6.06, to do or cause to be done any and all
things in connection with such servicing and administration which it may deem
necessary or desirable.*


*Page 82: At the written request of the Master Servicer, the Trustee
shall execute and furnish to the Master Servicer such documents as are necessary
or appropriate to enable the Master Servicer to carry out its servicing and
administrative duties hereunder. By execution of this Agreement, the Trustee, on
behalf of the Trust Fund, hereby grants to the Master Servicer a power of
attorney to execute any and all documents necessary to carry out any and all
servicing duties described in this Agreement (including the taking of and
transferring title of REO Properties to third parties held in the name of the
Trustee for the benefit of the Trust) and expressly confirms that this paragraph
along with the face page and a copy of the signature page (duly executed) to
this Agreement shall constitute the power of attorney for evidentiary and/or
recording purposes. The Trustee shall not be liable for the actions of the
Master Servicer or any Sub-Servicers under such powers of attorney.*
Page 82: Consistent with the terms of this Agreement, the Master
Servicer may waive, modify or vary any term of any Mortgage Loan or consent to
the postponement of strict compliance with any such term or in any manner grant
indulgence to any Mortgagor
Page 83: The NIMS Insurer's prior written consent shall be
required for any modification, waiver or amendment if the aggregate number of
outstanding Mortgage Loans which have been modified, waived or amended exceeds
5% of the number of Mortgage Loans as of the Cut-off Date. In the event of any
such arrangement pursuant to clause (ii) above, the Master Servicer shall make
timely advances on such Mortgage Loan during such extension pursuant to Section
4.03 and in accordance with the amortization schedule of such Mortgage Loan
without modification thereof by reason of such arrangements.
Page 83: Notwithstanding the foregoing, in the event that any Mortgage

Case 4:09-bk-09703-EWH    Doc 70-1    Filed 06/21/10    Entered 06/21/10 21:49:21    Desc
Exhibit X H.1 APPENDIX TO DECLARATION OF NEIL FRANKLIN GARFIELD    Page 70 of 76

Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable, the Master Servicer, consistent with the Servicing Standard, may also waive, modify or vary any term of such Mortgage Loan (including modifications that would change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor (any and all such waivers, modifications, variances, forgiveness of principal or interest, postponements, or indulgences collectively referred to herein as *"forbearance"*), provided, however, that in determining which course of action permitted by this sentence it shall pursue, the Master Servicer shall adhere to the Loss Mitigation Action Plan.

*Page 8: (b) DEPOSITS TO THE COLLECTION ACCOUNT. On behalf of the Trust Fund, the Master Servicer shall deposit or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, and shall thereafter deposit in the Collection Account, in no event more than two Business Days after the deposit of such funds into the clearing account, as and when received or as otherwise required hereunder, and retain therein, the following payments and collections received or made by it subsequent to the Cut-off Date with respect to the Mortgage Loans, or payments (other than Principal Prepayments) received by it on or prior to the Cut-off Date but allocable to a Due Period subsequent thereto:*
*(i) all payments on account of principal, including Principal Prepayments, on the Mortgage Loans and REO Properties;*
***(iii) all Insurance Proceeds and Liquidation Proceeds (other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Servicing Standard), Subsequent Recoveries and any amounts received in respect of the rental of any REO Property prior to REO Disposition;***
***(iv) all proceeds related to the purchase, substitution or repurchase of any Mortgage Loan or REO Property in accordance with Section 2.03;***
*(v) any amounts required to be deposited by the Master Servicer pursuant to Section 3.09 in connection with the deductible clause in any blanket hazard insurance policy, such deposit being made from the Master Servicer's own funds, without reimbursement therefor;*
*(vi) any amounts required to be deposited by the Master Servicer pursuant to Section 3.06 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;*
***(vii) all amounts required to be deposited in connection with shortfalls in principal amount of Qualified Substitute Mortgage Loans pursuant to Section 2.03 (for purposes of this clause (vii), the***

94

*Cut-off Date with respect to any Qualified Substitute Mortgage Loan shall be deemed to be the date of substitution);*
*(viii) any amounts required to be deposited by the Master Servicer pursuant to Section 4.03(b);*
*(ix) all Prepayment Charges collected by the Master Servicer, all Prepayment Charges payable by the Master Servicer pursuant to Section 2.03(b)(ii)(A) and all Master Servicer Prepayment Charge Payment Amounts payable by the Master Servicer pursuant to Section 2.03(b)(ii)(B) as limited by Section 2.03(b)(iii); and*
*(x) without duplication, all payments of claims under the PMI Policy.*

*Page 96: (a) The Master Servicer shall, consistent with the Servicing Standard and the Loss Mitigation Action Plan, foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.02.*

Page 97: (a) The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, in trust for the benefit of the Certificateholders. Pursuant to the power of attorney granted in Section 3.01, the Master Servicer is hereby authorized to transfer the title of any REO Property taken in the name of the Trustee to a third party purchaser pursuant to this Section 3.13 without further documentation of its authority as attorney-in-fact for the Trustee on behalf of the Trust.

Page 101: The Master Servicer shall file information returns with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

*(a)(i) The NIMS Insurer may, at its option, purchase a Mortgage Loan which has become 90 or more days delinquent or for which the Master Servicer has accepted a deed in lieu of foreclosure. Prior to purchase pursuant to this Section 3.16(a)(i), the Master Servicer shall be required to continue to make Advances pursuant to Section 4.03. The NIMS Insurer shall not use any procedure in selecting Mortgage Loans to be repurchased which is materially adverse to the interests of the Certificateholders. The NIMS Insurer shall purchase such delinquent Mortgage Loan at a price equal to the Purchase Price of such Mortgage Loan. Any such purchase of a Mortgage Loan pursuant to this Section 3.16(a)(i) shall be accomplished by remittance to the Master Servicer for deposit in the Collection Account of the amount of the Purchase Price. The Trustee shall effectuate the conveyance of such delinquent Mortgage Loan to the NIMS Insurer to the extent necessary, as requested, and the Trustee shall promptly deliver all documentation to the NIMS Insurer.*

95

Page 102: (a) Upon the payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full shall be escrowed in a manner customary for such purposes, the Master Servicer shall promptly notify the Trustee and any related Custodian by a certification in the form of Exhibit E or such other form supplied by the Master Servicer provided that it does not differ from the substantive content of Exhibit E, (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.04(b) have been or shall be so deposited) of a Servicing Officer and shall request delivery to it of the Mortgage File.

Page 103: (c) Upon written certification of a Servicing Officer, the Trustee shall execute and deliver to the Master Servicer any court pleadings, requests for trustee's sale or other documents reasonably necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Each such certification shall include a request that such pleadings or documents be executed by the Trustee and a statement as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee shall not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

*Page 122: (a) On or before each Determination Date, the Master Servicer shall determine as to each Mortgage Loan and REO Property: (i) the total amount of Realized Losses, if any, incurred in connection with any Final Recovery Determinations made during the related Prepayment Period; (ii) whether and the extent to which such Realized Losses constituted Bankruptcy Losses; and (iii) the respective portions of such Realized Losses allocable to interest and allocable to principal. On or before each Determination Date, the Master* **Servicer shall also determine as to each Mortgage Loan: (A) the total amount of Realized Losses, if any, incurred in connection with any Deficient Valuations made during the related Prepayment Period and (B) the total amount of Realized Losses, if any, incurred in connection with Debt Service Reductions**

Page 127: (c) For federal and state income tax purposes**, the Class CE Certificateholders shall be deemed to be the owners** of the Net WAC Rate Carryover Reserve Account and all amounts deposited into the Net WAC Rate Carryover Reserve Account (other than the initial deposit therein of $1,000) shall be treated as amounts distributed by REMIC II to the Holders of the Class CE Certificates. Upon the termination of the Trust, or the payment in full of the Class A Certificates and the Mezzanine Certificates, all amounts remaining on deposit in the Net WAC Rate Carryover Reserve Account shall be released by the Trust and distributed to the Class CE Certificateholders or their designees. The Net WAC Rate Carryover Reserve Account shall be part of the Trust but not part of any REMIC and any payments to the Holders of the Class A Certificates or

96

the Mezzanine Certificates of Net WAC Rate Carryover Amounts shall not be payments with respect to a *"regular interest"* in a REMIC within the meaning of Code Section 860(G)(a)(1).

*Page 128: (a) The Certificates in the aggregate shall represent the entire beneficial ownership interest in the Mortgage Loans and all other assets included in REMIC I. At the Closing Date, the aggregate Certificate Principal Balance of the Certificates shall equal the aggregate Stated Principal Balance of the Mortgage Loans.*

*The Certificates shall be substantially in the forms annexed hereto as Exhibits A-1 through A-19. The Certificates of each Class shall be issuable in registered form only, in denominations of authorized Percentage Interests as described in the definition thereof. Each Certificate shall share ratably in all rights of the related Class.*

*Upon original issue, the Certificates shall be executed and delivered by the Trustee and the Trustee shall cause the Certificates to be authenticated by the Certificate Registrar*

*Page 149: The Trustee, prior to the occurrence of a Master Servicer Event of Default and after the curing of all Master Servicer Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement.*

*Page 150: (i) The Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;*

*(ii) The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;*

*(iii) The Trustee shall not be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the NIMS Insurer, pursuant to the provisions of this Agreement, unless such Certificateholders or the NIMS Insurer, as applicable, shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses an liabilities which may be incurred therein or thereby;*

*nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of a Master Servicer Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs;*

*(iv) The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon*

97

*it by this Agreement;*

*(v) Prior to the occurrence of a Master Servicer Event of Default hereunder and after the curing of all Master Servicer Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the NIMS Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee not reasonably assured to the Trustee by such Certificateholders, the Trustee may require reasonable indemnity against such expense, or liability from such Certificateholders or the NIMS Insurer as a condition to taking any such action;*

Page 157: **ARTICLE IX**
**TERMINATION**
**SECTION 9.01 Termination Upon Repurchase or Liquidation of All Mortgage Loans.**

(a) Subject to Section 9.02, the respective obligations and responsibilities under this Agreement of the Depositor, the Master Servicer and the Trustee (other than the obligations of the Master Servicer to the Trustee pursuant to Section 8.05 and of the Master Servicer to provide for and the Trustee to make payments in respect of the REMIC I Regular Interests, the REMIC II Regular Interests or the Classes of Certificates as hereinafter set forth) shall terminate upon payment to the Certificateholders and the deposit of all amounts held by or on behalf of the Trustee and required hereunder to be so paid or deposited on the Distribution Date coinciding with or following the earlier to occur of (i) the purchase by the Terminator (as defined below) of all Mortgage Loans and each REO Property remaining in REMIC I and (ii) the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or REO Property remaining in REMIC I; provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof. The purchase by the Terminator of all Mortgage Loans and each REO Property remaining in REMIC I shall be at a price (the *"Termination Price"*) equal to greater of (A) the aggregate fair market value of all of the assets of REMIC I and (B) the sum of the Stated Principal Balance of the Mortgage Loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and the appraised fair market value of the REO Properties plus accrued interest through the end of the calendar month preceding the month of the final

98

Distribution Date and any unreimbursed Advances and Servicing Advances (in the case of fair market values required to be determined under (A) or (B) above, as determined by the Terminator, the Trustee and, if the Terminator is not the NIMS Insurer, the NIMS Insurer, as of the close of business on the third Business Day next preceding the date upon which notice of any such termination is furnished to Certificateholders pursuant to the third

Page 161: The Trustee shall prepare, sign and file all of the Tax Returns in respect of each REMIC created hereunder. The expenses of preparing and filing such returns shall be borne by the Trustee without any right of reimbursement therefor. The Master Servicer shall provide on a timely basis to the Trustee or its designee such information with respect to the assets of the Trust Fund as is in its possession and reasonably required by the Trustee to enable it to perform its obligations under this Article.

Page 166: To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer at the expense of the Certificateholders, but only upon direction of the Trustee accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.
For the purpose of facilitating the recordation of this
Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Page 169: It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Depositor to the Trustee be, and be construed as, a sale of the Mortgage Loans by the Depositor and not a pledge of the Mortgage Loans by the Depositor to secure a debt or other obligation of the Depositor or the Seller.

***Page 170: The NIMS Insurer shall be deemed a third-party beneficiary of this Agreement to the same extent as if it were a party hereto, and shall have the right to enforce the provisions of this Agreement.***

99