Ronald Ryan
Ronald Ryan PC
Attorney at Law
1413 E. Hedrick Drive
Tucson, Arizona 85719
(520)298-3333 phone (520)743-1020 fax
AZ #018140 Pima County #65325

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA TUCSON

| | |
|---|---|
| **ANTHONY TARANTOLA, DEBTOR**<br>_____<br><br>**DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE IN TRUST FOR THE BENEFIT OF THE CERTIFICATE HOLDERS FOR ARGENT SECURITIES INC., ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2004-W8, ITS ASSIGNEES AND/OR SUCCESSORS, MOVANT**<br><br>**VS.**<br><br>**ANTHONY TARANTOLA, DEBTOR RESPONDENT** | **Case #   4:09-bk-09703-EWH**<br><br>**DEBTOR'S STATEMENT OF FACTS FOR POST TRIAL BRIEF (SOME IMPORTANT KEY FACTS)**<br><br>**HEARING: 6/23/10 @ 9:00 AM**<br><br>**(MOTION TO LIFT STAY HEARING**)<br><br><br>Chapter 13 |

**STATEMENT OF SOME MAJOR KEY FACTS WITH REFERENCE TO RECORD**

(I)     REQUIREMENT FOR SUCCESSFUL POOLING OF MORTGAGE NOTES

    (A)     REQUIREMENT FOR SUCCESSFUL POOLING OF MORTGAGE
        NOTES AND PROOF THEREOF FROM POOLING AND SERVICING
        AGREEMENT ("PSA")

        Attached hereto are some selected sections from the PSA and are described here.  Because there was some confusion as to whether Movant had all the same pages of the PSA that Debtor had, Movant's version is provided.  Movant did have all the same pages.  The page numbers at the bottom of these pages will be used here.

See all highlighted portions.  Summaries are below.[1]

The "closing Date" is May 6, 2004.  PSA, definitions, p.18.

The "Cut-off Date" with respect to any Mortgage Loan, was the close of business on May 1, 2004.  PSA, definitions, p.19.

Each successfully pooled note had to be sold, negotiated and the original transferred in exactly the following order by the "Cut-off Date" of May 1, 2004, or the "Closing Date" of May 6, 2004."):  Argent Mortgage Company LLC ("Lender" or "Originator"), to Argent Securities Inc., "Depositor," to Ameriquest Mortgage Company, "Seller," to Deutsche Bank National Trust Company, as "Pool Trustee," along with several other requirements.  PSA, p.69, 294, 295, 296

Each original Mortgage Note, had to be endorsed in blank, without recourse, or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse," **with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person** so endorsing to the Trustee. . . " Emphasis added.  PSA, p.69, 296.

All successfully Pooled Notes had to be described in the Closing Schedule and separately and independently listed in "Mortgage Loan Schedule," by the Closing Date.  PSA p.295,

The sale and delivery on the Cutoff Date or Closing Date of the Mortgage Loans described on the Mortgage Loan Schedule in accordance with the terms and conditions of this Agreement as set forth above is mandatory.   There is a contractual understanding that each Mortgage Loan was unique and identifiable on the closing date and that an award of money damages would be insufficient to compensate the Purchaser for the losses and damages incurred by the Purchaser in the event of the Seller's failure to deliver the Mortgage Loans on or before the Closing Date.   PSA, p.311.

The Mortgage Loan Schedule filed with the SEC was blank.  PSA, p.336.  On the page following is Debtor's version of the Mortgage Loan Schedule, because the Movant's version of said blank schedule does not take up a full page as it does in the SEC version, and it doesn't have the feel of emptiness if a full page isn't shown.

(B)     REQUIREMENT FOR SUCCESSFUL POOLING OF MORTGAGE

---

[1]  Exhibit A here (from Movant's 6 and Debtor's F).  Referred to here as PSA followed by Movant's Page Number.  There are only 9 page extracted from PSA, but they come from throughout the document.

NOTES AND PROOF THEREOF FROM GARFIELD DECLARATION AND TESTIMONY[2]

Most likely the Note in this case was never perfected into any pool. B, p.5, 9, 14, 15, 16, 17, 18,

In fact it was virtually impossible for it to be successfully pooled. Exhibit B ("B"), p.7 ( c) and (d), 17,

II    OTHER GARFIELD DECLARATION AND TESTIMONY REFERENCES

The only Real Parties in Interest in each and every securitized mortgage transaction, were the borrower (debtor) and the creditor (investors that purchased Mortgage Bonds or Certificates from which the loan was funded).[3] B, p.3, 13, 14, 15, 16,

MBS Trustee Movants have a duty to credit Debtor for MUCH MUCH more than just the mortgage payments, but they intentionally do not and attempt to keep this fact hidden from public knowledge. B.8, 11, 12, 13, 17, 20,

Garfield concludes that the only beneficiary of record was the originating lender. However, all the facts point to no funding by Argent as a creditor, but by unknown Investors and it was therefore his conclusion that legal ownership remains vested in Argent with equitable ownership in the investors. B., p.9.[4]

Other issues not part of issues Court wants briefed are not discussed here.

The securitization in this case as it was practiced in the real world was probably illegal. B, p.11, 12, 17, 20,

Specifically referring to Standing and RPI, Garfield believes no party involved has Standing, or has not or cannot demonstrate it without fabricating evidence, in which case it still does not establish standing, but may succeed at what amounts to fooling the Court. G, p.12, 13, 14, 15, 16, 18, 20,

---

[2] Exhibit B here is Garfield Declaration Without Appendix (Debtor's Trial Exhibit H).

[3] Though Debtor is not taking the position that a MBS Trustee can stand in for RPI Investors, so long as they are named, and Trust Pool is shown to include Note in question.

[4] Incidentally, Debtor's Counsel doesn't agree with the first part of this opinion.

Only a full equitable proceeding can set the rights of the parties, because of what has been done in terms of misfeasance and malfeasance, including the fact that standing cannot be otherwise established.  14-16, 17, 18, 19, 20,

III.    DEBTOR'S SUMMARY OF MOVANT'S DISCOVERY RESPONSES[5]

They need not be repeated here.  They are attached.

Dated: July 8, 2010

Respectfully submitted,
/s/ Ronald Ryan
Ronald Ryan, Debtor's Counsel

### CERTIFICATE OF SERVICE

I certify that on this date, a true copy of the forgoing was emailed to: Matthew A. Silverman and Jessica R. Kenney McCarthy Holthus Levine 3636 North Central Avenue Suite 1050 Phoenix, AZ 85012 through Jessica R. Kenney Attorneys for Movant, Deutsche Bank National Trust Company, as Trustee in trust for the benefit of the Certificateholders for Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2004-W8;  Chapter 13 Trustee; and Debtor.

/s/ Ronald Ryan

---

[5]  Exhibit C to Statement of Key Facts (Movant's Trial E.1)

Tarantola - Pooling and Servicing Agreement.txt
annexed hereto as Exhibit A-18 and evidencing a Regular Interest in REMIC II for
purposes of the REMIC Provisions.

"Class R Certificate": Any one of the Class R Certificates
executed, authenticated and delivered by the Trustee, substantially in the form
annexed hereto as Exhibit A-19 and evidencing the ownership of the Class R-I
Interest and the Class R-II Interest.

"Class R-I Interest": The uncertificated Residual Interest in
REMIC I.

"Class R-II Interest": The uncertificated Residual Interest in
REMIC II.

"Closing Date": May 6, 2004.

"Code":  The Internal Revenue Code of 1986, as amended.

"Collection Account": The account or accounts created and
maintained by the Master Servicer pursuant to Section 3.04(a), which shall be
entitled "Ameriquest Mortgage Company, as Master Servicer for Deutsche Bank
National Trust Company, as Trustee, in trust for the registered holders of
Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2004-W8."
The Collection Account must be an Eligible Account.

"Commission": The Securities and Exchange Commission.

"Compensating Interest": As defined in Section 4.03(e) hereof.

"Corporate Trust Office": The principal corporate trust office
of the Trustee at which at any particular time its corporate trust business in
connection with this Agreement shall be administered, which office at the date
of the execution of this instrument is located at 1761 East St. Andrew Place,
Santa Ana, California 92705-4934, or at such other address as the Trustee may
designate from time to time by notice to the Certificateholders, the Depositor
and the Master Servicer.

18

<PAGE>

"Corresponding Certificate": With respect to each REMIC II
Regular Interest, as follows:

| REMIC I Regular Interest | Class |
|---|---|
| REMIC I Regular Interest I-LTA1 | A-1 |
| REMIC I Regular Interest I-LTA2 | A-2 |
| REMIC I Regular Interest I-LTA3 | A-3 |
| REMIC I Regular Interest I-LTA4 | A-4 |
| REMIC I Regular Interest I-LTA5 | A-5 |
| REMIC I Regular Interest I-LTM1 | M-1 |
| REMIC I Regular Interest I-LTM2 | M-2 |
| REMIC I Regular Interest I-LTM3 | M-3 |
| REMIC I Regular Interest I-LTM4 | M-4 |
| REMIC I Regular Interest I-LTM5 | M-5 |
| REMIC I Regular Interest I-LTM6 | M-6 |
| REMIC I Regular Interest I-LTM7 | M-7 |

Page 25

```
REMIC I Regular Interest I-LTM8                    M-8
REMIC I Regular Interest I-LTM9                    M-9
REMIC I Regular Interest I-LTM10                   M-10
REMIC I Regular Interest I-LTM11                   M-11
REMIC I Regular Interest I-LTP                     P
```

"Credit Enhancement Percentage": For any Distribution Date and Class of Offered Certificates, will be the percentage equivalent of a fraction, calculated after taking into account distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount to the Certificates then entitled to distributions of principal on such Distribution Date, the numerator of which is the sum of the aggregate Certificate Principal Balances of the Classes of Certificates with a lower distribution priority than such Class, and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

"Cumulative Loss Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred from the Cut-off Date to the last day of the preceding calendar month (reduced by the aggregate amount of Subsequent Recoveries received from the Cut-off Date through the last day of the related Due Period) and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

"Custodian": A Custodian, which shall initially be Deutsche Bank National Trust Company.

"Cut-off Date": With respect to any Mortgage Loan, the close of business on May 1, 2004. With respect to all Qualified Substitute Mortgage Loans, their respective dates of substitution. References herein to the "Cut-off Date," when used with respect to more than one Mortgage Loan, shall be to the respective Cut-off Dates for such Mortgage Loans

19

<PAGE>

"Debt Service Reduction": With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction resulting from a Deficient Valuation.

"Deficient Valuation": With respect to any Mortgage Loan, a valuation of the related Mortgaged Property by a court of competent jurisdiction in an amount less than the then outstanding Stated Principal Balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"Definitive Certificates":  As defined in Section 5.01(b).

"Deleted Mortgage Loan": A Mortgage Loan replaced or to be replaced by a Qualified Substitute Mortgage Loan.

"Delinquency Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of all Mortgage Loans as of the last day of

Page 26

SECTION 1.03 Rights of the NIMS Insurer.

Each of the rights of the NIMS Insurer set forth in this Agreement shall exist so long as (i) the NIMS Insurer has undertaken to guarantee certain payments of notes issued pursuant to an Indenture and (ii) any series of notes issued pursuant to one or more Indentures remain outstanding or the NIMS Insurer is owed amounts in respect of its guarantee of payment on such notes; provided, however, the NIMS Insurer shall not have any rights hereunder (except pursuant to Section 11.01 in the case of clause (ii) below) during the period of time, if any, that (i) the NIMS Insurer has not undertaken to guarantee certain payments of notes issued pursuant to the Indenture or (ii) any default has occurred and is continuing under the insurance policy issued by the NIMS Insurer with respect to such notes.

63

<PAGE>

## ARTICLE II

### CONVEYANCE OF MORTGAGE LOANS;
### ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01. Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement, all other assets included or to be included in REMIC I and the Cap Contracts. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement and the PMI Policy, and the Trustee, on behalf of the Certificateholders, acknowledges receipt of the same.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee the following documents or instruments with respect to each Mortgage Loan so transferred and assigned, the following documents or instruments (a "Mortgage File"):

(i) the original Mortgage Note, endorsed in blank, without recourse, or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee, or with respect to any lost Mortgage Note, an original Lost Note Affidavit; provided however, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance of which is less than or equal to 2.00% of the Pool Balance as of the Cut-off Date;

D-1

<PAGE>

### MORTGAGE LOAN PURCHASE AGREEMENT

This is a Mortgage Loan Purchase Agreement (the "Agreement"), dated May4, 2004, between Ameriquest Mortgage Company, a Delaware corporation (the "Seller") and Argent Securities Inc., a Delaware corporation (the "Purchaser").

#### Preliminary Statement
---------------------

The Seller intends to sell the Mortgage Loans (as hereinafter defined) to the Purchaser on the terms and subject to the conditions set forth in this Agreement. The Purchaser shall deposit the Mortgage Loans into a mortgage pool constituting the Trust Fund. The Trust Fund will be evidenced by a single series of asset-backed pass-through certificates designated as Series 2004-W8 (the "Certificates"). The Certificates will consist of nineteen classes of certificates. The Class M-11 Certificates, the Class CE Certificates, the Class P Certificates and the Residual Certificates (collectively, the "Non-Offered Certificates") will be delivered to the Seller or its designee as partial consideration for the Mortgage Loans as further described below.

The Certificates will be issued pursuant to a Pooling and Servicing Agreement relating to the Series 2004-W8 Certificates, dated as of May 1, 2004 (the "Pooling and Servicing Agreement"), among the Purchaser as depositor (in such capacity, the "Depositor"), the Seller as master servicer (the "Master Servicer") and Deutsche Bank National Trust Company as trustee (in such capacity, the "Trustee"). Pursuant to the Pooling and Servicing Agreement, the Depositor will assign all of its right, title and interest in and to the Mortgage Loans, together with its rights under this Agreement, to the Trustee for the benefit of the Certificateholders. Capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement.

The parties hereto agree as follows:

SECTION 1. AGREEMENT TO PURCHASE. The Seller hereby sells, and the Purchaser hereby purchases, on or before May 6, 2004 (the "Closing Date"), certain adjustable-rate and fixed- rate conventional, one- to four-family, residential mortgage loans (the "Mortgage Loans"), having an aggregate principal balance as of the close of business on May 1, 2004 (the "Cut-off Date") of $1,065,000,005.62 after giving effect to all payments due on the Mortgage Loans on or before the Cut-off Date (the "Closing Balance"), whether or not received, including the right to any Prepayment Charges collected after the Cut-off Date from the Mortgagors in connection with any Principal Prepayments on the Mortgage Loans. Any payments (including Prepayment Charges) collected on or before the Cut-off Date, including all scheduled payments of principal and interest due on or before the Cut-off Date and collected after the Cut-off Date, shall belong to the Seller. In addition to the sale of the Mortgage Loans, the Seller will cause the Cap Contracts to be transferred to the Purchaser.

Page 294

<PAGE>

-2-

SECTION 2. MORTGAGE LOAN SCHEDULE AND PREPAYMENT CHARGE SCHEDULE. The Purchaser and the Seller have agreed upon which of the mortgage loans owned by the Seller are to be purchased by the Purchaser pursuant to this Agreement, and the Seller shall prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Closing Schedule") describing such Mortgage Loans and setting forth all of the Mortgage Loans to be purchased under this Agreement. The Closing Schedule shall conform to the requirements set forth in this Agreement and to the definition of "Mortgage Loan Schedule" under the Pooling and Servicing Agreement. The Closing Schedule shall be used as the Mortgage Loan Schedule under the Pooling and Servicing Agreement. The Seller shall also prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Prepayment Charge Schedule") setting forth each Mortgage Loan containing a Prepayment Charge and conforming to the definition of Prepayment Charge Schedule under the Pooling and Servicing Agreement.

SECTION 3. CONSIDERATION.

In consideration for the Mortgage Loans that will be purchased hereunder, the Purchaser shall, as described in Section 8, (i) pay to or upon the order of the Seller in immediately available funds an amount equal to the net sale proceeds of the Class A-1 Certificates, the Class A-2 Certificates, the Class A-3 Certificates, the Class A-4 Certificates, the Class A-5 Certificates, the Class M-1 Certificates, the Class M-2 Certificates, the Class M-3 Certificates, the Class M-4 Certificates, the Class M-5 Certificates, the Class M-6 Certificates, the Class M-7 Certificates, the Class M-8 Certificates, the Class M-9 Certificates and the Class M-10 Certificates and (ii) deliver to the Seller, or its designee, the Non-Offered Certificates.

SECTION 4. TRANSFER OF THE MORTGAGE LOANS.

(a) POSSESSION OF MORTGAGE FILES. The Seller does hereby sell to the Purchaser, without recourse but subject to the terms of this Agreement, all of its right, title and interest in, to and under the Mortgage Loans, including the related Prepayment Charges collected after the Cut-off Date. The contents of each Mortgage File not delivered to the Purchaser or to any assignee, transferee or designee of the Purchaser on or prior to the Closing Date are and shall be held in trust by the Seller for the benefit of the Purchaser or any assignee, transferee or designee of the Purchaser. Upon the sale and contribution of the Mortgage Loans, the ownership of each Mortgage Note, the related Mortgage and the other contents of the related Mortgage File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or that come into the possession of the Seller on or after the Closing Date shall immediately vest in the Purchaser and shall be delivered immediately to the Purchaser or as otherwise directed by the Purchaser.

(b) DELIVERY OF MORTGAGE LOAN DOCUMENTS. The Seller will, on or prior to the Closing Date, deliver or cause to be delivered to the Purchaser or any assignee, transferee or designee of the Purchaser each of the following documents for each Mortgage Loan:

<PAGE>

(i) the original Mortgage Note, endorsed in blank, without recourse, or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee, or with respect to any lost Mortgage Note, an original Lost Note Affidavit; provided however, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance of which is less than or equal to 2.00% of the Pool Balance as of the Cut-off Date;

(ii) the original Mortgage with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(iii) an original Assignment of the Mortgage assigned in blank, without recourse;

(iv) the original recorded intervening Assignment or Assignments of the Mortgage showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee as contemplated by the immediately preceding clause (iii) or the original unrecorded intervening Assignments;

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(vi) the original lenders's title insurance policy or an attorney's opinion of title or similar guarantee of title acceptable to mortgage lenders generally in the jurisdiction where the Mortgaged Property is located, together with all endorsements or riders which were issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such original title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

If any document referred to in Section 4(b)(ii), 4(b)(iii) or 4(b)(iv) above has been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Seller hereunder shall be deemed to have been satisfied upon (1) delivery by or on behalf of the Seller promptly upon receipt thereof to the Purchaser or any assignee, transferee or designee of either the original or a copy of such document certified by the Seller in the case of (x) above or the public recording office in the case of (y) above to be a true and complete copy of the recorded original thereof and (2) if such delivered copy is certified by the Seller then in addition thereto delivery promptly upon receipt thereof of either the original or a copy of such document certified by the public recording office to be a true and complete copy of the original. In

<PAGE>

Tarantola - Pooling and Servicing Agreement.txt
Person shall pay) the costs and expenses of printing (or otherwise reproducing)
and delivering this Agreement, the Pooling and Servicing Agreement, the
Certificates, the prospectus and the Prospectus Supplement relating to the
Certificates and other related documents, the initial fees, costs and expenses
of the Trustee relating to the issuance of the initial certification of the
Trustee under Section 2.02 of the Pooling and Servicing Agreement, the fees and
expenses of the Seller's counsel in connection with the preparation of all
documents relating to the securitization of the Mortgage Loans, the filing fee
charged by the Securities and Exchange Commission for registration of the
Certificates, the cost of outside special counsel that may be required for the
Purchaser, the cost of obtaining the documents referred to in Section 9(g) and
the fees charged by any rating agency to rate the Certificates. All

<PAGE>

-19-

other costs and expenses in connection with the transactions contemplated
hereunder shall be borne by the party incurring such expense.

          SECTION 11. [Reserved].

          SECTION 12. [Reserved].

          SECTION 13. MANDATORY DELIVERY; GRANT OF SECURITY INTEREST.
The sale and delivery on the Closing Date of the Mortgage Loans described on the
Mortgage Loan Schedule in accordance with the terms and conditions of this
Agreement is mandatory. It is specifically understood and agreed that each
Mortgage Loan is unique and identifiable on the date hereof and that an award of
money damages would be insufficient to compensate the Purchaser for the losses
and damages incurred by the Purchaser in the event of the Seller's failure to
deliver the Mortgage Loans on or before the Closing Date. The Seller hereby
grants to the Purchaser a lien on and a continuing security interest in the
Seller's interest in each Mortgage Loan and each document and instrument
evidencing each such Mortgage Loan to secure the performance by the Seller of
its obligation hereunder, and the Seller agrees that it holds such Mortgage
Loans in custody for the Purchaser, subject to the Purchaser's (i) right, prior
to the Closing Date, to reject any Mortgage Loan to the extent permitted by this
Agreement, and (ii) obligation to deliver or cause to be delivered the
consideration for the Mortgage Loans pursuant to Section 8 hereof. Any Mortgage
Loans rejected by the Purchaser shall concurrently therewith be released from
the security interest created hereby. The Seller agrees that, upon acceptance of
the Mortgage Loans by the Purchaser or its designee and delivery of payment to
the Seller, that its security interest in the Mortgage Loans shall be released.
All rights and remedies of the Purchaser under this Agreement are distinct from,
and cumulative with, any other rights or remedies under this Agreement or
afforded by law or equity and all such rights and remedies may be exercised
concurrently, independently or successively.

          Notwithstanding the foregoing, if on the Closing Date, each of the
conditions set forth in Section 8 hereof shall have been satisfied and the
Purchaser shall not have paid or caused to be paid the purchase price, or any
such condition shall not have been waived or satisfied and the Purchaser
determines not to pay or cause to be paid the purchase price, the Purchaser
shall immediately effect the redelivery of the Mortgage Loans, if delivery to
the Purchaser has occurred and the security interest created by this Section 13
shall be deemed to have been released.

          SECTION 14. NOTICES. All demands, notices and communications
                    Page 311

Tarantola - Pooling and Servicing Agreement.txt
MORTGAGE LOAN SCHEDULE

Filed By Paper

Schedule I-1

<PAGE>

SCHEDULE 2

PREPAYMENT CHARGE SCHEDULE

Available Upon Request

Schedule-2-1

<PAGE>

SCHEDULE 3

PMI MORTGAGE LOANS

Available Upon Request

Schedule-3-1

</TEXT>
</DOCUMENT>

Page 336

SCHEDULE 1

MORTGAGE LOAN SCHEDULE

Filed By Paper

Schedule I-1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| **ANTHONY TARANTOLA, Debtor** <br><br> _____ <br><br> **Deutsche Bank National Trust Company , as Trustee in trust for the benefit of the Certificateholders for Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2004-W8, its assignees and/or successors, Movant,** <br> **v.** <br> **Anthony Tarantola, Debtor; and Dianne C. Kerns, Chapter 13 Trustee, Respondents.** | Case #  **4:09-bk-15411-EWH** <br><br> **EXPERT DECLARATION OF** <br> **NEIL FRANKLIN GARFIELD, ESQ.** <br><br><br><br> Chapter 13 |

STATE OF ARIZONA       )
                              )
COUNTY OF MARICOPA  )

Neil Franklin Garfield, Esq., deposes and states unsworn under penalty of perjury as follows:

      I am over the age of 18 years and qualified to make this affidavit.  I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations, analysis, opinions and testimony.  I have been a licensed member in good standing of the Florida Bar since May 31, 1977.  My resume was filed by debtor previously and is incorporated herein.

      My area of expertise which is offered in the case at bar is based upon my knowledge, training and experience in the field of securities, the securities industry, derivative securities, securitization of debt, securities regulation, special purpose vehicles, structured investment vehicles, pooling of assets for issuance of asset-backed securities, issuance and sale of asset-backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named (frequently as a trust with a trustee for the holders of certificates or non-certificated interests in mortage-backed securities), the economics of securitized residential mortgages, the securitization of mortgage loans, accounting, generally accepted accounting principles, and Financial Accounting Standards in the context of said securitizations, the internal revenue code as it applies to REMIC vehicles and pooling and servicing of securitized loans.  I also rely upon my specific experience with the creation of derivative securitized instruments when I worked on Wall Street for various investment banking firms, and as an investment banking consultant in a company that was owned by me.  I also rely upon current and recent

1

contacts in the investment banking industry, including intermediary conduits, underwriters of issued and reissued securities that were sold to investors in the form of mortgage-backed securities. I have knowledge, training and direct experience with various precursor asset protection strategies including minimization of tax liability which also are constructed to be made bankruptcy remote in commercial and real estate settings. I have knowledge, training and experience in loan origination, underwriting, and the assignment and assumption of securitized residential mortgage loans. I also have legal knowledge, training and experience including areas of securities law and litigation, real estate property law and litigation, and the Internal Revenue Code as applicable to REMICs and the uniform commercial code.

Further, I have knowledge, training and experiences in the ==actual practices prevalent during the period of 2001 to 2008 that enabled the securitization of residential home mortgage loans,== the accumulation and availability of investment dollars, and the representations and assumptions used in the sale of mortgage-backed securities to investors. In addition, I have specific knowledge, training and experience in the review of hundreds of mortgage closing documentation, and compliance with the Federal Truth in Lending Act, the Federal Real Estate Settlement and Procedures Act and other consumer protection statutes, common law, rules, and regulations from federal and state agencies regarding predatory lending practices, and customary practices in the closing of real estate transactions in the State of Arizona.

==All factual testimony or statements made in this declaration are true and correct to the best of my knowledge and belief. All opinions stated herein are based upon a reasonable degree of probability or a high likelihood of probability.== I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations, analysis, opinions and testimony.

==I have been asked to render opinions== pertaining to the closing of a purported loan transaction between Anthony Tarantola and an entity named in the closing papers as "Argent Mortgage." ==I have reviewed== all appropriate documentation in connection with the purported loan closing specifically, I have reviewed the contextual documentation which provided the foundation by which the loan closing could occur, to wit: the securitization documents that were executed prior to the offering or origination of the subject loan. In addition, I have reviewed the actual closing documents in the subject loan and I have reviewed various web sites of the parties that were named at the time of the closing, and the intermediaries in the securitization chain who were conduits for the origination, underwriting and funding of the loan on behalf of investors who purchased mortgage-backed securities.

Each of the documents, web sites, and other materials which are in my possession by virtue of having done similar reviews and analysis on numerous other transactions, some of which involve the same parties as in the instant litigation, are of the type that experts in my field would customarily rely upon in forming opinions and inferences.

The method of analysis which I employed consisted of numerous steps which are summarized as follows:

1.      Review of the securitization documentation enabling the offer and sale of the loan product to the debtor/borrower in the instant case.

2

2.      Review of the closing documentation between the borrower and the alleged "lender."

3.      A comparison of the closing documentation with the borrower and the foundation documents, in particular, the pooling and service agreement, assignments, assumptions, underwriting standards, acceptance standards for receipt and acceptance of the borrower's obligation into a pool of other loans, and the roles of the securitization participants.

4.      Analysis of the chain of title on record in connection with the property described in the closing documents of the borrower.

5.      Analysis of the chain of negotiation of the obligation, note and mortgage (Deed of Trust).

6.      Opinion and conclusions relating to the ownership of the obligation, note and/or mortgage.  In rendering these opinions and conclusions, I assumed that the transaction consisted of a loan that was funded for the benefit of the borrower thus creating an obligation.  I further assumed that the note and writer were evidence of said obligation.  In addition, I assumed that the Deed of Trust was incident to the executed note and did not constitute evidence of the obligation nor did it replace or constitute the note.

7.      Opinions and conclusions relating to the current status of the obligations of the borrower.

8.      Opinions and conclusions relating to the current status of the creditor, including an identification of the creditor.

9.      Opinions and conclusions regarding the status of the obligation as reflected by the servicer's records.

10.     Opinions and conclusions regarding the status of the obligation in accordance with all receipts and disbursements by or on behalf of the creditor, its agents or affiliates, including third-party mitigation payments received by or on behalf of the owner of the beneficial or equitable interest in the obligation.

My opinions and conclusions are affected by the context of my general opinions and conclusions regarding the securitization of residential home loans during the period 2002 through 2008.  In my opinion, the real parties in interest in each and every such transaction, were the borrower (debtor) and the creditor (investors who advanced the funds from which the loan was funded).

The obligation that arose as a result of the funding of the loan and the acceptance of the benefits of said funding, gave rise to an obligation between the borrower and the actual lender (investor).  In my opinion, the documentation utilized by the parties at many levels in the securitization chain, do not reflect the intention of the real parties in interest, and therefore do not constitute complete evidence of the obligation.

3

In my opinion, the Deed of Trust utilizing a nominee or strawman as the beneficiary, where said nominee was never involved in the funding of the transaction, or in many cases specifically disclaimed on the face of the documentation, and elsewhere any interest or claim regarding the obligation note or mortgage (Deed of Trust) is the equivalent of the failure to state any beneficiary under the Deed of Trust or any mortgagee under mortgage deed. Lastly, my opinion is that the party who can exercise the power of sale under non-judicial statutory authority, is limited to a party who could plead and prove a case in foreclosure in a judicial proceeding. My opinion is that said statement, is the only valid conclusion, inasmuch as any other interpretation would open the door to moral hazard, allowing the taking of property without due process.

## TARANTOLA PARTIES

It is my observation that many different parties in the securitization chain have initiated foreclosure expressing title or attempted to claim rights to enforce the DOT and Note. This serves as the backdrop to the instant litigation. In thousands of cases, servicers, MERS, agents with "power of attorney", trustees of every ilk and level etc. have initiated such actions claiming or representing that they stand in the shoes of the Lender without a shred of evidence to proffer under the rules of evidence to support their claim.

Several such attempts, upon discovery have led to extremely heavy sanctions not only against the party illicitly seeking foreclosure, but against the law firm that advocated for such an unjust result.

Civil sanctions as high as $850,000 have been levied against lawyer and client.

Criminal investigations are underway in many states, class actions by investors, class actions by borrowers and qui tam actions are all underway alleging tawdry schemes, fraud and deception.

In some of those cases I have seen the evidence to support the allegations of investors against these same parties and class actions by borrowers against these same parties and in my opinion they have merit, while the defenses offered are, in my opinion completely without merit.

I do not convey here, with certainty that the Movant is automatically subject to sanctions or criminal penalties as a result of other cases; however, the backdrop of hundreds of cases in which documents were fabricated and forged in the name of Deutsch Bank in particular, leaves me extremely skeptical as to the efficacy of their claims.

I have reviewed multiple files in which securitization participants have all claimed to be the holder, Lender, HDC or agent for an undisclosed creditor who nonetheless had every right to take the property of a homeowner based upon a presumed but unproved debt owed to another party.

The parties the subject transaction according to my review of the securitization documentation dated May 1, 2004 (the cutoff date), the loan closing documents, and my knowledge of the parties and standard practices of the financial services industry are as follows:

1. Unidentified Investors ("Lender" as a group) who purchased mortgage backed securities. This purchase was the source of money advanced into an account from which, among other things, the borrower's loan was funded. The Lender received a bond with terms and conditions at substantial variance from the note signed by

4

the borrower. It is therefore my opinion that the obligation owed to the Lender was different in amount and rights to payments than the obligation signed by the borrower as to amount and obligation to make payments. **Both the bond and the note anticipate insurance and other mitigating payments, hence the Lender and borrower, although unknown to each other, were in agreement on one point: that insurance, guarantee or other counterparty payments would be credited to the Lender and a credit against the obligation owed by the borrower.** The Movant steadfastly refuses to answer questions about such payments or even the identity of the Lender. These payments were never allocated to the individual loans giving rise to the claim for third party payments, although they were paid to the Lender or the Lender's agents. The money to purchase the insurance, guarantee and counterparty contracts was paid by the intermediaries from money due to the investor, the borrower or both. Since the condition subsequent is expressly stated in the securitization documentation in compliance with like provisions in the note signed by borrower I presume that the only reason why the Movant would refuse to provide a proper accounting and the identity of the Lender is that they either don't know, don't care or are hiding something. It is my opinion that the answer can fairly be stated as all three. The intermediaries, having sought and obtained false appraisals of the securities sold to investors, false appraisals of the property used as collateral for the buyer, and falsely made insurance claims on their own behalf, now seek to obtain an even greater benefit using the argument, as I have heard it in hundreds of cases, that it is somehow more equitable that they profit at the expense of the borrower and the investor.

a.      In accordance with the Uniform Commercial Code as adopted by the State of Arizona, the Investors as a group are the creditor of the obligation from the borrower.

      i.      The almost universal practice of the industry and certainly the pattern of conduct of the parties named as underwriters and other intermediaries in the Tarantola chain, is that the securities transaction occurred prior to the offering or closing on the origination of the loan to Tarantola through Argent Mortgage acting as a mortgage broker, unregistered as such in the State of Arizona.

b.      In this case there are two pools identified and named. This might be an error of the underwriters or evidence that the loan was split into two pools or that the loan was intended to be transferred into both pools. If the loan was intended to be transferred into both pools, it is possible that the first one in time may have priority.

c.      For reasons explained below, it is my opinion that the status of the loan in terms of securitization is most likely that it was never perfected into any pool. My conclusion is that virtually all other parties in the securitized loan chain are irrelevant other than the Lender as identified in this paragraph and, as nominal parties, Argent Mortgage Company, LLC and/or Argent Securities, Inc. However, several of the parties named below received mitigation payments to be applied to loans that included the Tarantola loan.

5

d.   The amount of money advanced by investors in relation to this loan I have computed through mathematical calculation (see below) to be approximately $747,000.

e.   The amount of money shown on the closing documents to have been funded on this loan was approximately $377,000, plus points etc.

f.   The amount of money received through third party payments I have computed through mathematical calculation to be a minimum of 5 times the loan amount and a maximum of 30 times the loan amount. Thus the minimum received from third parties for contractual loss mitigation broken down and allocated to this loan was approximately $1,885,000. Adding the yield spread premium gap ($747,000-$377,000=$370,000) the gross amount received by intermediary agents of the investors totals approximately $2,255,000. These third party payments are specifically provided in the securitization documents (see appendix) but undisclosed to both the real parties in interest, to wit: the borrower and the Lender. I therefore conclude that the loan is not and never was in default.

2.   Anthony Tarantola, borrower

3.   Argent Securities Inc. as depositor

2.   Ameriquest Mortgage Company, as seller and master servicer

3.   Deutsche Bank National Trust Company as trustee for American Home Mortgage Assets Trust 2007-1 mortgage back **** through certificates, Series 2007-1

4.   Greenwich Capital Markets Inc.

5.   Banc of America Securities LLC, underwriter

6.   Goldman Sachs and Company, underwriter

7.   Deutsche Bank Securities Inc., underwriter

8.   Merrill Lynch Pierce Fenner and Smith Incorporated, underwriter

9.   NIMS, insurer; one or more insurance companies issuing a financial guaranty insurance policy covering payments to be made under the securitization documents

10.   Argent Mortgage Company LLC, wholesaler, "the mortgage loans will have been originated by the sellers wholesale lending affiliates, Argent Mortgage Company LLC and Olympus Mortgage Company" (prospectus)

11.   Town and Country Credit Corp., retailer

12.   Olympus Mortgage Company, wholesaler, "the mortgage loans will have been originated by the sellers wholesale lending affiliates, Argent Mortgage Company LLC and Olympus Mortgage Company" (prospectus)

13.   Bedford Home Loans Inc., retailer Alt-A

14.   Radian Guaranty a Pennsylvania Corporation, insurer, providing limited protection in the event of mortgage loan default

15.   Series 2004-W8 Trust, a putative trust referred to in the prospectus and pooling and service agreement, "the depositor will establish a trust relating to the Series 2004-W8 certificates…" (Prospectus), indicating that a condition subsequent was required, to wit: the formation of a trust under applicable state law, presumably the laws of the State of New York

16.   John P. Grazer, CFO, signatory for Argent Securities Inc.

17.   John P. Grazer, EVP, signatory for Ameriquest Mortgage Company

18.   Ronaldo Reyes, assistant vice president, signatory for Deutsche Bank National Trust Company

6

19. Valerie Delgado, associate, signatory for Deutsche Bank National Trust Company
20. MERS System
21. DTC
22. Clear Stream (Luxemburg) Euroclear Bank SA/NV
23. Deutsche Bank National Trust Company as trustee for Argent Securities Inc. asset back past through certificates Seires (sic) 2004-W8, referred to in the securitization as a "Trust" to be created in the future by the depositor Argent Securities.

a. My research reveals no actual entity by that name although it seems to have been filed for REMIC status with the Internal revenue Service.

b. The existence of the trust is therefore unknown, in the absence of further evidence.

c. Whether the trust ever had "ownership" of the loan if it did exist is subject to conditions precedent that affirmatively appear to have been unsatisfied. Hence acceptance of any assignment or attempted assignment of the subject loan is doubtful at best.

d. If the loan was effectively transferred, the current status of the loan is dependent upon conditions subsequent expressly stated in the securitization documents. Since the loan is part of a failed pool wherein the customary practice was liquidation and transfer of assets for resecuritization and reissuance of mortgage backed securities or derivatives thereof, it is virtually impossible for the loan to be in the pool claimed by Movant.

e. My conclusion is that unless the Movant is an actual trustee with actual trustee powers of an actual successor trust wherein actual assets in the trust include the Tarantola loan, then the Movant has no basis in fact for attempting enforcement of the obligation, note or mortgage. I have neither seen nor am I able to uncover through research such situation.

f. Accordingly, it my opinion that the legal title to the loan is hopelessly defective but the equitable title remains with the investors who advanced the money from which the borrower's loan was funded. But, since the agents of the investors received money that is due to the borrower under the Truth in Lending Act (being undisclosed fees and profits) the investors have a legal claim against the investment bank that did the writing and selling of the mortgage backed securities. The equitable claim for a lien on the borrower's property is extinguished by virtue of the fact that the amounts received offset any scheduled payments in the past, present or future.

The loan made to Debtor was part of a two way transaction in which the two parties at each end thereof each purchased a "Financial Product."

On one end, the home buyer or refinancer was "sold" a residential home loan.

On the other side, a Mortgage Bond was sold to an Investor.

In my opinion, both financial products were securities. Neither set of securities were properly registered or regulated.

Information that would reveal the identity of the "Lender" is in the sole care, custody and control of the Loan Servicer or another Intermediary conduit in the Securitization Chain, including but not limited to the Trustee or Depositor for

7

the Special Purpose Vehicle that re-issued the homeowner's Note and encumbrance as a Derivative Hybrid Debt Instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

Said Security, the Bond, that was sold to an Investor was done by use of the Borrower's identity and obligation without permission. In my opinion, it is equally probable that the Investors were kept unaware that a maximum of only 2/3 of their investment was actually going to fund Debtor's loan and others similarly situated, with the excess being used to create instant income for Participants. Debtor was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

In my opinion, Tarantola's obligation is owed to the party who advanced the money to fund the loan. This party consists of a group of investors who purchased interest known as mortgage-backed securities, granting them the full beneficial right and ownership of a percentage of a pool of assets in the process of securitization. My conclusion is that the borrower owes the money to the creditor as described above. It is the creditor who has an obligation to provide a full and complete accounting of all receipts and disbursements that are allocable to the loan account or the loan transaction with the borrower. In the case at bar, no such accounting has been offered. In fact, the intermediaries who purport to have the right to foreclose, clearly refuse or have failed to provide the necessary information for the borrower to determine the current status of the obligation. Instead, the intermediaries offer only an accounting for transactions during a specific period between the borrower and the servicer. Missing from this accounting, are transactions between the borrower and the originating "lender" (Argent) and transactions in which third-party payments were received by the creditor or on behalf of the creditor through authorized agents or affiliates, all as set forth in the pooling and service agreement and prospectus, a copy of which is attached hereto with excerpts that in my opinion are relevant to the analysis of this case.

In my opinion Argent was acting as the agent, subagent, or affiliate of multiple parties (each with conflicting interests and roles) at the time of the closing with the borrower. The principal was undisclosed. Argent was, as I have seen in numerous transactions, engaged in a pattern of conduct in which it acted as the Agent for undisclosed principles. Thus the loan clearly a table-funded loan, as promulgated by Regulation Z of the Federal Reserve, and the applicable provisions of the Truth in Lending Act. The purpose of said regulations and laws is to reduce the asymmetry of information between the borrower and the lender. It is presumed that the lender is in a superior position and far more sophisticated in the analysis of proposed loan transactions than a borrower who may be accepting the offering of a loan product with little or no knowledge as to what it contains. This transaction was a single transaction between the borrower and the party who advanced funds, with many intermediaries acting as conduits and agents for documentation and money.

Based upon the answers and objections to debtor's discovery, I conclude that there is an issue of fact as to whether the loan was in fact securitized. Movant declined to answer a question as to whether it was the beneficiary of the Deed of Trust. Instead it declares that it is the holder of the note. From that answer, it appears that Movant is not the beneficiary of the Deed of Trust

8

but is asserting the position that it is the holder of the note. Movant declines to answer whether the note is payable to Movant. Therefore I conclude that the note is payable to some other party.

Movant declines to answer any question about the pooling of the obligation, evidence of the obligation (note) or any instrument incident to said evidence (note) that would secure the obligation with an encumbrance upon real property. I conclude that this is an admission against interest. Movant alleges that it is the Trustee of a Pool of Assets that includes the debtor's obligation. Yet Movant declines to answer any questions, including an admission that said pool of assets actually includes Debtor's obligation. I therefore conclude that the Pool does not include debtor's obligation, as of the time of the response to debtor's discovery.

Since Movant asserts it the Trustee of a Trust and the subject matter in dispute in the case at bar does not appear to have any relationship to said trust, the Trustee (Deutsch) has no interest in the debtor's obligation, directly or indirectly. Based upon my knowledge of standard industry practices the most likely reason is that the alleged assignments either never actually took place or never were perfected. While it is possible, although unlikely, that any such assignments were properly and timely executed, there is no evidence that the assignment was accepted, and thus the transaction was never completed.

Therefore, I conclude that the only beneficiary of record is Argent, the originating lender. However, all the facts point to the intention of the parties to securitize the loan and thus was funded not by Argent as a creditor, but by investors who purchased mortgage backed securities. It is therefore my conclusion that legal ownership remains vested in Argent with equitable ownership or rights of subrogation in favor of the investors. This was a table-funded loan, which was funded like hundreds of others originated by Argent, through third parties that were not disclosed nor were the fees for the origination, yield spread premiums or other compensation relating to the funding disclosed to the borrower. This is presumptively a predatory loan under regulation Z of the Federal Reserve, and the Federal Truth in Lending Act.

To be clear, in other forums the attempt has been made to characterize this analysis as meaning that although the borrower took the benefit of the loan and the creditor (investor) advanced the money that funded the loan, the borrower no longer had any obligation. This is not correct.

This analysis only means that the identity of the creditor has been misstated and the issue of whether the obligation is secured is dependent upon whether there was a split of the note from the mortgage which is a question of fact.

The simple answer is that if the note is payable to one party and the beneficiary under the deed of trust is another party, the note and mortgage were separated and the obligation is no longer secured. However, this cannot be finally resolved in this forum with the current configuration of parties. The reality is that the equitable owner of the obligation (the investor) intended to have the money advanced secured by a mortgage, as all the paperwork shows. The borrower clearly understood that an obligation was being created and that it was secured by an encumbrance upon the debtor's real property.

9

Hence, the intention of the real creditor and the borrower were the same. It was the intermediaries, acting as agents of the investors, that failed to perform their duties in perfecting or completing the transaction, thus causing numerous breaks in the chain of title of both the note and the mortgage.

The obligation lies at the essence of the transaction whether documents were prepared or not, and whether those documents were prepared correctly or not and whether they were properly recorded or not. The investor therefore has equitable rights to assert which the debtor must answer. Those rights are subject to a complete accounting from the creditor (investor) and the agents of the creditor. The balance, if any, is still due and might be secured by a lien created by the court. The terms of payment might be gleaned from the original note as amended by the court in equity.

At this time, therefore, there is no valid notice of default or notice of sale. The substitute trustee has failed to perform due diligence or is ignoring the duty to do so. Based on the above, the substitute Trustee on the deed of trust has a duty to cease any proceedings. The substitution of trustee was, as indicated above, most likely executed by a party with no interest, beneficial or otherwise, in the obligation, note or mortgage. To a high degree of certainty I conclude that the Trustee under the Deed of Trust remains unchanged from the recitations on the recorded Deed of Trust.

Securitization of residential home mortgages are not improper or illegal. The method, in practice, by which residential home mortgages were securitized during the period 2002 to 2008 was mostly improper and illegal. Besides the usual predatory practice of steering borrowers into more expensive and less viable loans than would be appropriate or acceptable to either the borrower or the lender (investor), there existed a second yield spread premium at the level of the sale of the loan to the investor. The prospectus and pooling and service agreement clearly allow for the funds to be used for general operational purposes, instead of providing a specific schedule of a use of proceeds in which all of the invested funds are used to fund residential home mortgages and fees as set forth in those documents.

This created a gap, which was used by the investment banking underwriter who created and controlled all of the intermediaries, in which the difference between the rate of return promised in the offering of mortgage-backed securities and the nominal rate of return of the pool resulted in a gap which varied from 5 percent to 100 percent of the actual loan funded in any given case. In my opinion, in the case at bar, this yield spread premium gap, properly allocated to the loan in the case at bar, together with the undisclosed fees and yield spread premiums paid to the parties and intermediaries involved in the closing, actually exceeds the entire principle due at the time of the closing of the loan.

CALCULATION OF YIELD SPREAD PREMIUM IN UPPER TIER OF SECURITIZATION CHAIN: $1 billion (approximate) in securities offering. No showing of actual proceeds or any limitations on issuer. Second yield spread premium may exist in this unknown spread or in the spread between the offering amount and the unknown actual amount funded. Extrapolating from yields disclosed in the prospectus the actual yield promised to investors was approximately 7%, with the right to reduce same under a variety of circumstances wholly in control of the

10

underwriters. The nominal yield weighted average is stated in several different ways in order to confuse the reader and make computation more challenging. Based upon computations made directly from the prospectus and comparing it with similar prospectuses involving most of the same parties, the nominal actual average interest was sold to the SPV at approximately 9.6%. Thus, rounding down, the yield spread premium was 2.5%. 2.5% is 26% of the nominal 9.6% rate. Applying 26% to the declared proceeds, the dollar yield spread, undisclosed to either the investors or the borrowers, was approximately $250,000,000. The nominal principal of the debtor's note is approximately $377,000. The non-weighted yield spread premium at this level of the lending chain should therefore be expressed as either $94,250 or $82,500. Applying an average between the two methods, the estimated non-weighted yield spread premium on this loan is approximately $88,000 without weighting. Applying the customary weighting using the actual nominal rate sold on this debtor's loan (14.1%), the estimated yield spread premium earned by participants in this lending chain from this level of the lending chain was in fact approximately $369,460 (almost equal to the loan itself). Adding customary interest ($232,759.80) and treble damages ($1,108,380) under the Federal Truth and Lending Act the net actual dollar liability for yield spread premium at said level due from the lending chain on debtor's loan would therefore be expressed as $ $1,341,139.80 due to borrower. This amount is subject of course to a determination of all other claims and defenses each or any of the parties may have.

Under the terms of the Truth in Lending Act and other applicable statutes, undisclosed fees are due back to the borrower, and thus would affect the status of any alleged default, and the balance due on the obligation. In addition, the presence of the second yield spread premium as described above, necessitates the purchasing of insurance and other credit enhancements, hedge products and guarantees. The reason why it necessitates the use of such products, besides the obvious risk that the loan is likely to go unpaid by the borrower, is that in the event that the loan is in fact paid, and remains fully performing, the amount owed to the creditor will be equivalent to the amount allocated to his purchase of mortgage-backed securities. This would leave the securities underwriter in the position of owing the difference between what the investor thought was being invested in loans and the actual lower amount.

The purchase amount of the securities vastly exceeds the amount that was invested in the funding of mortgage loans including the one in the case at bar. In order to avoid criminal and civil liability in administrative sanctions, it would be necessary for the intermediaries who retained the yield spread premium gap, to retain the power to declare the pool in which loans were allegedly located, to have been depreciated in value and thus collect the proceeds of insurance, credit enhancements, hedge products and so forth. By retaining the power to declare a pool as being in default or failure, the intermediaries were guaranteed the proceeds of insurance or other third-party payments regardless of whether a particular loan went into default or not.

These amounts were default mitigation payments, which should have been allocated on some basis to each obligation claimed to be in the loan pool. I have sued a simple mathematical calculation arriving at the relative size of the loan to the entire "pool" identified by the prospectus. In accordance with the provisions of the note, which is partial evidence of the obligation as stated above, the receipt of such payments would be first applied to payments due, second to fees due, and third returnable to the borrower. Presumably, the return to the borrower would be by way of a credit against the obligation due; however, it is an open question as to

11

whether or not the money received from third parties should be actually paid to the borrower or simply credited against the obligation due.

In my opinion, none of the parties in the case at bar have any credible claim to the status of the "creditor." Further, none of the parties in the case at bar have any clear credible claim to being in the status of an authorized agent for the principle.

There are several reasons for the above findings.

First the actual principle is a confused issue which must be sorted out with the proof as offered by the alleged "lender."

There are multiple levels of potential authority to enforce the obligation if any is due. Because of the extremely high likelihood that third-party payments were received, but are neither denied nor admitted by the parties in the case at bar, it is most likely that the notice of default was fatally defective, and in fact that there is no default when the third-party payments are applied as required.

The confusion arises out of the creation of documents by the investment banking underwriter which were intentionally obscure. The purpose of said obfuscation was to enable the investment banker to write down the value of the pool of assets, while at the same time allowing the master servicer to purchase the assets at a vastly reduced price compared to that which was paid by the actual lender (investors).

Thus the payment by third-party insurers or counter-parties, would be retained by the master servicer and used as profit which was directed to certain entities which appear to be located in London. Taking the securitization documentation on its face, however, one would reach the inevitable conclusion that the lender is the investor, the trustee is in actuality a conditional agent of an undetermined pool of assets which purportedly are organized into a trust which is not properly formed under the laws of the State of New York as specified by the laws of said state. Thus the grouping of investors was at best a loosely knit partnership using the prospectus and pooling service agreement as a reference point for what appears to be an unwritten operating agreement.

The master servicer is the party that, on its face, retains all power over all transactions and would be the party that might conceivably have some claim of agency to bring claims for enforcement of the obligation. However, at the instruction of the master servicer, and in accordance with the provisions of the securitization documentation, there is no requirement for due diligence, inquiry or investigation as to the actual status of a particular obligation and whether it is in actuality in default after giving credit for all potential payments that may have been made and accepted on behalf of whoever is the current holder of the paper which is used as evidence of the obligation.

It is highly likely that the investors have a claim to the same money that the borrowers are entitled to receive under the Truth in Lending Act. Some of these actions by the intermediaries, violate the wording and the intent of the real parties and interests (the home owner and the investor). The actual documentation that serves as the evidence of the obligation is both the note that was executed by the borrower and the bond that was received by the lender (investors). In some cases the specific provisions vary considerably, and actually conflict with one another. That conflict is always resolved in favor of the intermediaries to the detriment of both the investor and the borrower.

12

In my opinion, neither the investor nor the borrower would have executed any documentation, advanced any funds, nor accepted the loan product that was offer, had the full facts been known by both sides. It is therefore the imperative of the intermediaries to keep the investor and the home owner separate inasmuch as sharing of information between the investor and the home owner could lead to a considerable chain of negative consequences to the intermediaries.

In addition, the chain of "authority" continues down from the master servicer to sub-servicers and other agents. In connection with this particular case, the pooling and service agreement was executed by Renaldo Reyes, whose conversation with a borrower was heard by the declarant. In part, I rely upon the content of said conversation in which Mr. Reyes said that notwithstanding the wording and provisions contained in the securitization documentation and the various instruments allegedly executed in connection with the underwriting, funding, and assignment of the subject obligation, that the party with the actual fiduciary rights, duties and obligations is the sub-servicer handling the account with the borrower. In fact, Mr. Reyes states that the final decision on the disposition of any loan, lies in practice solely with said servicer and not with the nominal trustee (Deutsch).

Thus we have nominally a number of intermediaries in the chain as described in the documentation, most of which is conflicting, and requires no action on the part of any of the intermediaries, and prevents any action by any of the intermediaries without satisfaction of conditions subsequent which are described in the securitization documentation. Contrary to the recitations in the documentation, Mr. Reyes seems to state that the practice employed in all securitized home mortgage transactions, is different than the requirements set forth in any of the documents, including the loan closing documents executed by the borrower.

The plain truth of the transaction is that the investor lent the money, the borrower took the benefit of the funding of the loan, while the documentation shown to the borrower and the documentation shown to the lender were different. On the one hand the borrower executed note and Deed of Trust and on the other hand the investor received a bond which was based upon the alleged existence of certain assets which could be changed out, depreciated or otherwise disposed of without the knowledge or consent of either the lender or the borrower. This contradiction in terms as well as contradiction in practice requires that any party seeking to enforce the obligation or enforce the right to an encumbrance on the real property, must state a case for doing so and show the actual chain of documentation which would in fact and in truth present the reality of the situation. In my opinion, the reality of the situation is that the lender has an equitable right to the obligation subject to an accounting for third-party payments. Further, it is my opinion that the lender may have an equitable right to seek an encumbrance upon the property securing the obligation, if any as it is redefined based upon the proof which is offered to the court. In turn the borrower has a claim against any party who received directly or indirectly the benefit of third party payments, the proceeds of which came from insurance policies purchased from the transaction between the Lender (Investors) and the borrower.

I use the following definition of "Creditor" taken from research in cases, the Bankruptcy Code and the Uniform Commercial Code. A "Creditor" is a legal entity that has advanced funds, goods or services in consideration of the right to payment, or has purchased the right to be paid.

13

In the bankruptcy context, a "Creditor" is an entity that had a Claim against Debtor before the case was filed. 11 U.S.C. § 101(10). A "Claim" is a right to payment. § 101(5). Only a Creditor may file a Proof of Claim. § 501(a). The "Official Form 10 reflects this requirement by describing the 'Name of Creditor' as 'the person or other entity to whom the debtor owes money or property." In the context of securitized residential mortgages (including the one in the instant case), a "Creditor" is a legal entity or group of entities or persons under the law who have advanced money for the funding of mortgage loans and who are owed money from those mortgage loans. The creditor in the case at bar can be generically described as an Investor, as defined under the rules and regulations of the Securities and Exchange Commission who has paid money to an intermediary in a chain of securitization that resulted in the funding of one or more residential loan transactions; the promise to pay is from an entity usually referred to as a Special Purpose Vehicle (SPV) which is frequently erroneously referred to as a "Trust" with a "Trustee," that in the applicable Pool in this case was Movant.

The creditor/investor receives an instrument which is generically referred to as a Mortgage Backed Asset Certificate ("Certificate"). The Certificate incorporates terms by which the promise to pay interest and principal is made by the issuing SPV.

The promise to pay is conditioned upon several terms, including but not limited to the performance of a pool of loans, the obligations of third parties, and impliedly the receipt of insurance proceeds triggered by partial non-performance of the pool of assets allocated to the SPV.

In turn the SPV pool is carved out of other pools created by Aggregators employed by investment banking firms. The Aggregators are parties to Pooling and Service Agreements and Assignment and Assumption Agreements, which are Securitization documents that predate the funding of the loans in any of the Pools. The Certificate issued to the Investor conveys a percentage interest in the Pool of assets that is allocated to the SPV. To the extent the information in this paragraph was phrased in generalities, they were applicable to the specifics in this case.

I was asked to render an opinion as to the factual basis pertinent to the issue of Standing. As relates to Constitutional Standing, my opinion is premised on the following definition: Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the defendant's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision. Valley Forge Christian Coll. v. Am. United for Separation of Church and State, 454 U.S. 464, 472 (1982); United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996).

My presumption, in the context of the question posed to me, is that standing requires that a party will suffer financial loss derived from non-performance (i.e., nonpayment) of the subject contract, which in this case is the obligation that arose when the subject loan was funded on behalf of the debtor as homeowner and referred to in some documents as the Borrower. Since the funding occurred out of a pool of money received by the investment banker from the investors, the investors are the creditors.

By way of indenture (usually incorporating a prospectus) the investors agreed to an operating plan that defined the functions of the conduit which was used to funnel funds to the investor from the pool. However, since no assets remain in the conduit which is defined under the Internal Revenue Code as a REMIC (Real Estate Mortgage Investment Conduit) it is

14

challenging to describe the creation, maintenance and function of the "trust.". The REMIC is referred to in the world of finance as an SPV (Special Purpose Vehicle). I presume the words "conduit" and "vehicle" convey the fact that no actual business events of taxable or monetary significance takes place in the REMIC. I conclude that this corroborates my opinion that the investors are the creditors, having been the only parties to advance funds from which the subject loan was funded.

The note signed by said borrower and the mortgage-backed bond accepted by the investor who purchased said security are both evidence of the obligation.

The Deed of Trust is intended to be incident to the note and possibly incident to the bond, if the chain of title was perfected. The Payee on the note and the payee on the bond are different parties. The bonds were issued with three principal indentures: (1) repayment of principal non-recourse based upon the payments by obligors under the terms of notes and mortgages in the pool (2) payment of interest under the same conditions and (3) the conveyance of a percentage ownership in the pool of loans, which means that collectively 100% of the investors own 100% of the entire pool of loans.

This means that the "Trust" does NOT own the pool nor the loans in the pool. It means that the "Trust" is merely an operating agreement through which the investors may act collectively under certain conditions. Accordingly, it is my opinion that the parties with standing in relation to a securitized loan are the debtor/borrowers and the creditor/investors. This would be further corroborated if, as a matter of fact, the investment banker followed industry standard of selling the mortgage backed security FORWARD. "Selling forward" means that the security was sold and the money was collected before the first loan was offered or funded on behalf of borrowers. However, even if the investment banker had not closed the sale of the securities with investors before accepting applications for loans, it would have been on the basis of an expectation of said funding. Ultimately, in all securitized loans there is really only one transaction --- a loan from the investors to the homeowner. Without an investor there would be no loan; conversely without a borrower there would be no investor or investment.

It is accordingly my opinion that none of the intermediary parties are or ever were creditors and that they therefore lack standing as defined above. None of them had at any time relevant to the subject matter before this Court, the filing of the Bankruptcy Case to the present, suffered any actual or threatened injury as a result of the Debtor's non-payment of monthly payments pursuant to the original terms of the Note, nor because of her alleged default thereon, nor can any actual or threatened injury be traced to any other proceedings in bankruptcy court, including but not limited to the motion for relief from stay proceedings, any action involving a Proof of Claim, the Chapter 13 Plan or otherwise, and therefore there never was any legitimate redress available to any of these parties by a favorable decision.

As relates to the issue of Real Party in Interest, the factual criteria and question I have presupposed is: "Whether Movant"s own financial interest was at stake in the outcome of the litigation before the Bankruptcy Court." My opinion is offered based on all evidence before the Court to date is as follows:

A) Other than the Lender (investors) none of the parties to this transaction and certainly no party in court now ever had any of its own funds at risk in the outcome of the litigation.

B) The Trustee cannot act as one would have the authority to do, for example, as if it had an

15

unlimited power of attorney, or as in an express trust that grants unlimited authority to act on behalf of the Certificate Holders. The Trustee cannot "stand in the shoes" of the certificate holders without a special grant of authority and indemnification. Therefore, the Trustee does not have the authority to be the Real Party in Interest on behalf of the Certificate Holders. Also, the proof in the record is inadequate to establish that the ownership of the Note, holdership of the Note, or right to enforce the Note was properly pooled to the above described alleged Mortgage Trust "Pool." Accordingly, as the record stands, the evidence does not establish the Trustee as being the Real Party in Interest.

None of the known Participants in the subject securitization chain, including but not limited to Movant, has suffered any financial loss relating to the loan, nor are they threatened with any future loss even if foreclosure never occurs. None of the known securitization Participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding same with respect to the loan. None of the known securitization Participants, will suffer any monetary loss through non performance of the loan. All of the known securitization Participants received fees and profits relating to the loans. The existence and identity of the real parties in interest was withheld from the Borrowers/Plaintiffs in the closing and servicing of the loan, and since.

All of the known securitization Participants fail to meet one or more of the following two tests required for HDC status: 1) without actual knowledge of defects; and/or 2) in good faith, meaning a legitimate belief that the loan was solid, based upon the information they had at the time of purchase of the Note.

The investor is still the Creditor if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable. Thus for purposes of this declaration, the unknown and undisclosed Investors constitute the only Creditor presumed to exist until the undersigned is presented with contrary evidence of the type that an expert in my field of expertise would normally take into account in forming opinions and conclusions.

Therefore I conclude that if there remain any Creditors, pursuant to the Note, they are the unidentified Investors and all other parties are intermediary or representative or disinterested. Debtor has made unsuccessful attempts to obtain from Movant and others the identity of the Investors, the documentation authenticating their identity, and an accounting that would show all money paid or received in connection with the subject obligation. Neither Affiant, nor Movant, nor the Court will be able to determine the amount of Debtor's equity in the property until a complete accounting of all debits and credits, including but not limited to, the 3rd party payments referred to above.

Until such time as requests for said information have been answered, I will be unable to identify with certainty the exact identity of the current creditor, meaning the true owner of the alleged obligation, other than to say, with certainty, that it is not Movant, nor any Participant in the Securitization chain.

Several transactions have purportedly taken place regarding the subject loan, as the Note was

16

transferred up the chain of securitization to the Trustee of the MBS Pool. In my opinion, the "Lender," as set forth in the original DOT, in securitized loans is at best only a nominee for an undisclosed principal. The transaction with the homeowner was subject to a pre-existing contractual relationship wherein the Investors advanced the funding for the loan and profits, fees, expenses, rebates, and kickbacks. This is known to many of the known and unknown securitization Participants, inasmuch as they have been the recipients of memoranda from legal counsel and advisers, which in my opinion are not protected by attorney client privilege or the attorney work product privilege, in which they have been informed that it is only a "Nominee" when the "Lender" does not advance cash for funding the loan and does not receive any payments on the obligation.

MORAL HAZARD: A situation has been created which at least theoretically would allow multiple parties to make claims on the same property from the same borrower, claiming the same Note and DOT as the basis therefore. The intended monetary effect of the use of such a Nominee was to provide obfuscation of profits and fees that were disclosed neither to the Investor who put up the money nor to the Borrower in this loan. In the case at bar, it is my opinion based upon a reasonable degree of financial analytical certainty, that the total fees and profits generated were actually in excess of the principal stated on the note which is to say that Investors unknowingly placed money at risk the amount of which vastly exceeded the funding on the loan to the borrower.

The only way this could be accomplished was by preventing both the Borrower and the Investor from accessing the true information, which is why the industry practice of Nominees like the private MERS system were created. Even where MERS is not specifically named in the originating documents presented to the homeowner at the "closing" it was industry practice from 2001-2008 to utilize MERS "services", or to implement practices similar to those utilized by MERS.

Therefore it is possible and even probable that the data from the closing was entered into the MERS electronic registry and that an assignment was executed to MERS purportedly giving MERS some power over the obligation, the Note and/or the encumbrance. As a general rule in securitized transactions and especially where MERS is named as Nominee, documents of transfer (assignments, endorsements, etc.) are created and executed contemporaneously with the notice of default thus selecting a Participant in or outside the securitization chain to be the party who initiates collection and foreclosure. The very practice of having a secret system of recording transfers of beneficial ownership of real estate notes, ipso facto creates an automatic cloud upon title.

In my opinion, it is unlikely that any HDC exists, because of the way securitization was universally practiced within the investment banking community during 2001 through 2008. Hence the loan product sold to the subject homeowner included a Promissory Note that was evidence of a real obligation that arose when the transaction was funded but lost its negotiability in the securitization process, which thus bars anyone from successfully claiming HDC status.

The negotiability of the note was negatively affected by (1) the splitting of the note and mortgage as described herein; (2) by the addition of terms, conditions, third party obligors and undisclosed profits, fees, kickbacks all contrary to existing federal and state applicable statutes and common law (which has relevance to the TILA, RESPA and related allegations in the Forensic Review Analysis, attached hereto as Exhibit A; and (3) knowledge of title and chain of title defects in the ownership of the Note, beneficial interest in the encumbrance, and position as

17

Obligee on the obligation originally undertaken by the subject homeowner.

The only party that can claim to be a Holder in Due Course ("HDC") of the Note are those that paid value for the Note, without knowledge that there were any pending challenges to its validity and who fulfill the other requirements for HDC status. This HDC and the Third Party Sources are the only ones that could conceivably suffer a monetary or pecuniary loss resulting from non-payment of the obligation. The Investor could lose if because they advanced the actual funds from which the Financial Product Loan was funded, assuming these Investors that purchased asset backed securities were those in which ownership of the Loans were described with sufficient specificity as to at least express the intent to convey ownership of the obligation as evidenced by the Promissory Note and an interest in real property consisting of a security interest held by an entity that was described as the Beneficiary of a Trust created by an instrument entitled "Deed of Trust." These Investors were not named. This practice has been intentional, in my opinion, based on the overwhelming commonality of this reoccurring obvious failure, and other overwhelming evidence. The Third Party Sources that could conceivably lose because they would have paid value prior to default or notice of default, and fall within one or more of the following classifications:

a) Insurers that paid some party on behalf of said investors;

b) Counterparties on credit default swaps;

c) Conveyances or constructive trusts arising by operation of law through cross collateralization and over collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches;[1]

d) The United States Treasury Department through the Troubled Assets Relief Program in which approximately $600 billion of $700 billion has been authorized and paid to purchase or pay the obligation on "troubled" (non performing) assets of the LOANS are part of the class of assets targeted by TARP;

e) The United States Federal Reserve, which has extended credit on said troubled assets and has exercised options to purchase said troubled assets;

f) Any other party that has traded in mortgage backed securities from the aggregated pools or securitized tranches containing interests in the Notes.

In my opinion, based on evaluation and review of a multitude of Mortgage Backed Securities documentation, financial documentation, from knowledge of the gains that can be made by various Participants from various triggers, and from investigations performed, and the consistency with which the same situation, with the same problems is seen to exist in nearly every example, it is reasonable to conclude that the creation of an untenable situation for Investors in these transactions, or the appearance of an untenable situation for Investors, is that paradoxically said situations have been intentionally created.

The loan made to Debtor was part of a two way transaction in which the two parties at each end thereof each purchased a "Financial Product." On one end, the home buyer or

---

[1] "Tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle. They are described in the Securitization Documents reviewed and on file.

18

refinancer was "sold" a residential home loan. On the other side, a Mortgage Bond was sold to an Investor. In my opinion, both financial products were securities. Neither set of securities were properly registered or regulated, and the information that would reveal the identity of the "Lender" is in the sole care, custody and control of the Loan Servicer or another Intermediary conduit in the Securitization Chain, including but not limited to the Trustee or Depositor for the Special Purpose Vehicle that re-issued the homeowner's Note and encumbrance as a Derivative Hybrid Debt Instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool). Said Security, the Bond, that was sold to an Investor was done by use of the Borrower's identity and obligation without permission. In my opinion, it is equally probable that the Investors were kept unaware that a maximum of only 2/3 of their investment was actually going to fund Debtor's loan and others similarly situated, with the excess being used to create instant income for Participants. Debtor was unaware that such large profits or premiums were being generated by virtue of his identity and signature on the purported loan documents.

According to information from Debtor, Debtor has made unsuccessful attempts to obtain from Movant and others the identity of the Investor/Creditor and possession of documentation authenticating this identity. Neither Affiant, Movant, nor the Court will be able to determine the identity of the Creditor, if any still remains, until requests for information and documentation have been complied with.

I have also reviewed, for the past 40 years, published Financial Accounting Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known Participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet, or on the ledgers used to prepare the balance sheet, but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization Participant in this case.

It also appears that the standard industry practice of creating a yield spread premium between the Creditor and Originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, it is highly probable, far beyond 50% probability that the Debtor's loan was sold or pre-sold to the Investors at a gross profit to the Participants in the securitization chain of at least 35% of the total principal balance of the note.

It is also my opinion that this was done without full disclosure to the Investors and that this is tantamount to fraud upon the Investors. In my opinion the investors were and remain completely unaware that much, and in many cases most of the money they supplied was used to fund fees for the Participants in the securitization chain, with the rest used to fund bloated mortgage loans based upon inflated appraisals by companies that had a less than arm's length relationship with the Originator and others involved in obtaining approval for the loan. These

19

yield spread premiums far exceed those ever paid prior to the securitization of residential mortgages.

With yield spread premiums such as these, there was no way that there could ever be a legitimate profit made by any Investor under ordinary circumstances, with the exception of those in upper tranches, whose profit was insured from the start, no matter how lacking in viability were these investment vehicles on the whole, because of the way payments to the Investors were prearranged. It is also my opinion that the overall Security was planned by the Aggregator (in this case, Goldman Sachs and subsidiaries) and other Participants to fail from the start. The reason for the intended failure of the overall Pool in my opinion was to better insure that the fraud perpetrated on the Investors would be less likely to be discovered and to make it so that additional unearned profit could be

made by the Aggregator and other Participants, based on the Third Party Payments discussed above that were payable only when there was a declaration of default by the Pool, often called a "trigger event," the various forms of which are defined in the PSA and other Securitization Documents. In my opinion, direct allegations or implications regarding fraud and conversion, as well as intentional aiding and abetting or conspiracy are well taken. The theory that each Participant, including the very first party in the securitization chain, the Lender on the Deed of Trust, is complicit in acts and series of acts with knowledge that these actions will harm the debtors, including fraud and conversion, and/or are part of a scheme to commit fraud and conversion in the form of not crediting borrowers account by third party source payments, thereby converting ownership of the property from the Borrower, the Debtor in this case, is well respected among those that study transactions of this sort.

The following are types of wrong performed upon borrowers, at least some of which occurred with the Debtor/Plaintiff in this case, by Loan Brokers and Originators ("Lenders" in the original deeds of trust), which were acts in furtherance of an overall fraud and conversion scheme that were necessary to its success, because without a large number of loans doomed to fail from the start the main planner and major Participants could not be certain that the Mortgage Pools as a whole would fail.

a) The fact that Borrowers paid as much as double what the homes were actually worth, due to a real estate market that was artificially inflated because of the wealth of investment dollars looking for a home following the bursting of the dot.com bubble, followed by what amounts to an economic depression for the working poor. Borrowers can't afford the payments and they are losing their homes, and the unbelievable abundance of foreclosures shows the extent to which any defect in character they may have is common to large numbers of persons. Appraisal values were often over-inflated even above the artificially high values provided by the market and appraisers were advised they would not receive further business unless they cooperated.

b) Borrowers were mislead as to what the monthly payments would be a few years into the loans.

c) In more extreme cases, Borrowers were often offered teaser rates that they qualified for, but which greatly increased within a very short period of time.

d) There was so much investment money looking for someone to borrow it

20

Case 4:09-bk-09703-EWH    Doc 78-1    Filed 07/08/10    Entered 07/08/10 15:12:05    Desc
Exhibit POST TRIAL BRIEF STATEMENT OF SOME KEY FACTS WITH EXHIBITS ATTACHED    Page 33 of 41

that could sign a note during this time, that loans were pushed at people with persuasive and high pressure tactics;

e) Borrowers were advised that they could afford a much nicer home then they really could. It appears hard to resist a home that is much nicer than thought affordable, when someone that appears to be a reputable professional assures them they can afford it. Optimism and wishful thinking overpower reason.

f) Loan brokers were pushed to offer loans that were on worse terms than the borrower could qualify for. Sometimes they received higher commissions, often in secret, for getting people to take out loans on terms that were less beneficial then a loan that Borrowers would have qualified for. And sometimes the only loan products that loan brokers had available to them were those containing unfavorable terms.

g) Borrowers were advised that they did not have to worry about the payments being unaffordable in the future, because they would be definitely be able to refinance again at that point, because the market was so solid.

h) Underwriters were pushed by supervisors to pass through bad loans, many of which were obviously doomed to fail from the start.

"Under the Truth in Lending Act, Regulation Z, and the Real Estate Settlement Procedures Act, these undisclosed yield spread premiums are a liability of Participants in the securitization chain, including the loan Originator and all Participants owed to the Homeowner/Debtor. In my opinion, this disclosure does not appear on any of the Homeowner/Debtor's documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real Estate Settlement and Procedures Act. Further, no information appears in Debtor's closing documentation that would have caused him to inquire about such a premium.

"In my opinion, the allegations contained in ¶¶ 21-23 of the Amended Complaint, pertaining to TILA, RESPA and similar statutes are well taken. Questions as to statute of limitation would not be applicable on a number of theories, including, but not limited to: fraud tolls the statute of limitations; and until the name of the true creditor, lender, beneficiary is made known to the borrower, the statute of limitations time frame does not begin to run.

A MBS Pool Trust is not really a true "Trust." The Trustee thereof has been involved in  a joint enterprise with the other Participants in the creation of a Financial Product for sale to Investors, the purchasers of Mortgage Bonds. The so-called Pool "Trustee" is more like an administrator. The first loyalty of the Pool Trustee is not to the Investors, but to the parties to which it entered into contract with, the Participants. Based on its actions as can be seen over and over again, it seems it is more interested finding ways not to reimburse the Investors than to find ways to do so.  In the securitization of the loans, the rights of various named mortgagees, assignees and/or Trustees have each been superseded by succeeding conduits including BAC,  the so-called "Trustee," which is really something of a figure-head.  The Trustee of a Mortgage Pool such as that in this case is more like an administrator than a trustee.  The powers of said officer or Trustee are limited to ONLY what the Certificate Holders authorize. It cannot be overemphasized that the **Investors were not signatories to the Securitization Documents**, only the named Participants were. The transaction with the Investor in which they advanced "loan"

21

money for the subject homeowner's loan product, was consummated most likely before the transaction with the homeowner or was subject to binding agreements between various Participants in the securitization scheme that pre-dated the transaction with the homeowner. Therefore, the actual and undisclosed Creditor was the Investor who advanced the cash and who was known by the securitization Participants, and therefore was the only party entitled to claim a first lien either legally or under equitable subrogation. Accordingly, the only potential party to a foreclosure wherein the purported creditor alleges financial injury and therefore a right to collect the obligation, enforce the Note or enforce the DOT is either a party who has actually advanced cash and stands to lose money or an authorized representative who can disclose the principal, provide proof of service or notice and show such express, unequivocal and complete authority to perform all acts and make all decisions without condition. In my opinion, any condition placed upon the Trustee to act for the MBS Pool Certificate Holders, including the power to enter into any compromise, makes the

The Trustee is something less than the Real Party in Interest on behalf of the Certificate Holders. For one thing, the certificate holders in either or any of the named pools might have settled their claims under the procedures set forth in the securitization documents. IN that case, the special purpose vehicle (i.e., the "pool" or "trust" is certainly dormant and probably dissolved, leaving the Trustee pursuing foreclosure on a home loan that (a) is not in the pool and (b) is paid off AND in some other pool.

Also, a party must be answerable to the claims, affirmative defenses and counterclaims of the homeowners for such causes of action or defenses as might be applicable or they would be blocked potentially by collateral estoppel if the court determined the foreclosing party was acting within the scope of its agency for the Principal, the Certificate Holders.

In my opinion, as above, and with a reasonable degree of factual and legal certainty, the disclosed principals in the securitization chain, up to and including the Pool Trustee, are not the Creditors nor are they authorized agents for the Creditors, without proof that they have been granted this authority pursuant to the terms of the Securitization documents.

Otherwise, the Participants, including Servicers and Pool Trustees, in my opinion, are interlopers or impostors whose design is to take title to property they have no right to claim, and to enforce a Note which is evidence of an obligation that is not owed to them but rather to another.

The details of this information, whether the Special Purpose Vehicle still exists, whether the investor has been paid in full through Third Party Payments, are known only to these securitization Participants and the heretofore undisclosed Investors. And the Participants have demonstrated time and time again that they are not credible. In my opinion the attorneys for the known Securitization Participants do not have any authority to represent the Creditor, and could not represent them due to the obvious conflict of interest, to wit: the Investors upon learning that a substantial amount of their advance of cash was pocketed by the intermediaries and now is left with a mortgage whose nominal value is far below what was paid, and whose fair market value is far below the nominal value, would have potential substantial claims against the securitization Participants for fraud, conversion, breach of contract, and other claims. Fraud upon the investors in relevant to borrowers because it is additional evidence of an overall fraud and conversion scheme against borrowers, because it tends to show motive and intent in the fraud and conversion claims made by borrowers.

22

"This concludes this Unsworn Declaration, made under penalty of perjury."

Signed on _June 21, 2010.


___/S/ **NEIL F. GARFIELD, ESQ.**_____
Neil Franklin Garfield, Esq.

1  Ronald Ryan
2  Ronald Ryan PC
   Attorney for Debtors
3  1413 E. Hedrick Drive
   Tucson, AZ 85719
4  (520)298-3333 ph 743-1020 fax
   ronryanlaw@cox.net
5  AZ Bar #018140 Pima Cty #65325

6  ## UNITED STATES BANKRUPTCY COURT
7  ### DISTRICT OF ARIZONA, TUCSON DIVISION

8
9  **ANTHONY TARANTOLA,**                    Case #   4:09-bk-09703-EWH

10 **DEBTOR**
   _____            **DEBTOR'S SUMMARY OF MOVANT'S
11                                             DISCOVERY RESPONSES**
12 **DEUTSCHE BANK NATIONAL TRUST
   COMPANY, AS TRUSTEE IN TRUST FOR
13 THE BENEFIT OF THE
   CERTIFICATE HOLDERS FOR ARGENT
14 SECURITIES INC., ASSET-BACKED            HEARING:   6/23/10 @ 9:00 AM
   PASS-THROUGH CERTIFICATES, SERIES
15 2004-W8, MOVANT**

16 **VS.**

17 **ANTHONY TARANTOLA, DEBTOR             Chapter 13
   RESPONDENT**
18

19      COMES NOW, Anthony Tarantola, Debtor and Respondent, and files this Debtor's Summary

20 of the Responses to Motion for Relief from Stay, served by Deutsche Bank National Trust

21 Company, as Trustee in trust for the benefit of the Certificateholders for Argent Securities Inc.,

22 Asset-Backed Pass-Through Certificates, Series 2004-W8, ("Pool Trustee" or MBS Pool Trustee"),

23 Movant, signed under penalty of perjury by Alexandru Nicolau and Warb Wilcox.  This filing is for

24 the Court's convenience and summarizes _some_ of the Responses to Debtor's Requests for

25 Admission, Interrogatories and Requests for Production to Creditor.   Movant's Discovery

26 Responses have made many points for Debtor by these responses. The Responses in their totality

27

28                          Page 1 of  5

with the questions with Debtor's Comments will be submitted to the Court as a trial exhibit. The Discovery Responses were filed by Movant at Doc 52-1 Filed 05/19/10, and are offered into evidence. The version of the Discovery Responses that will be a Trial Exhibit contains the below provided statements from Debtor as to the purport of some of the Responses just as they are provided below.

RESPONSES TO REQUESTS FOR ADMISSION

| Admission # | Purport |
|---|---|
| 3: | Fails to claim ownership of the Note, and skips question. |
| 4: | Takes the position that whether the Note was Pooled into a Pool of Mortgage Loans is not relevant. This is tantamount to arguing that ownership of the Note, and authentic and authorized negotiations and holdership are not relevant. |
| 5: | Takes the position that for who's pecuniary benefit they are attempting to enforcing the Note is irrelevant, meaning who the identity of the Real Party in Interest is not relevant. |
| 6. | Takes the position that the identity of the Real Party in Interest is not relevant. |
| 7. | Takes the position that the identity of the Real Party in Interest is not relevant. |
| 8. | Takes the position that the Note ownership and identity of the Real Party in Interest is not relevant. |
| 10. | Takes the position that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default. |
| 12. | Takes the position that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default. |
| 14. | Takes the position that whether note is secured is irrelevant. |
| 15. | Same as 12 and 14. |
| 21. | Takes the position that pocketing proceeds is irrelevant. |
| 26. | Takes the position that for who's pecuniary benefit they are attempting to enforcing the Note is irrelevant, meaning who the identity of the Real Party in Interest is not relevant. |
| 28. | Takes the position that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default. |
| 29. | Takes the position that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default. |
| 32. | Takes the position that the identity of the Real Party in Interest is not relevant. And also that intentionally creating the false appearance of a colorable interest is the same as having one. |
| 33. | Takes the position that who's financial interest is at stake in the case is irrelevant, meaning the identity of the Real Party in Interest is not relevant. |
| 34. | Takes the position that whether the note remains a negotiable instrument or not is irrelevant, establishing it is not a holder and definitely not a holder in due course ("HDC"). |
| 35. | Takes the position that whether Movant paid value for the Note is irrelevant, establishing |

Page 2 of 5

it has not proven it is a holder and definitely not a holder in due course ("HDC").

38. Establishes that Movant's position is that the party whose funds are at risk is irrelevant, and therefore did not prove the party whose funds are at risk.

40. Establishes that Movant's position is that the party whose funds are at risk is irrelevant, and therefore did not prove the party whose funds are at risk.

41. Establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

42. Establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

43. Takes the position that authority to act for RPI is irrelevant, thus establishing that Movant has not proven standing.

INTERROGATORIES

Interrogatory #        Purport

1. Fails to identify current owner of the Note and skips the question, thereby establishing a failure to prove ownership of the Note and therefore establishes a failure to prove standing.

2. Fails to prove or even explain chain of transfer of a securitized loan in a case where the validity authenticity, and authority of indorsements are valid has been challenged and whether successfully pooled is irrelevant, meaning ownership of note is irrelevant, thereby establishes a failure to prove standing.

6. Establishes that Movant's position is that HDC status of the Note is irrelevant, thereby establishing it has not proven it is a HDC.

7. Takes the position that whether Movant paid value for the Note is irrelevant, establishing it has not proven it is a holder and definitely not a holder in due course ("HDC").

8. Takes the position that whether Movant paid value for the Note is irrelevant, establishing it has not proven it is a holder and definitely not a holder in due course ("HDC").

9. Establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

10. Because Notes that have been Pooled are listed in the Mortgage Loan Schedule ("MLS") of the PSA, since Movant's position is that the number by which the Note would be identified on the MLS is irrelevant, this establishes that it has not proven that the Note was Pooled, and therefore has not proven Standing and RPI.

11. Establishes that Movant cannot claim the Note was purchased from the MBS Pool after it was pooled, if it was pooled.

12. Establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

14. Establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

16. Establishes that Movant sees nothing wrong with someone transferring an interest in a Note that it does not own, and that this is not a problem in this case, which is tantamount to an admission that Movant's evidence is not credible.

17. Establishes that Movant thinks that the party that is the "Creditor" the party to whom money

Page 3 of 5

is or may be owed to on the Note is irrelevant, thereby establishing that it has not proven Standing and RPI.

18. Will not provide name of auditing firm for Trust, from which Debtor can obtain information on 3rd Party Payments or Miscellaneous Proceeds thereby establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

20. Will not accounting documents for the MBS Trust, from which Debtor can obtain information on 3rd Party Payments or Miscellaneous Proceeds thereby establishes that Movant's position is that crediting Debtor' account for "Miscellaneous Proceeds" in DOT and "Discharge by Payment" rule from 3rd Party Sources at ARS § 47-3602(A), is irrelevant, which establishes that it has not proven that Debtor is in default.

## REQUESTS FOR PRODUCTION

1. Refuses to provide chain of transfer documents of a securitized loan in a case where the validity authenticity, and authority of indorsements are valid has been challenged and whether successfully pooled is irrelevant, meaning ownership of note is irrelevant, thereby establishes a failure to prove standing.

2. These documents take a few minutes to obtain by Movant online and they provide some evidence of the chain of transfer of Note ownership of a securitized loan in a case where the validity authenticity, and authority of indorsements are valid has been challenged and whether successfully pooled is irrelevant, meaning ownership of note is irrelevant, thereby establishes a failure to prove standing.

3. Bond Indentures provide some information relevant to 3rd Party Source Payments, if Movant takes the position they are irrelevant, there is a failure to prove Movant is in default.

6. Many of these are public records filed with the SEC, but after a time there is no longer a requirement to file them. It is important to obtain the Monthly Distribution Reports, which show payments made to Investors, to obtain more complete information relevant to 3rd Party Source Payments and Miscellaneous Proceeds. To claim this as irrelevant is tantamount to taking the position that whether Debtor is in default is irrelevant to a MLS.

7. Because Notes that have been Pooled are listed in the Mortgage Loan Schedule of the PSA, but that Schedule on the PSA is blank, as it always is, saying "available on request" or similar language. But since Movant's position is that this list is irrelevant, this establishes that it has not proven that the Note was Pooled, and therefore has not proven Standing and RPI.

8. Good answer.

9. Refuses to produce 3rd Party Source Payments accounting documents. If Movant takes the position they are irrelevant, there is a failure to prove Movant is in default.

15. Just as information on the Prospectus is relevant to many issues, such as Standing and 3rd Party Source Payments, if the final Prospectus exists that was not filed as a public record with the SEC, it is important to obtain a copy. And if there was no final version, that is also relevant for these and other reasons.

18. Debtor may wish to contact the Investors, who are the actual creditors, now or at some time in the future. Surely, the identity of the actual Creditors may be relevant to some issues.

June 22, 2010

Respectfully submitted,
/S/ Ronald Ryan

1    Ronald Ryan, Debtor's Counsel

2    CERTIFICATE OF SERVICE

3        I certify that on June 22, 2010, a true copy of the forgoing with the Discovery Requests and
     Responses with Debtor's comments as to the meaning of some of the Responses was emailed to:
4    Matthew A. Silverman and Jessica R. Kenney McCarthy Holthus Levine 3636 North Central Avenue
     Suite 1050 Phoenix, AZ 85012 through Jessica R. Kenney Attorneys for Movant, Deutsche Bank
5    National Trust Company , as Trustee in trust for the benefit of the Certificateholders for Argent
     Securities Inc., Asset-Backed Pass-Through Certificates, Series 2004-W8, Chapter 13 Trustee; and
6    Debtor.

7                                    /s/ Ronald Ryan
8                                    Ronald Ryan

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  Page 5 of  5